# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JUAN LIZCANO,** | : | |
| Petitioner, | : | |
| | : | No. 3:16–cv–1008–B–BN |
| v. | : | **THIS IS A CAPITAL CASE** |
| **LORIE DAVIS,** | : | |
| **Director, Texas Department of Criminal Justice, Correctional Institutions Division,** | : | |
| | : | |
| Respondent. | : | |

## SECOND AMENDED PETITION
## FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Debra J. McComas
  State Bar No. 00794261
  Debbie.McComas@haynesboone.com
Stephanie Sivinski
  State Bar No. 24075080
  Stephanie.Sivinski@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX  75219
Telephone: (214) 651-5000
Fax: (214) 651-5940
**Counsel for Juan Lizcano for Part A**

Shawn Nolan
PA Bar No. 53565
Chief, Capital Habeas Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928 0520
shawn_nolan@fd.org
**Counsel for Juan Lizcano for Part B**

Dated: January 5, 2021

## PRELIMINARY STATEMENT

Petitioner Juan Lizcano will be referred to by name or as "Petitioner." Notes of testimony of state court proceedings will be cited as "NT [date]" followed by the relevant page number(s). Citations to "A" followed by page number(s) refer to documents included in Petitioner's Appendix to Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, filed simultaneous with this petition.

The opinion of the Texas Court of Criminal Appeals denying Petitioner's direct appeal, *Lizcano v. State*, No. AP–75879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010) (unpublished), is referred to as *Lizcano-1*. The Texas district court's Findings of Fact and Conclusions of Law in support of its decision denying post-conviction relief, *Ex Parte Lizcano*, No. W05–59563–S(A) (Tex. Dist. Ct.—Dallas Co., June 16, 2014) (Chatham, J.), is referred to as *Lizcano-2*. The Court of Criminal Appeals decision adopting the trial court's findings and conclusions, *Ex Parte Lizcano*, No. WR–68,348–03, 2015 WL 2085190 (Tex. Crim. App. Apr. 15, 2015) (unpublished), is referred to as *Lizcano-3*. The Court of Criminal Appeals decision granting penalty phase relief, *Ex Parte Lizcano*, No. WR–68,348–03 (Tex. Crim. App. Sept. 16, 2020) (unpublished), is referred to as *Lizcano-4*.

All emphasis is supplied unless otherwise indicated.

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... i

TABLE OF CONTENTS.........................................................................II

TABLE OF AUTHORITIES ................................................................IIv

INTRODUCTION ................................................................................. 1

PROCEDURAL HISTORY..................................................................... 2

GROUNDS FOR RELIEF ASSERTED IN  PART A AND PART B ......................... 6

PART A ................................................................................................ 6

CLAIM FOR RELIEF .......................................................................... 6

I.    MR. LIZCANO'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO PURSUE COMPENTENCY PROCEEDINGS. ......... 6

    A.    Factual Background ........................................................ 7

    B.    Counsel Was Ineffective. ............................................... 12

    C.    Mr. Lizcano Satisfies the Requirements of § 2254(d). ............ 16

PART B.............................................................................................. 21

GENERAL STATEMENT RELATING TO STATE HABEAS COUNSEL INEFFECTIVENESS ........................................................................ 21

STATEMENT REGARDING  PROCEDURAL BARS ..................................... 23

CLAIMS FOR RELIEF ....................................................................... 24

II.   MR. LIZCANO'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE TRIAL COURT FAILED TO ORDER SUA SPONTE COMPETENCY PROCEEDINGS AFTER RECEIVING, AND EVEN RULING THAT IT HAD RECEIVED, SUFFICIENT EVIDENCE; APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE AND LABORED UNDER A CONFLICT OF INTEREST; STATE HABEAS COUNSEL RENDERED INEFFECTIVE ASSISTANCE WITH REGARD TO APPELLATE COUNSEL'S INEFFECTIVENESS AND CONFLICT........................................ 24

    A.    Factual Background ........................................................ 25

    B.    Mr. Lizcano's Due Process Rights Were Violated. ............... 25

    C.    Appellate Counsel Was Ineffective for Not Raising Federal and State Law Issues..................................................................................... 30

    D.    Appellate Counsel Labored Under a Conflict Of Interest. ....... 34

    E.    State Habeas Counsel Were Ineffective............................... 37

    F.    State Court Proceedings ................................................. 39

III.  TRIAL COUNSEL INEFFECTIVELY LITIGATED PETITIONER'S CLAIM THAT THE STATE UNCONSTITUTIONALLY STRUCK PROSPECTIVE JUROR RICHARD HOWARD ON THE BASIS OF HIS RACE; STATE HABEAS COUNSEL FAILED TO RAISE PRIOR COUNSEL'S INEFFECTIVENESS............................................ 41

A.   *Batson v. Kentucky* and Its Progeny Prohibit the Exclusion of Even a Single Potential Juror on the Basis of Race. ........................................................ 42

B.   The State's Justifications for Striking Venire Member Howard Were Pretextual. ................................................................................................. 45

C.   Trial Counsel Ineffectively Litigated the *Batson* Challenge. ............................... 54

D.   State Habeas Counsel Failed to Raise Prior Counsel's Ineffectiveness. ............. 55

IV.   THE PROSECUTOR'S CLOSING ARGUMENT WAS GROSSLY IMPROPER; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT AND STATE HABEAS COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE TRIAL COUNSEL'S ERROR IN FAILING TO OBJECT TO THE PROSECUTOR'S MISCONDUCT. ........... 56

A.   The State's Plea on Behalf of Law Enforcement and Request that Jurors "Send a Message" Exceeded Constitutional Limits. ............................................. 57

B.   The Prosecution Improperly Impugned Defense Counsel during Guilt Phase Summation. ....................................................................................... 58

C.   The Cumulative Effect of the Prosecutor's Misconduct Deprived Mr. Lizcano of a Fair Trial. ...................................................................................... 62

D.   Trial Counsel and State Habeas Counsel Were Ineffective for Failing to Raise Prosecutorial Misconduct Claims. ........................................................ 62

V.   MR. LIZCANO'S CONVICTION IS UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF PRIOR COUNSEL'S INADEQUATE REPRESENTATION AND THE TRIAL COURT'S DENIAL OF DUE PROCESS; STATE HABEAS COUNSEL INEFFECTIVELY FAILED TO RAISE A CUMULATIVE ERROR CLAIM. ...................................................................................... 63

REQUEST FOR RELIEF .................................................................................. 65

## TABLE OF AUTHORITIES

**Federal Cases**

*Akins v. Texas*, 325 U.S. 398 (1945)................................................................................ 51

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)) .......................... 53

*Atkins v. Virginia* , 536 U.S. 304 (2002).................................................................... 4, 5

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................... passim

*Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) ................................................................. 37

*Bolius v. Wainwright*, 597 F.2d 986 (5th Cir. 1979)...................................................... 30

*Bundy v. Dugger*, 816 F.2d 564 (11th Cir. 1987) .......................................................... 30

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ............................................ 24, 56, 63, 64

*Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997)..................................................... 27, 32

*Chamberlin v. Fisher*, No. 15–70012, 2017 WL 1506408 (5th Cir. Apr. 27, 2017) ................... 44

*Chambers v. Mississippi*, 410 U.S. 284 (1973)............................................................. 64

*Christeson v. Roper*, 574 U.S. 373 (2015) ................................................................... 35

*Coleman v. Thompson*, 501 U.S. 722 (1991) ................................................................ 23

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ................................................................. 29

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)...................................................................... 34

*Darden v. Wainwright*, 477 U.S. 168 (1986) ................................................................ 58

*Davila v. Davis*, 137 S. Ct. 2058 (2017)....................................................................... 39

*Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) ............................................... 23, 38, 56

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).......................................................... 56

*Dorsey v. Stephens*, 720 F.3d 309 (5th Cir. 2013) .................................................. 31, 32

*Drope v. Missouri*, 420 U.S. 162 (1975)................................................................. passim

*Dusky v. United States*, 362 U.S. 402 (1960)............................................................ 7, 33

*Edwards v. Carpenter*, 529 U.S. 446 (2000) ................................................................ 36

*Flowers v. Mississippi*, 139 S. Ct. 2228 (2019) ............................................................ 44

*Foster v. Chatman*, 136 S. Ct. 1737 (2016) ............................................................ 48, 53

*Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001)........................................................... 31

*Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009) .................................................... 36

*Hayes v. Thaler*, 361 F. App'x 563 (5th Cir. Jan. 19, 2010) ..................................... 43, 46, 48

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014)............................................................. 13, 21

*Holland v. Florida*, 560 U.S. 631 (2010).................................................................... 36

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ................................................ 42, 50

*James v. Singletary*, 957 F.2d 1562 (11th Cir. 1992) ..................................................... 38

*Jamison v. Lockhart*, 975 F.2d 1377 (8th Cir. 1992) ..................................................... 36

*Lokos v. Capps*, 625 F.2d 1258 (5th Cir. 1980)................................................. 27, 28, 32, 33

*Manning v. Foster*, 224 F.3d 1129 (9th Cir. 2000)........................................................ 36

*Maples v. Thomas*, 565 U.S. 266 (2012).................................................................... 36

*Martel v. Clair*, 565 U.S. 648 (2012)......................................................................... 37

*Martinez v. Ryan*, 566 U.S. 1 (2012) .................................................................... passim

*Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000)........................................................... 27

*McConico v. Alabama*, 919 F.2d 1543 (11th Cir. 1990)................................................. 34

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ...................................................... 17, 43, 51, 52

*Miller-El v. Dretke*, 425 U.S. 231 (2005) .............................................................. passim

*Moore v. Dretke*, 182 F. App'x 329 (5th Cir. 2006)..................................................... 15

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ........................................................ 4, 31, 33
*Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006) ............................................ 32
*Newman v. Norris*, 597 F. Supp. 2d 890 (W.D. Ark. 2009) ..................................... 22
*Pate v. Robinson*, 383 U.S. 375 (1966)................................................................ passim
*Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996) .............................................. 34, 37
*Porter v. McCollum*, 558 U.S. 30 (2010).............................................................. 13
*Powers v. Ohio*, 499 U.S. 400 (1991) .................................................................. 42
*Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987) ....................................... 14, 15, 18
*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)....................................... 43, 44, 45
*Reese v. Wainwright*, 600 F.2d 1085 (5th Cir. 1979) .............................................. 30
*Rhoades v. Davis*, 852 F.3d 422 (5th Cir. 2017)..................................................... 44
*Riggins v. Nevada*, 504 U.S. 127 (1992)............................................................... 29
*Rompilla v. Beard*, 545 U.S. 374 (2005)...................................................... 13, 21, 38
*Saranchak v. Secretary*, 802 F.3d 579 (3d Cir. 2015) ............................................ 14
*Sears v. Upton*, 561 U.S. 945 (2010) ................................................................... 13
*Smith v. Robbins*, 528 U.S. 269 (2000)........................................................... 31, 32
*Smith v. White*, 815 F.2d 1401 (11th Cir. 1987) .................................................... 34
*Snyder v. Louisiana*, 552 U.S. 472 (2008).................................................... 43, 45, 48
*Spence v. Johnson*, 80 F.3d 989 (5th Cir. 2004)..................................................... 64
*Strauder v. West Virginia*, 100 U.S. 303 (1879) .................................................... 42
*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... passim
*Swain v. Alabama*, 380 U.S. 202 (1965).............................................................. 42
*Tabler v. Stephens*, 591 F. App'x 281 (5th Cir. 2015).......................................... 35, 37
*Taylor v. Kentucky*, 436 U.S. 478 (1978) ............................................................ 64
*United States v. Alston*, 895 F.2d 1362 (11th Cir. 1990) ......................................... 54
*United States v. Dennis*, No. 11–10250–EFM, 2012 WL 4794593 (D. Kan. Oct. 9, 2012)......... 11
*United States v. Flores-Martinez*, 677 F.3d 699 (5th Cir. 2012) ................................ 32
*United States v. Gallardo-Trapero*, 185 F.3d 307 (5th Cir. 1999).............................. 56
*United States v. Goff*, 847 F.2d 149 (5th Cir. 1988), *opinion modified on reh'g* (July 18, 1988)................................................................................. 58
*United States v. Guerra-Marez*, 928 F.2d 665 (5th Cir. 1991)................................... 54
*United States v. Murrah*, 888 F.2d. 24 (5th Cir. 1989)............................................ 60
*United States v. Phillips*, 210 F.3d 345 (5th Cir. 2000)........................................... 31
*United States v. Socony-Vacuum Co.*, 310 U.S. 150 (1940)..................................... 62
*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ..................................... 31
*Wiggins v. Smith*, 539 U.S. 510 (2002)........................................................... passim
*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... 13, 16

**State Cases**

*Acosta v. State*, 233 S.W.3d 349 (Tex. Crim. App. 2007)...................................... 35, 37
*Barber v. State*, 737 S.W.2d 824 (Tex. Crim. App. 1987) ....................................... 29
*Bradly v. State*, 691 S.W.2d 699 (Tex. Crim. App. 1985)........................................ 58
*Bray v. State*, 478 S.W.2d 89 (Tex. Crim. App. 1972)............................................ 61
*Carpenter v. State*, 507 S.W.2d 794 (Tex. Crim. App. 1974) ................................... 29
*Crutcher v. State*, 481 S.W.2d 113 (Tex. Crim. App. 1972) ..................................... 61
*Davis v. Fisk Elec. Co.*, 268 S.W.3d 508 (Tex. 2008)............................................ 51
*Dinkins v. State*, 894 S.W.2d 330 (Tex. Crim. App. 1995) ...................................... 60
*Dykes v. State*, 325 S.W.2d 135 (Tex. Crim. App. 1959) ........................................ 61

v

*Ex parte Hagans*, 558 S.W.2d 457 (Tex. Crim. App. 1977) ........................................................ 33
*Ex parte LaHood*, 401 S.W.3d 45 (Tex. Crim. App. 2013)...................................................... 27
*Ex Parte Lizcano*, No. W05–59563–S(A) (Tex. Dist. Ct.—Dallas Co., June 16, 2014)....... passim
*Ex Parte Lizcano*, No. WR–68,348–03 (Tex. Crim. App. Sept. 16, 2020)
   (unpublished) ................................................................................................ 6, 20, 22
*Ex Parte Lizcano*, No. WR–68,348–03, 2015 WL 2085190 (Tex. Crim. App. Apr. 15, 2015)
   (unpublished) ................................................................................................ 3, 32, 36
*Ex Parte Lizcano*, No. WR–68,348–04 (Tex. Crim. App. Sept. 16, 2020)
   (unpublished). ................................................................................................ 6
*Fuentes v. State*, 664 S.W.2d 333 (Tex. Crim. App. 1984) ..................................................... 62
*Greene v. State*, 264 S.W.3d 271 (Tex. App. 2008) ..................................................... 3, 32, 36
*Lewis v. State*, 529 S.W.2d 533 (Tex. Crim. App. 1975) ........................................................ 60
*Lizcano v. State*, No. AP–75879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010)................. 3
*Lopez v. State*, 500 S.W.2d 844 (Tex. Crim. App. 1973) ........................................................ 60
*Lopez v. State*, 909 S.W.2d 512 (Tex. Crim. App. 1995) ........................................................ 29
*Luna v. State*, 268 S.W.3d 594 (Tex. Crim. App. 2008)......................................................... 26
*Moore v. State*, 999 S.W.2d 385 (Tex. Crim. App. 1999) ....................................................... 27
*Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) ...................................................... 60
*Torres v. State*, 593 S.W.2d 717 (Tex. Crim. App. 1980) ...................................................... 32
*Turner v. State*, 422 S.W.3d 676 (Tex. Crim. App. 2013)................................................. passim
*Wilson v. State*, 938 S.W. 2d 57 (Tex. Crim. App. 1996)....................................................... 62

## Statutes

28 U.S.C. § 2254........................................................................................................... 1
Tex. Code Crim. Proc. art. 11.071 ............................................................................. passim
Tex. Code Crim. Proc. art. 46B .................................................................... 7, 10, 26, 30

## Other Authorities

43 Tex. Prac., Criminal Practice And Procedure § 31:25 (3d ed.) .............................................. 30
43 Tex. Prac., Criminal Practice And Procedure § 31:28 (3d ed.) .............................................. 29
43 Tex. Prac., Criminal Practice And Procedure § 31:36 (3d ed.) .............................................. 26
*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*,
   31 Hofstra Law Rev. 913, 1023 (rev. ed. 2003) ........................................................... passim
Am. Ass'n on Mental Retardation, *A User's Guide for AAMR's 2002 Definition, Classification
   and Systems of Supports: Applications for Clinicians, Educators, Disability Program
   Managers, and Policy Makers* (2005) .......................................................................... 10
Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders, Fourth
   Edition–Text Revision* (2000) ................................................................................... 9
Monte Miller, Equal Access to Justice in a Rural Western State, Advances in Social Work,
   Vol. 5, No. 2 (Fall 2004)........................................................................................ 11
Rachel Kalbeitzer et al., Assessment of Competency to Stand Trial in Individuals with
   Mental Retardation, 9 J. of Forensic Psychology Practice 237, 244 (2009)........................... 11
Tex. Bar Ass'n, *Guidelines and Standards for Texas Capital Counsel*,
   69 Tex. B.J. 966 (2006) .................................................................................... 22, 54

## INTRODUCTION

1.      Petitioner Juan Lizcano files this Second Amended Petition pursuant to the

Court's Order dated October 7, 2020, directing that he file and serve on Respondent an amended

petition setting forth all claims Petitioner that remain pending in this cause following the

September 16, 2020, decision of the Texas Court of Criminal Appeals ("CCA") granting him

relief from his sentence of death. ECF No. 56.

2.      Because Petitioner is currently represented by two distinct teams of lawyers—his

initial habeas counsel from the law firm Haynes and Boone, LLP ("Pro Bono Counsel"); and the

Federal Community Defender Office for the Eastern District of Pennsylvania ("Independent

Counsel"), which was appointed for the limited purpose of investigating claims that may be

cognizable pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012)—he divides his claims for relief into

two parts.

3.      Part A contains the relevant allegations from the single claim that remains

pending from his initial habeas petition, filed on April 13, 2016. *See* ECF No. 1 (Claim III). Pro

Bono Counsel represents Petitioner with regard to Part A.

4.      Part B contains four claims that remain pending from his Supplement and

Amendment to Petition for Writ of Habeas Corpus, filed on June 14, 2017. *See* ECF No. 32–2

(Claims VII, X, XI, and XIII). Independent Counsel represents Petitioner with regard to Part B.

5.      As detailed below, Pro Bono Counsel does not object to or oppose any of the

claims or allegations filed by Independent Counsel. *See infra* ¶ 18.

## JURISDICTION

6.      The District Court has jurisdiction to consider this petition pursuant to 28 U.S.C.

§ 2254. Petitioner, Juan Lizcano, is in the custody of the Texas Department of Criminal Justice.

## PROCEDURAL HISTORY

7.      Mr. Lizcano is an intellectually disabled ("ID") individual convicted for the fatal shooting of Dallas Police Officer Brian Jackson on November 13, 2005.

8.      Soon after Mr. Lizcano's arrest, the trial court appointed Brook Busbee and Juan Carlos Sanchez as trial counsel. Ms. Busbee served as lead trial counsel and was in charge of investigating, preparing, and presenting Mr. Lizcano's case at trial. But she had trouble communicating with Mr. Lizcano, who is a Mexican national and speaks no English, and largely delegated to Mr. Sanchez the task of meeting with Mr. Lizcano. John Tatum, who was appointed appellate counsel, also joined the trial team in November 2005, and participated as a member of the defense throughout the trial. *See* A338; NT 11/7/12 at 13.

9.      Following weeks of individual voir dire, forty-seven venire members were found qualified to sit on Mr. Lizcano's jury: thirty-two were white, eight were African-American, six were Hispanic, and one was Indian. Of the eight African-American venire members, the State exercised peremptory challenges to strike six. Although counsel challenged the strikes as racially-motivated, counsel ineffectively litigated the claim by failing to present readily available evidence demonstrating that the State's purported race-neutral justifications were merely pretexts.

10.     On September 17, 2007, nearly two years after they began representing Mr. Lizcano, trial counsel filed a motion for a competency examination and trial. The trial court granted the motion for examination and appointed Dr. William Flynn to evaluate Mr. Lizcano. On September 25, 2007, Dr. Flynn informed the trial court and both parties in chambers via telephone that he believed that Mr. Lizcano was competent. NT 9/25/07 at 5–6. However, neither the trial court nor trial counsel had received Dr. Flynn's report or his underlying data. Later that

day, the trial court "ruled that there was sufficient evidence to proceed forward with a competency trial." *Id.* at 4. Nevertheless, defense counsel withdrew their previously-filed motion for a competency trial. The court took no further action, despite having a duty to sua sponte hold a competency hearing if, at any time prior to or during trial, the evidence raises a bona fide question as to the defendant's competency.

11.     Trial commenced one week later. During closing arguments, the prosecutor improperly inflamed the passions of the jury and impugned defense counsel, but counsel failed to object to any of the constitutionally-offensive remarks.

12.     Mr. Lizcano was convicted of capital murder on October 9, 2007. Following a penalty phase, the jury sentenced him to death. The Texas Court of Criminal Appeals affirmed Mr. Lizcano's conviction or sentence on May 5, 2010. *See Lizcano v. State*, No. AP–75879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010) (unpublished) (*Lizcano-1*).

13.     After Mr. Lizcano was convicted and while his appeal was pending, he filed a counseled petition for post-conviction relief in the state district court. Mr. Lizcano was represented on state habeas by Alma Lagarda of the Texas Defender Service and attorneys from Haynes & Boone, LLP. The Texas district court denied post-conviction relief on June 16, 2014. *See Ex Parte Lizcano*, No. W05–59563–S(A) (Tex. Dist. Ct.—Dallas Co., June 16, 2014) (Chatham, J.) (*Lizcano-2*). The CCA adopted the trial court's findings and conclusions on April 15, 2015. *Ex Parte Lizcano*, No. WR–68,348–03, 2015 WL 2085190 (Tex. Crim. App. Apr. 15, 2015) (unpublished) (*Lizcano-3*).

14.     On April 13, 2016, the attorneys who had represented Mr. Lizcano in state post-conviction proceedings filed a Petition for Writ of Habeas Corpus by a Person in State Custody in the District Court for the Northern District of Texas. ECF No. 1. With the exception of one

3

claim challenging counsel's failure to proceed with a competency trial, all of the claims in the federal habeas petition related to the penalty phase of Mr. Lizcano's trial.

15.     On September 14, 2016, United States Magistrate Judge David L. Horan issued a limited appointment order appointing Independent Counsel "for the limited purpose of (1) investigating whether any claims of ineffective assistance of trial counsel were not presented to the state court because of the ineffective assistance of counsel who are now also representing Lizcano in these proceedings, (2) advising Lizcano regarding any such matters, and (3) reporting to this Court ex parte regarding the results of the investigation and consultation with Lizcano." ECF No. 26. In addition, counsel was directed to file with its report any "proposed supplemental pleadings setting forth" any "potential claims that may come within" the exception established by *Martinez*, as well as "any motions for leave to file those pleadings and motions to stay these proceedings to present those claims to the state court with accompanying briefs." ECF No. 28.

16.     On June 14, 2017, Independent Counsel filed on behalf of Petitioner: (1) an Ex-Parte Report Regarding *Martinez* Issues (ECF No. 32); (2) a Motion for Leave to File Supplement and Amendment to Petition for Writ of Habeas Corpus (ECF No. 32–1); and (3) a Supplement and Amendment to Petition for Writ of Habeas Corpus (ECF No. 32–2). In his supplemental petition, Mr. Lizcano raised ten new claims, five of which were unrelated to his penalty-phase proceedings and/or his death sentence.

17.     On June 19, 2017, Pro Bono Counsel, who continue to represent him as to those claims raised in the April 13, 2016 petition, filed a Motion to Stay and Hold in Abeyance Federal Habeas Proceedings to allow Petitioner to seek reconsideration of his claim under *Atkins v. Virginia* , 536 U.S. 304 (2002), in state court following the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017). ECF No. 34.

18.     At the direction of the Magistrate Judge, *see* ECF No. 33, on July 19, 2017, Pro Bono Counsel filed a response to Independent Counsel's June 14, 2017 filings, *see* ECF No. 39. Pro Bono Counsel stated:

> [T]he Court should accept the new allegations that conflict counsel raises in its report and attached supplemental filings, deem those pleadings filed of record, and proceed to consider conflict counsel's arguments and allegations as part of this habeas proceedings. . . . [B]ecause conflict counsel raises additional facts and grounds supporting Mr. Lizcano's requested habeas relief that trial habeas counsel failed to develop and raise below (or even in the habeas petition before this Court), these new allegations must be addressed as part of the habeas process.

*Id*. at 2–3.

19.     On September 21, 2017, the Magistrate Judge recommended that Mr. Lizcano's motion to stay proceedings to allow him to return to state court to exhaust his new *Atkins* claim be granted. On the same day, the Magistrate Judge ordered Mr. Lizcano's Supplement and Amendment to Petition for Writ of Habeas Corpus filed as of June 14, 2017, for purposes of the Anti-Terrorism and Effective Death Penalty Act. ECF No. 44. However, the Magistrate Judge deferred the time for any response to Mr. Lizcano's motions, including his motion to amend his habeas petition, pending the final disposition of the *Atkins* stay motion. *Id.*

20.     On October 6, 2017, the District Court accepted the Magistrate Judge's recommendation and granted Mr. Lizcano's *Atkins* stay motion. ECF No. 51.

21.     On July 14, 2017, Petitioner filed in the state courts a motion to reconsider his *Atkins* claim, as well as a subsequent application for a writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5, containing the unexhausted claims pled in his supplemental and amended federal habeas petition.

22.     On September 16, 2020, following further proceedings before the trial court, the CCA granted Mr. Lizcano relief on his *Atkins* claim and reformed his sentence of death to a

sentence of life imprisonment without parole. *Ex Parte Lizcano*, No. WR–68,348–03 (Tex. Crim. App. Sept. 16, 2020) (unpublished) (*Lizcano-4*). On the same date, the CCA dismissed Mr. Lizcano's subsequent Article 11.071, Section 5 application for a writ of habeas corpus, by which he sought relief on the unexhausted claims pled in his supplemental and amended federal habeas petition. *Ex Parte Lizcano*, No. WR–68,348–04 (Tex. Crim. App. Sept. 16, 2020) (unpublished).

23.    On October 7, 2020, after receiving notices from both parties indicating that Petitioner's claims attacking his conviction remain to be decided, the Magistrate Judge ordered Petitioner to file within ninety days an amended petition setting forth all remaining claims Petitioner wishes the Court to consider in this cause. ECF No. 56.

24.    This amended petition follows.

**GROUNDS FOR RELIEF ASSERTED IN**
**PART A AND PART B**

25.    By this amended petition, Petitioner timely asserts that his conviction violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and should be vacated for each of the reasons set forth herein.

**PART A**

**CLAIM FOR RELIEF**

**I.    MR. LIZCANO'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO PURSUE COMPENTENCY PROCEEDINGS.**[1]

26.    Under Texas law, a defendant is incompetent if he proves by a preponderance of the evidence that he lacks: (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational and factual understanding of the

---

[1] This claim was initially pled as Claim III.A of the habeas petition filed on April 13, 2016. ECF No. 1.

6

proceeding against him. Tex. Code Crim. P. Art. 46B.003; *see also Dusky v. United States*, 362 U.S. 402 (1960). Furthermore, Texas requires that "forensic psychologists and psychiatrists appointed by the trial court to perform competency evaluations [] specifically consider, among other things: . . . the impact of . . . mental retardation, if existent, on the defendant's capacity to engage with counsel in a reasonable and rational manner[.]" *Turner v. State*, 422 S.W.3d 676, 689 (Tex. Crim. App. 2013) (quoting Tex. Code Crim. Proc. art. 46B.024 §§ (1)(C) & (4)).

27.     Here, defense counsel failed from the moment of their appointment to adequately investigate the background and cognitive functioning of Mr. Lizcano, a man who has since been found to be intellectually disabled. As a result, counsel waited nearly two years to file a motion for a competency examination and trial, and then prematurely withdrew the motion without conducting the inquiries required of objectively reasonable counsel under the circumstances. Counsel performed deficiently and Mr. Lizcano was prejudiced. The state court's findings to the contrary warrants no deference under § 2254(d).

     A.     **Factual Background**

28.     Mr. Lizcano's trial team never conducted the constitutionally-required investigation into his background and cognitive functioning. Counsel waited four months after being appointed to hire Debbie Nathan to serve a mitigation specialist. Ms. Nathan had never served as a mitigation investigator before, yet received little direction from the attorneys. NT 11/06/12 at 9–12, 43–44. In June 2006, only three months after she was hired, Ms. Nathan was told that the team was done with her services and that they planned to go to trial at the end of summer. By this time, Ms. Nathan had begun writing memos to herself to document the attorneys' poor performance and lack of communication with either Ms. Nathan or Mr. Lizcano. Eventually, Ms. Nathan convinced trial counsel to seek an extension, but counsel's lack of

concern with collecting and developing mitigating evidence remained clear to Ms. Nathan. *See* A345–47.

29.     During voir dire proceedings held in June 2007, trial counsel noticed that Mr. Lizcano was not able to assist in selecting a jury for his upcoming capital murder trial. On September 17, 2007, nearly two years after they began representing Mr. Lizcano, trial counsel filed a motion for a competency examination and trial. The motion attached: (1) a neuropsychological report from Dr. Antonio Puente, who examined Mr. Lizcano in Spanish and determined that he was intellectually disabled, and who noted in the report that Mr. Lizcano had IQ scores of 48, 60, and 62, A216–17; and (2) an affidavit from Mr. Sanchez stating that Mr. Lizcano "was not able to [provide input regarding strategy during voir dire]," barely spoke, and "could not in any way assist [trial counsel] in [the voir dire and strategy process], thus raising questions as to whether he fully understood the nature and object of the proceedings against him," A220–21.

30.     Counsel subsequently submitted a letter from neuropsychologist Gilbert Martinez, who also examined Mr. Lizcano in his native language, and who opined on the basis of his evaluation that Mr. Lizcano "d[id] not have sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding nor d[id] he have a rational or a factual understanding of the proceedings against him." A225; *see also* A227–43. Finally, at a hearing on counsel's motion, counsel made statements regarding Mr. Lizcano's intellectual impairments and doubts about his competency. NT 9/17/07 at 18–25.

31.     The trial court granted the motion for examination and appointed Dr. William

8

Flynn to evaluate Mr. Lizcano.[2] Dr. Flynn does not speak Spanish, and was only able to evaluate

Mr. Lizcano with the help of a Spanish-speaking, court-appointed translator. Despite Mr.

Lizcano's inability to correctly answer such basic questions as: "[W]hat does it mean to be

innocent?," A209, on the morning of September 25, Dr. Flynn informed the trial court and both

parties in chambers via telephone that he believed that Mr. Lizcano was competent, NT 9/25/07

at 5–6. Neither the trial court nor trial counsel had received Dr. Flynn's report.[3]

32.     Later that day, but still prior to the court or counsel receiving Dr. Flynn's report,

the trial court "ruled that there *was sufficient evidence to proceed* forward with a competency

trial." NT 9/25/07 at 4. Nevertheless, defense counsel went on record to withdraw their

previously-filed motion for a competency trial. *Id.* at 4–5.

33.     Had counsel read Dr. Flynn's report and raw data, they would have identified

several factors that cast significant doubt on his findings. For instance, on the basis of a single

interview during which he conducted no formal testing, Dr. Flynn declared in his report that

Petitioner "**does not** qualify for a diagnosis of mental retardation." A186–87 (emphasis in

original). But this conclusion had absolutely no basis under the standards set forth in the then-

current leading diagnostic manuals, which defined ID as significantly sub-average intellectual

functioning (defined by an IQ score below 75) and related limitations in adaptive functioning,

the onset of which occurred prior to the age of 18. *See* Am. Psychiatric Ass'n, *Diagnostic and

Statistical Manual of Mental Disorders, Fourth Edition–Text Revision* (2000) ("DSM-IV") at 41;

---

[2] Because the trial court appointed Dr. Flynn as a second expert to address a first expert's potential conflict of interest, Mr. Lizcano only addresses Dr. Flynn's actions. *See* NT 11/06/12 at 161–62.

[3] The trial court stated that it would receive the report that afternoon or the following day and place it under seal until later hearing motions about it. *See* NT 9/25/07 at 6.

9

Am. Ass'n on Mental Retardation, *A User's Guide for AAMR's 2002 Definition, Classification and Systems of Supports: Applications for Clinicians, Educators, Disability Program Managers, and Policy Makers* (2005) ("AAMR") at 35–36. Dr. Flynn had reviewed Dr. Puente's report describing Mr. Lizcano's IQ scores of 48, 60, and 62, and did not dispute those scores. Rather, he based his diagnosis entirely on a handful of self-reported statements from Mr. Lizcano regarding his adaptive functioning. However, the diagnostic standards required that evidence regarding deficits in adaptive functioning be obtained "from one or more reliable independent sources," DSM-IV at 42, and advised that "self ratings have a high risk of error in determining 'significant limitations in adaptive behavior,'" AAMR at 30. Although Dr. Flynn was asked to assess for Mr. Lizcano's competency to stand trial, not whether he was intellectually disabled, Texas law expressly states that ID is a relevant consideration in assessing competency. *See* Tex. Code Crim. Proc. art. 46B.024 § (2)(B). Moreover, the fact that Dr. Flynn's report unconditionally (and erroneously) declared Mr. Lizcano to not be ID based on a contra-diagnostic assessment undermined his findings as to competency.

34.     Other issues with Dr. Flynn's methodology and findings included that: (1) Dr. Flynn used an interpreter who translated English version of the Competency Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR") into Spanish, a practice "repudiated in the field [of] forensic evaluations," *see* A359; (2) Dr. Flynn indicated that Mr. Lizcano was not intellectually disabled, but used a test designed for individuals who were, *id.*; (3) the CAST-MR test is scored based on "poor norms that do not contain Hispanics" and requires a grade-level of comprehension in English that Mr. Lizcano had not obtained, *id.*; (4) Dr. Flynn erroneously found that Mr. Lizcano has a driver's license without evidence to support that finding, *id.*; and (5) Dr. Flynn stated that Mr. Lizcano could make change, despite

the fact that he could not identify a penny, *id.*

35.    Furthermore, review of Dr. Flynn's testing sheets revealed a serious flaw in his scoring methodology. Dr. Flynn's report concluded: "According to Mr. Lizcano's responses to the [CAST-MR], he understands basic legal concepts [and] has the skills to assist defense." A187. The test pages for the "Skills to Assist Defense" section of CAST-MR, however, reveal an unexplained scoring method inconsistent with the one used elsewhere by Dr. Flynn and with the CAST-MR manual. Dr. Flynn scored Mr. Lizcano's accuracy on this section as "8/10." *See* A207. Indeed, Mr. Lizcano had answered eight questions correctly. But the total number of possible correct answers for that section was fifteen, not ten. *See id.*[4] Mr. Lizcano's actual score on the "Skills to Assist Defense" was eight correct answers out of fifteen total questions, a section score that is below the mean score among intellectually disabled individuals found incompetent to stand trial. *See* A207–14; A483–84.[5]

---

[4] Dr. Flynn reasonably could not have excluded responses marked "I don't know" because doing so would have been inconsistent with the CAST-MR manual, and would not explain why he subtracted five possible answers from the section, because there were seven responses marked "I don't know," six of which had blanks in the multiple choice section and one of which had an incorrect multiple choice guess, *see* A212–13. Also, there was one "don't know" response in the "Basic Legal Concepts" section, but Dr. Flynn did not change the total number of possible correct answers for that section. *See id.* at A211.

[5] *See also United States v. Dennis*, No. 11–10250–EFM, 2012 WL 4794593, at *1 n.4 (D. Kan. Oct. 9, 2012) (listing "Mean MR & Incompetent Score[s]" as 12.3 on "Basic Legal Concepts," 8.2 on "Skills to Assist Defense," 5.2 on "Understanding Case Events," and 25.6 in total; and listing "Mean MR, but Competent Score[s]" as 18.3 on "Basic Legal Concepts," 10.7 on "Skills to Assist Defense," 8.2 on "Understanding Case Events," and 37.0 in total) (citing Douglas Mossman et al., AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial, 35 J. of the Am. Acad. of Psychiatry & L. S3, S41 (Supp. 2007)); *see also* Rachel Kalbeitzer et al., Assessment of Competency to Stand Trial in Individuals with Mental Retardation, 9 J. of Forensic Psychology Practice 237, 244 (2009); Monte Miller, Equal Access to Justice in a Rural Western State, Advances in Social Work, Vol. 5, No. 2 (Fall 2004), 211–24) ("Clinical cut off scores for determining competency to stand trial are 14 points for Section I, 10 points for Section II, 7 points for Section III, and 30 points for the total CAST-MR

36.     Examination of Dr. Flynn's testing sheets from the Fitness Interview Test would have also provided counsel reason to distrust his conclusions. For instance, based on Mr. Lizcano's answers to questions under the heading "Understanding of the Legal Process," Dr. Flynn rated him as having a "Definite/Serious Impairment." A192. Yet Dr. Flynn concluded in his report that Mr. Lizcano "understands the legal proceedings." A187. Dr. Flynn also labeled Mr. Lizcano has having "No Impairment" in several categories of questions falling within "Ability to Participate in Defen[s]e," even though Mr. Lizcano expressed a lack of understanding or provided conflicting answers. *See, e.g.*, A194–95, A200, 0203.

37.     Unsurprisingly, in light of these multiple errors, Dr. Flynn admitted to Ms. Busbee in a telephone conversation on September 26, 2007—the day after counsel had withdrawn the motion for a competency trial—that his opinion was incomplete and lacked merit. A244. Despite this admission, trial counsel did not reassert the motion for a competency trial.

38.     Nor did counsel conduct any further inquiries into Mr. Lizcano's competency to stand trial. Had they done so, they would have learned that Mexican Consulate officer Luis Lara had regularly visited Mr. Lizcano since his arrest and found that he had communication difficulties and an inability to understand legal concepts or proceedings. *See* A342; *see also* A343 (regarding Mr. Lizcano's inability to understand his punishment). Likewise, mitigation specialist Debbie Nathan, who regularly had to "play interference" between Mr. Lizcano and his lawyers, found that he was unable "to understand what was happening in his case." *See* A346.

### B.     Counsel Was Ineffective.

---

(Everington & Dunn, 1995)."). Although Mr. Lizcano's properly computed score on the test as a whole might appear to fall above the "cutoff" total score, his "Skills to Assist Defense" score does not, and his total score appears to fall below the mean intellectually disabled competent score. *See* Kalbeitzer, at 211–24; *see also Dennis*, No. 11-10250-EFM, 2012 WL 4794593, at *1 n.4 (listing mean intellectually disabled incompetent and competent scores).

39.     Under *Strickland v. Washington*, 466 U.S. 668, 688–95 (1984), a petitioner

seeking to establish the ineffective assistance of trial counsel must show that: (1) counsel's

performance was deficient because it fell below "an objective standard of reasonableness," and

(2) the deficient performance prejudiced the defense because there is a reasonable probability

that, but for counsel's errors, the outcome would have been different. *See also Hinton v.*

*Alabama*, 134 S. Ct. 1081, 1089 (2014); *Sears v. Upton*, 561 U.S. 945, 955–56 (2010); *Porter v.*

*McCollum*, 558 U.S. 30, 32 (2010); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v.*

*Smith*, 539 U.S. 510, 538 (2002); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Mr. Lizcano

satisfies both prongs.

### 1.     Deficient performance

40.     Counsel performed deficiently when they withdrew the defense motion for a

competency trial on September 25, 2007. Prior to that date, counsel had gathered more than

enough evidence to support a claim that Petitioner was not competent to stand trial, including Dr.

Puente's report determining that Mr. Lizcano is intellectually disabled; counsel's own

observations that their client was unable to assist in formulating strategy during voir dire; and Dr.

Martinez's report concluding that Mr. Lizcano met the Texas standard for incompetency. *See*

*supra* ¶¶ 29–30. The trial court agreed that this evidence was sufficient to warrant a competency

trial. NT 9/25/07 at 4. Nevertheless, following a telephone conversation with court-appointed

psychologist Dr. Flynn in which he stated that he had found Mr. Lizcano competent—and

without reviewing Dr. Flynn's report or conducting any further inquiry—counsel withdrew their

motion.

41.     Objectively reasonable trial counsel would have taken several steps before

determining whether Dr. Flynn's conclusion justified forgoing the competency trial that had

already been granted. First, reasonable counsel would have reviewed Dr. Flynn's testing sheets and report. Had they done so, they would have easily discovered the multiple flaws in Dr. Flynn's evaluation and conclusions. *See supra* ¶¶ 33–36. But Mr. Lizcano's trial counsel did not ever review the report or the testing sheets, even after Dr. Flynn admitted to Ms. Busbee that he had realized "that he didn't have the full picture" and was willing to "re-evaluate." A244.

42.     Furthermore, when faced with Dr. Flynn's conclusion regarding competency that was contradictory to that of their own experts, reasonable counsel would have conducted further investigation into the matter before dropping it completely. For instance, had counsel consulted their own experts, those experts could have identified the many errors and inconsistencies in Dr. Flynn's report. *See* A359; A483–84. Additionally, counsel would have learned that Mexican Consulate officer Mr. Lara and mitigation specialist Ms. Nathan—both of whom had regularly visited Mr. Lizcano since his arrest—had determined he was unable to comprehend the legal proceedings or to communicate effectively.

43.     Counsel's performance was clearly deficient. Capital trial counsel have a duty to conduct a thorough investigation into the client's cognitive functioning, in part to inform decisions about competency. *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.7, Commentary, 31 Hofstra Law Rev. 913, 1023 (rev. ed. 2003) (hereinafter, "ABA Guidelines"); *see also Wiggins*, 539 U.S. at 524 (failure to adhere to ABA standards constitutes a violation of an attorney's ethical and professional responsibilities). And the Fifth Circuit has expressly held that "obtaining the opinion of a court-appointed psychiatrist" does not "excuse[] defendant's counsel of any duty to investigate further." *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987); *see also Saranchak v. Secretary*, 802 F.3d 579 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1494 (2016) (finding counsel's performance

"unreasonably deficient" where counsel, "content with the court-appointed expert's investigation of [client's] competency to stand trial," failed to conduct any mental health investigation).

44.      In *Profitt*, the court found counsel performed deficiently by relying on the "report of a court-appointed psychiatrist received on the day of the competency trial" to assess their client's mental health, despite knowing that the client had previously been institutionalized. *Profitt*, 831 F.2d at 1249. Here, Mr. Lizcano's counsel performed deficiently by relying on the oral representation of Dr. Flynn, "received on the day of the competency trial," that Mr. Lizcano was competent, despite having received reports from two of their own experts indicating otherwise. Reasonable counsel would have, at a minimum, assessed the reliability of Dr. Flynn's report before abandoning their motion for a competency trial.

### 2.      Prejudice

45.      In the context of competency, counsel's deficient performance is prejudicial if there is a reasonable probability that the state court would have found the defendant incompetent but for the ineffectiveness. *Moore v. Dretke*, 182 F. App'x 329, 336 (5th Cir. 2006).

46.      Here, counsel had already provided the trial court with sufficient evidence to warrant a competency trial, including an expert opinion from Dr. Puente concluding that Mr. Lizcano was intellectually disabled; Mr. Lizcano's low IQ scores (48, 60, and 62); the statements of trial counsel; and an expert opinion from Dr. Martinez concluding that Mr. Lizcano did not meet the standard for competency under state and federal law. *See* A216–33; A225.[6] Although

_____

[6] Trial counsel Busbee testified during state habeas that Dr. Martinez had "said he was uncomfortable with saying he was incompetent," later adding that the expert lacked familiarity with Texas-specific competency law. NT 11/6/12 at 71, 80–81, 128. Dr. Martinez, however, testified that he "did not recall . . . telling her that." *Id.* at 14. As the court observed, "Dr. Martinez did concede that he did not conduct the statutorily required competency examination and instead based his opinion regarding applicants' competency on his clinical observations."

Dr. Flynn initially reported a contrary conclusion, the errors evident on the face of Dr. Flynn's written report would have cast significant doubt on that conclusion. Accordingly, if Mr. Lizcano's trial counsel had not dropped their motion for a competency trial, Mr. Lizcano would likely have been found incompetent.

### C.   Mr. Lizcano Satisfies the Requirements of § 2254(d).

47.     Mr. Lizcano raised this claim in his first state habeas application. The trial court denied relief under both of *Strickland*'s prongs, adopting verbatim the State's proposed findings of fact and conclusions of law. A411–22, ¶¶ 28–76; *see Lizcano-2*, ¶¶ 28–76. The CCA affirmed, relying on the trial court's—and therefore, the State's—findings and conclusions. *Lizcano-3*, at *1.[7]

48.     Under § 2254(d)(1), a federal court may grant relief where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions at the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court ruling involves an "unreasonable application" of clearly established federal law the court "identifies the correct governing legal principle from [the Supreme Court's] decisions but

---

*Lizcano-2*, ¶ 48 n.3. Dr. Martinez's report at the time of trial, however, confirms that, regardless of Texas's legal definition of "incompetent," Dr. Martinez opined that Mr. Lizcano "d[id] not have sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding nor d[id] he have a rational or a factual understanding of the proceedings against him." A225.

[7] Specifically, the CCA adopted the trial court's findings and conclusions "except for Findings and Conclusions nos. 78 through 82 and 261 through 269," none of which is relevant to this claim. *Lizcano-2*, 2015 WL 2085190, *1; *see also id.* ¶¶ 78–82 (applying procedural bar to claim of ineffective assistance of counsel in jury selection); *id.* ¶¶ 261–69 (applying procedural bar to claim of ineligibility for death penalty based on intellectual disability).

16

unreasonably applies that principle to the facts of the prisoner's case." *Id.* A court may grant relief under § 2254(d)(2) where a state court merits determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*).

49.     Mr. Lizcano satisfies these standards with respect to the state court's findings on each of the *Strickland* prongs. The court should review the claim de novo.

### a.     Deficient performance

50.     The state court determined that counsel did not perform deficiently in withdrawing the request for a competency trial because counsel believed that Mr. Lizcano was competent to stand trial and had strategic reasons for withdrawing the request. These findings warrant no deference under § 2254(d).

51.     First, the court's finding that counsel performed reasonably based on "their belief that applicant was competent to stand trial," *Lizcano-2*, ¶ 45, involved an unreasonable application of *Strickland*, which calls for an objective assessment of counsel's representation. *Strickland*, 466 U.S. at 688. The question is not whether Mr. Lizcano's counsel subjectively believed their client was competent. The question is whether a professionally reasonable attorney would have withdrawn the motion for a competency trial, even after receiving opinions from two defense experts supporting the motion, and without reviewing Dr. Flynn's report or conducting other inquiries. For all of the reasons articulated above, the answer to that question is clearly no.

52.     Furthermore, given that counsel had repeatedly represented that they believed Mr. Lizcano was *not* competent, *see* A220–21; NT 9/17/07 at 18–19, 23–25—including in an interview with Dr. Flynn *the day before* withdrawing the motion for a competency trial, A186—it stands to reason that they changed their belief and reformulated their strategy based solely on the oral representation they received from Dr. Flynn on September 25, 2007. But *Strickland*

17

dictates that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also Wiggins*, 539 U.S. at 528 (same). As explained above, counsel withdrew the competency claim without: (1) obtaining a copy of Dr. Flynn's report, (2) evaluating the validity or strength of Dr. Flynn's report, (3) consulting either of their two retained neuropsychologists, (4) consulting the mitigation investigator on the case, or (5) consulting any of the individuals from the Mexican Consulate who were tasked with explaining the United States legal system to Mr. Lizcano.[8] Had counsel, *at a minimum*, reviewed Dr. Flynn's report before dropping the competency trial, they would have learned that it was invalid due to scoring errors, and itself was full of evidence that Mr. Lizcano was incompetent. In fact, only one day after announcing his opinion, Dr. Flynn indicated to Ms. Busbee that he failed to consider all relevant factors and doubted his conclusions about Mr. Lizcano's intellectual disability. A244. Thus, the state court's "deference to counsel's strategic decision" to withdraw the motion for a competency trial, "despite the fact that counsel based this alleged choice on . . . an unreasonable  investigation, was" itself "objectively unreasonable." *Wiggins*, 539 U.S. at 528; *see also Profitt*, 831 F.2d at 1249 (no deference is due to counsel's strategy where "counsel made their 'tactical' decision based on . . . information that was faulty because of

---

[8] The court observed that trial counsel "reasonably could have determined that the accounts of Mr. Lara and Ms. Nathan would not have been materially helpful," *Lizcano-2*, ¶ 68, but there is no evidence suggesting counsel had any basis to reach such a determination. To the contrary, Mr. Lara stated that, although he had contact with trial counsel Busbee, she "never sought [his] personal knowledge about [his] visits with Mr. Lizcano or about [Mr. Lizcano's] difficulty communicating with [Mr. Lara] and understanding legal concepts." A344, ¶ 15. And Ms. Nathan reported that she generally had very little contact from Ms. Busbee, who "did not like [Ms. Nathan] suggesting things to her" and who was "unwilling to accept new information." A345–47, ¶¶ 3, 19.

their ineffective investigatory steps").

53.     The forgoing analysis applies with equal force to the trial court's finding that it "was reasonable for counsel to decide to forego a competency trial in order to preclude the State from obtaining all of the underlying data essential to their mental retardation cases." *Lizcano-2*, ¶ 52 (citing trial counsel's Sanchez habeas testimony). As an initial matter, "this information was already in the possession of the State's expert Dr. Price." *Id.* n.5. Furthermore, Mr. Sanchez acknowledged that they would have been required to turn over the relevant data to the attorneys in two weeks' time, NT 11/06/12 at 164, meaning counsel abandoned a motion that could have precluded their incompetent client from being tied altogether in order to gain a brief delay in their disclosure obligations. Most important, however, is the fact that counsel had presumably already weighed the potential benefits of a competency trial against the disclosure costs prior to filing their motion for a competency evaluation and strategically determined that the balance favored pursuing incompetency. And again, the only factor that could have changed that calculation was counsel's receipt of Dr. Flynn's oral representation regarding Mr. Lizcano's competence. Given that this representation was unreliable, the change in strategy absent further investigation was professionally unreasonable and the state court's finding otherwise was an unreasonable application of *Strickland* and its progeny.

### b.     Prejudice

54.     The state court also found that, even assuming *arguendo* counsel performed deficiently, Mr. Lizcano could not satisfy the prejudice prong of *Strickland*. Specifically, the court found Petitioner failed to show there was a reasonable probability he would have been found incompetent to stand trial because: (1) "Dr. Flynn and applicant's counsel believed that applicant was competent," *Lizcano-2*, ¶ 73; and (2) there was "no evidence" that Mr. Lizcano suffered from a "severe mental illness" or was "at least moderately retarded," *id.* ¶ 75. As with

the court's deficiency ruling, both findings are unreasonable under § 2254(d).

55.     First, in relying on Dr. Flynn's finding of competence, the trial court completely disregarded Mr. Lizcano's evidence demonstrating multiple flaws with Dr. Flynn's report,[9] as well as Dr. Flynn's own admission to trial counsel that he did not have confidence in his conclusion. *See supra* ¶ 37. In light of this evidence, it is unreasonable to assume that Dr. Flynn's report—had it not been retracted altogether or at least substantially revised—would be found to be more credible than the substantial evidence counsel could have presented in a competency trial. And, because counsel decided to withdraw the motion for competency based solely on Dr. Flynn's unreliable opinion, it is unreasonable to assume that they would have maintained a belief that their client was competent had they actually reviewed Dr. Flynn's report. Indeed, as the state court acknowledged, prior to learning of Dr. Flynn's opinion, counsel had made statements to the court indicating the exact opposite. *See Lizcano-2*, ¶¶ 34, 35.

56.     Second, the court's finding that there was "no evidence" that Mr. Lizcano was even "mildly" intellectually disabled is flatly contradicted by Dr. Puente's report, which expressly stated that Mr. Lizcano's "intellectual quotients were in the mild mental impairment range." *Id.* ¶ 34. The court provided no basis on which to assume that these scores would have been deemed incredible during a competency trial. And, to the extent that Dr. Puente's report was insufficient evidence, counsel was ineffective for failing to investigate and present the overwhelming evidence, available at the time of trial, establishing intellectual disability. *See Lizcano-4* (holding that Mr. Lizcano is an intellectually disabled individual).

---

[9] The only critique of Dr. Flynn's evidence that was even acknowledged by the state court is the fact that he used a translator, which the court found to be an insufficient basis on which to discount his report. *See Lizcano-2*, ¶ 58.

57.     In short, counsel's ineffective failure to present evidence in support of competency cannot be justification for finding that there was no reasonable likelihood of a different outcome had the competency trial been held. In fact, as detailed above, had counsel conducted a thorough investigation into Mr. Lizcano's mental status and intellectual functioning, the evidence would have been more than sufficient to establish his incompetency to stand trial. *See supra* ¶¶ 33–38. The court's finding to the contrary, like its finding on deficiency, cannot survive § 2254(d) scrutiny.

## PART B

### GENERAL STATEMENT RELATING TO STATE HABEAS COUNSEL INEFFECTIVENESS

58.     By the terms of the capital habeas statute and according to prevailing norms of practice, state habeas counsel were required to make an expeditious and thorough investigation of all possible avenues for relief. *See, e.g.*, *Strickland*, 466 U.S. at 691; *Rompilla*, 545 U.S. at 389; *Hinton*, 134 S. Ct. at 1088–89; *Wiggins*, 539 U.S. at 524; *Trevino v. Davis*, 829 F.3d 328, 347 (5th Cir. July 11, 2016). Article 11.071, Section 3(a) requires counsel to "investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus." Tex. Code Crim. Proc. art. 11.071 Section 3(a). Additionally, the American Bar Association Guidelines mandate that "[a]t every stage of the proceedings counsel has a duty to investigate the case thoroughly." ABA Guideline 10.7, 31 Hofstra L. at 1028; *see also id.* at 1080 (Guideline 10.15.1(e)(4)) (requiring post-conviction counsel to "continue an aggressive investigation of the case"). The State Bar of Texas's Guidelines and Standards for Texas Capital Counsel, adopted in 2006, contain the same requirements. Tex. Bar Ass'n, *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966, 976 (2006) (Guideline 12.2(B)) (hereinafter, "Texas Capital

Counsel Guidelines").

59.     Mr. Lizcano's state habeas counsel fell short of these statutory and professional

duties with regard to numerous unexhausted, but meritorious, claims. In general, state habeas

counsel unreasonably limited their investigation to issues related to Mr. Lizcano's intellectual

disability and thus did not conduct an objectively reasonable investigation that would have

revealed numerous other constitutional violations in this case, some of which were apparent from

the record. *See* A476–78, ¶¶ 2–14. The failure to investigate also caused counsel to omit critical

aspects of the few claims that were asserted. *See id.* ¶¶ 2–6, 8–9, 11–12, 14.

60.     Among the constitutional violations that counsel's ineffectiveness caused them to

overlook were: appellate counsel's conflict of interest and ineffective assistance regarding

federal and state rights to competency procedures after the trial court had found sufficient

evidence of Mr. Lizcano's incompetency; a meritorious claim under *Batson v. Kentucky*, 476

U.S. 79 (1986); trial counsel's failure to object to prosecutorial misconduct in closing arguments;

and a claim of cumulative error regarding trial counsel and trial court errors. These omissions

were not the result of strategy, nor could they reasonably have been. *See id.* ¶¶ 2–6, 8–12, 14.

61.     Mr. Lizcano was in no position to address his state habeas counsel's

ineffectiveness on his own because of his well-documented intellectual impairments and

problems understanding court proceedings. *See* A225 (Dr. Martinez Letter regarding Opinion on

Competency); A218–33 (Motion Suggesting Incompetency and Request for Examination, with

Exhibits); NT 9/17/07 at 18–25; A227–43 (Report of Neuropsychological Evaluation by Dr.

Martinez); A349–85 (Report of Dr. Llorente, 11/1/12); *Lizcano-4* (holding that Mr. Lizcano is an

intellectually disabled individual). *Cf. Newman v. Norris*, 597 F. Supp. 2d 890, 896 (W.D. Ark.

2009) ("We find that Petitioner's mental impairment and questionable competence at the time he

should have filed his state appeals is an exceptional circumstance that constitutes good cause for his failure to exhaust his claims.").

62.     Prejudice arises in relation to state habeas counsel's default of substantial claims. *Cf. Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (en banc) (plurality op.) ("[N]o showing of prejudice from [post-conviction] counsel's deficient performance is required, over and above a showing that [post-conviction] counsel defaulted a 'substantial' claim of trial-counsel IAC, in order to establish 'cause' for the procedural default.").

**STATEMENT REGARDING**
**PROCEDURAL BARS**

63.     Due to state habeas counsel's ineffective assistance in Petitioner's initial collateral review proceeding, *see supra* ¶¶ 59–60, numerous claims asserted in this Part B were not raised in his initial state post-conviction proceedings. Also, due to state habeas counsel having served as initial federal habeas counsel, most of the claims asserted below were omitted from the initial federal petition. Nevertheless, Petitioner can overcome any procedural default or otherwise demonstrate why he is entitled to merits review of his claims.

64.     The doctrine of procedural default is judge-made law designed "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez*, 566 U.S. at 9. The doctrine imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Id.* This bar does not apply, however, if petitioner establishes "cause" for the default and "prejudice" from the violation of federal law. *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

65.     Post-conviction counsel's ineffective assistance can constitute "cause" to overcome a default. In *Martinez*, the Court held that, when an initial-review collateral proceeding

23

is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, state

habeas counsel's ineffective assistance at that stage could supply "cause" for the default of the

trial ineffectiveness claim. 566 U.S. at 17. The next Term, the Court clarified that this rule

applied to Texas, because the "state procedural framework, by reason of its design and operation,

makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to

raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569

U.S. 413, 428–29 (2013).

> 66.    A petitioner can show cause and thereby excuse a default:

> where (1) the claim of "ineffective assistance of trial counsel" was a "substantial"
> claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective"
> counsel during the state collateral review proceeding; (3) the state collateral
> review proceeding was the "initial" review proceeding in respect to the
> "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an
> "ineffective assistance of trial counsel [claim] ... be raised in an initial-review
> collateral proceeding."

*Id.* at 423; *accord Canales v. Stephens*, 765 F.3d 551, 567–68 (5th Cir. 2014). Petitioner makes

these showings with respect to each of the claims asserted below for which a procedural default

might apply.

## CLAIMS FOR RELIEF

**II.    MR. LIZCANO'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE
TRIAL COURT FAILED TO ORDER SUA SPONTE COMPETENCY
PROCEEDINGS AFTER RECEIVING, AND EVEN RULING THAT IT HAD
RECEIVED, SUFFICIENT EVIDENCE; APPELLATE COUNSEL RENDERED
INEFFECTIVE ASSISTANCE AND LABORED UNDER A CONFLICT OF
INTEREST; STATE HABEAS COUNSEL RENDERED INEFFECTIVE
ASSISTANCE WITH REGARD TO APPELLATE COUNSEL'S
INEFFECTIVENESS AND CONFLICT.[10]**

> 67.    On September 25, 2007, the trial court stated on the record that it had sufficient

---

[10] This claim was initially pled as Claim VII of the supplemented and amended habeas petition
filed on June 14, 2007. ECF No. 32–2.

evidence to proceed to a competency trial, thus also necessarily finding that it had a bona fide doubt as to Mr. Lizcano's competency. *See supra* ¶¶ 29–32 (detailing evidence submitted to the court in support of motion for competency trial). This evidence triggered a duty on the part of the trial court to "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). The court's failure to do so in reliance on trial counsel's ineffective withdrawal of the request for a competency trial violated Mr. Lizcano's rights to due process under federal and state law. *See id.*; *Turner v. State*, 422 S.W.3d 676, 688 (Tex. Crim. App. 2013) ("A criminal defendant who is incompetent may not be put to trial without violating due process."). Nevertheless, appellate counsel—who was also a member of the trial team—failed to raise these issues on direct appeal. And state habeas counsel failed to raise appellate counsel's ineffectiveness and conflict of interest in Mr. Lizcano's initial post-conviction petition.

68.    The court should reach the merits and grant relief on the basis of the federal due process violation, appellate counsel's ineffectiveness, and appellate counsel's conflict of interest.

### A.    Factual Background

69.    Mr. Lizcano incorporates the factual background set forth in ¶¶ 29–38 above as if set forth completely herein.

### B.    Mr. Lizcano's Due Process Rights Were Violated.

#### 1.    The procedural guarantees

70.    Due process "mandates state procedures that are adequate to assure that incompetent defendants are not put to trial." *See Pate v. Robinson*, 383 U.S. 375, 378 (1966). "To that end," the Texas legislature "has codified the [federal] constitutional standard for competency to stand trial and has elaborately described the circumstances that require, and procedures for making, a determination of whether a defendant is competent to stand trial."

*Turner*, 422 S.W.3d at 689.

71.     First, as to the applicable standing, the legislature has:

> directed that forensic psychologists and psychiatrists appointed by the trial court
> to perform competency evaluations [] specifically consider, among other things:
> 1) the defendant's "capacity . . . during criminal proceedings to . . . engage in a
> reasoned choice of legal strategies and options;" as well as 2) "the impact of the
> mental illness or mental retardation, if existent, on the defendant's capacity to
> engage with counsel in a reasonable and rational manner[.]"

*Id.* (quoting Tex. Code Crim. Proc. art. 46B.024 §§ (1)(C) & (4)).

72.     Second, Texas law mandates that, "[i]f evidence suggesting the defendant *may be*
incompetent to stand trial comes to the attention of the court, the court *on its own motion shall
suggest* that the defendant may be incompetent to stand trial." Tex. Crim. Proc. Code art.
46B.004(b); *see also Luna v. State*, 268 S.W.3d 594, 598–99 (Tex. Crim. App. 2008). The
burden of proof here is low; a "'suggestion' of incompetency" is "sufficient to trigger an
informal inquiry" into the matter. *Turner*, 422 S.W.3d at 692.

73.     Third, if the informal inquiry shows that "evidence exists to support a finding of
incompetency, the court *shall order*" a formal examination "to determine whether the defendant
is incompetent to stand trial in a criminal case." Tex. Crim. Proc. Code art. 46B.005(a). Again,
the burden is not high. The court *must* hold a competency trial *unless*: "(1) neither party's
counsel requests a trial on the issue of incompetency; (2) neither party's counsel opposes a
finding of incompetency; and (3) the court does not, on its own motion, determine that a trial is
necessary to determine incompetency." Tex. Crim. Proc. Code art. 46B.005(b)–(c); *cf.* 43 Tex.
Prac., Criminal Practice And Procedure § 31:36 (3d ed.) ("Best read, a determination that there is
some evidence from any source that would support a finding that the defendant is incompetent to
stand trial mandates a determination of competency.").

74.     State law also makes clear that, in conducting the forgoing inquiry, the trial court

does not consider evidence that would tend to show *competency*; rather, the trial court shall "consider only that evidence tending to show *incompetency*, 'putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency.'" *Turner*, 422 S.W.3d at 692 (quoting *Ex parte LaHood*, 401 S.W.3d 45, 52–53 (Tex. Crim. App. 2013), and collecting cases); *see Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999); *Ex parte LaHood*, 401 S.W.3d 45, 60 (Tex. Crim. App. 2013); *Drope*, 420 U.S. at 179–80; *Pate*, 383 U.S. at 385–86. Focusing exclusively on expert evidence of competency when there is sufficient evidence to support a finding of incompetency, thus, would lead to error. *See Turner*, 422 S.W.3d at 694; *Drope*, 420 U.S. at 179–80; *Pate*, 383 U.S. at 385–86.

> **2.**   **The evidence before the trial court was sufficient to trigger sua sponte action to safeguard Mr. Lizcano's due process rights.**

75.   Under *Pate*, a court must sua sponte hold a competency hearing if, at any time prior to or during trial, the evidence raises a "bona fide" question as to the defendant's competency. *Pate*, 383 U.S. at 385; *Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. 2000) ("A state court must conduct an inquiry into the defendant's mental capacity sua sponte if the evidence raises a bona fide doubt as to competency."). A *Pate* violation is separate and distinct from a substantive claim of incompetency to stand trial. The petitioner need not establish that he was incompetent to stand trial or plead guilty to obtain relief; rather he need only establish that the trial judge should have ordered a hearing to determine his competency. *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980); *see also Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997) (distinguishing "the substantive right not to be tried and convicted while incompetent" from "the procedural guarantee of a competency hearing in the event that a bona fide doubt arises at trial as to competency"). If petitioner satisfies this burden, it is for the State to convince the court that

27

the "tools of rational decision are now available" to "determine retrospectively the petitioner's competency as of the time of his trial." *Lokos*, 625 F.2d at 1261. If the State fails to do so, relief is warranted. Otherwise, petitioner bears the burden of proving his incompetency by a preponderance of the evidence.

76.     Mr. Lizcano presents sufficient evidence to establish a *Pate* violation. As discussed above, on September 25, 2007, the trial court itself acknowledged that it had sufficient evidence to proceed to a competency trial under state law, necessarily finding that it had a bona fide doubt as to Mr. Lizcano's competency. Thus, the court itself acknowledged that it had sufficient "information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Lokos*, 625 F.2d at 1261. Specifically, this evidence included: (1) Dr. Puente's expert opinion on intellectual impairments, including IQ scores of 48, 60, and 62, A216–17; (2) trial counsel statements about incompetency, A220–21; (3) additional trial counsel statements regarding intellectual impairments and doubts about competency, NT 9/17/07 at 18–25; and (4) an expert opinion from Dr. Martinez that Mr. Lizcano was not competent after a neuropsychological evaluation, A225.

77.     This evidence demanded a competency trial. In *Turner*, two experts opined about a defendant's possible mental health issues, but concluded that he had been competent to stand trial. *See Turner*, 422 S.W.3d at 693. Still, the court held that the trial court had erred in failing to hold a competency trial, reasoning "there was some evidence to support a rational finding of incompetence" after the defendant refused to participate in voir dire, and both experts "observed signs of paranoid delusions that would at least minimally support a finding that the appellant

28

suffered from a mental disorder that impaired his ability to participate rationally in the preparation and presentation of his defense." *Id.* And in *Barber v. State*, 737 S.W.2d 824, 826–27 (Tex. Crim. App. 1987), error arose when the trial court failing to hold a competency trial after receiving one expert opining that defendant was incompetent and another expert opining that the defendant was not incompetent.

78.     Here, the trial court correctly found that the evidence required a competency trial, even after the court and the parties had been told via telephone that Dr. Flynn believed Mr. Lizcano was competent. *See* NT 9/25/07 at 4. The court ruled correctly, as neither the court nor the parties had yet reviewed Dr. Flynn's report or underlying data. And, had they done so, they would have discovered numerous inconsistencies and errors that undermined the credibility of Dr. Flynn's competency opinion. *See supra* ¶¶ 33–36.

79.     Trial counsel's ineffective decision to withdraw the defense motion for a competency trial did not relieve the court of its duties. *See* NT 11/6/12 at 162–65, 209–10, 89–91, 128; NT 11/07/12 at 17–18.[11] Texas law requires that, if "evidence exists to support a finding

---

[11] Mr. Lizcano did not waive competency, and both the trial court and the State stated that trial counsel were not waiving competency, but rather withdrawing an earlier-filed motion. *See* NT 9/25/07 at 5–6. Justice Kennedy's concurrence in *Riggins v. Nevada*, 504 U.S. 127 (1992), indicates that "a general rule permitting waiver [of one's right to be tried while competent] would not withstand scrutiny under the Due Process Clause, given . . . *Pate* and *Drope*." *Id.* at 140 (Kennedy, J., concurring); *see Pate*, 383 U.S. at 384 ("But it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."); *Cooper v. Oklahoma*, 517 U.S. 348, 354 n.4 (1996) ("Indeed, the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination."). Further, "[f]our members of the Court of Criminal Appeals have indicated that they regard the argument that a potentially incompetent defendant cannot . . . 'waive' his right to an inquiry [if defense counsel tells the court they believe the defendant is competent] as a viable one." 43 Tex. Prac., Criminal Practice and Procedure § 31:28 (3d ed.) (citing *Lopez v. State*, 909 S.W.2d 512, 515 (Tex. Crim. App. 1995)); *cf. Carpenter v. State*, 507 S.W.2d 794, 795 (Tex. Crim. App. 1974) ("If, however, the trial court at any stage during the proceedings determines

of incompetency," a competency trial is required if either party so requests *or* the court

determines on its own motion that a trial is necessary to determine incompetency." Tex. Crim.

Proc. Code art. 46B.005(a)–(c). Here, trial counsel Sanchez claimed that counsel "weigh[ed] . . .

having the hearing versus the State's great desire to have the underlying data of [their] experts."

NT 11/6/12 at 162. Regardless of whether this was a credible or rational decision, *see supra* at ¶¶

52–53, the trial court had an independent duty to ensure that the defendant was competent to

proceed to trial based on the information it had already received. *See Pate*, 383 U.S. at 384;

*Drope*, 420 U.S. at 178; *Bundy v. Dugger*, 816 F.2d 564, 566–67 (11th Cir. 1987) (per curiam).[12]

80.    At the very least, once the court had received Dr. Flynn's unreliable report and

testing sheets, knowing that counsel was no longer moving for a competency trial, the court had

a duty to act sua sponte. The court's failure to do so unreasonably violated Mr. Lizcano's clear

procedural rights.

### C.    Appellate Counsel Was Ineffective for Not Raising Federal and State Law Issues.

81.    The trial court's failure sua sponte to order a hearing and the treatment of trial

---

that such issue does exist, under our holding in *Perryman*, . . . the court is under a Duty to
empanel a separate jury to determine the issue, and this regardless of whether the defendant so
moves, or not, or even opposes it."); 43 Tex. Prac., Criminal Practice And Procedure § 31:25 (3d
ed.) ("The Texas court has apparently had no cases under the post-1975 statute in which a
defendant actively resisted inquiry into his or her competency. However, it has spoken of the
trial court's duty to hold a jury trial in terms that suggest a duty to hold such a trial despite the
defendant's opposition." (citing cases, including *Carpenter*)).

[12] Although trial counsel taking a position that their client was competent may be "persuasive
evidence" for a trial court, *see Reese v. Wainwright*, 600 F.2d 1085, 1092 (5th Cir. 1979), it also
in retrospect may warrant less weight than that of a disinterested witness: "Had counsel testified
to anything other than [a client]'s competence to plead guilty, he would have placed himself in
an awkward ethical position by revealing that he had allowed his client to plead guilty at a time
when he personally believed [the client] to be incompetent," *Bolius v. Wainwright*, 597 F.2d 986,
989 (5th Cir. 1979).

counsel's withdrawn motion as dispositive of the incompetency issue violated Mr. Lizcano's state and federal rights, and a reasonable appellate attorney would have raised these meritorious issues on direct appeal. *See Moore*, 999 S.W.2d at 393; *LaHood*, 401 S.W.3d at 60; *Drope*, 420 U.S. at 179–80; *Pate*, 383 U.S. at 385–86.

### 1.    Deficient performance

82.    A reviewing court assesses a claim that appellate counsel was ineffective under the *Strickland* standard. *Smith v. Robbins*, 528 U.S. 269, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309 (5th Cir. 2013). "[T]o be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). "This reasonableness standard requires counsel 'to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention.'" *Id.* (quoting *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)). Appellate counsel is deficient if counsel failed to raise an obvious and potentially successful issue, stronger than those that counsel did present. *Dorsey*, 720 F.3d at 320. Particularly in a capital case, appellate counsel can have no reasonable strategy to justify failing to raise a meritorious issue. *See Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("[I]n a capital case . . . appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim.").

83.    Here, appellate counsel performed deficiently in failing to raise the violation of Mr. Lizcano's due process rights on direct appeal. As discussed above, the issues had significant merit under controlling state and federal law. Although appellate counsel did not raise these meritorious issues, he raised clearly non-meritorious claims by rehashing at least twenty-six

31

unsuccessful claims from a previously denied appeal in which he had represented another prisoner. *See Lizcano-1* at *31.

### 2. Prejudice

84.     A habeas petitioner challenging appellate counsel's representation establishes prejudice by showing that, but for counsel's error, there was a reasonable probability that the outcome of the appeal would have been different. *Dorsey*, 720 F.3d at 321; *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006) ("When the petitioner challenges the performance of his appellate counsel, he must show that with effective counsel, there was a reasonable probability that he would have won on appeal." (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)) (footnote omitted).

85.     As explained above, if "state procedures were inadequate to ensure that [a petitioner] was competent to stand trial," a court "must consider whether a meaningful hearing can be held nunc pro tunc to determine retrospectively the petitioner's competency as of the time of trial." *Carter*, 131 F.3d at 459 n.10 (citing *Lokos*, 625 F.2d at 1262). Thus, prejudice is established if, but for appellate counsel's errors, there was a reasonable probability that Mr. Lizcano would have successfully raised a procedural competency claim on appeal and received a remand for either a nunc pro tunc competency determination or a new trial. *See, e.g.*, *Torres v. State*, 593 S.W.2d 717, 719 (Tex. Crim. App. 1980); *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012); *Lokos*, 625 F.2d at 1262. Had appellate counsel raised the issue, the CCA would have reviewed the procedural competency issue under federal and state law.

86.     Mr. Lizcano has demonstrated a reasonable probability he would have received relief on appeal for violation of his state and federal rights that undermined the fairness and reliability of the trial. The trial court "ruled that there was sufficient evidence to proceed forward

with a competency trial [for Mr. Lizcano]." NT 9/25/07 at 4. And sufficient evidence supported that finding, including IQ scores, expert opinion, and initial trial counsel opinions. The evidence and the trial court's ruling demonstrate prejudice on appeal under both state and federal law. *See Turner*, 422 S.W.3d at 692–94; *Moore*, 999 S.W.2d at 393; *LaHood*, 401 S.W.3d at 60; *Drope*, 420 U.S. at 179–80; *Pate*, 383 U.S. at 385–86.

87.     To evaluate this ineffectiveness claim rooted in procedural error, Mr. Lizcano does not concede that the State could have met its burden to "convince the court that the tools of rational decision are now available," for purposes of a retrospective competency determination, *Lokos*, 625 F.2d at 1262,[13] or that the Court should consider whether there was a reasonable probability that Mr. Lizcano would have been found incompetent[14] to stand trial. *See, e.g.*, *Drope*, 420 U.S. at 183 ("Given the inherent difficulties of such a nunc pro tunc determination under the most favorable circumstances, we cannot conclude that such a procedure would be adequate here." (citing *Pate*, 383 U.S. at 386–87; *Dusky*, 362 U.S. at 403)). Even if the Court were to undertake either or both inquiries, however, Mr. Lizcano would succeed, as detailed in Claim I above.

88.     In sum, both federal and Texas law required constitutionally sufficient inquiry

---

[13] *See also Greene v. State*, 264 S.W.3d 271, 272–73 (Tex. App. 2008) ("While retrospective competency inquiries may be conducted consistent with the requirements of due process in most cases, we are of the opinion that the present case poses an exception." (citing *Barber v. State*, 737 S.W.2d 824, 828 (Tex. Crim. App. 1987), for the proposition that retrospective determination "'can be made within the limits of due process depending upon the quality and quantity of the evidence available'")).

[14] *See Ex parte Hagans*, 558 S.W.2d 457, 461 (Tex. Crim. App. 1977) ("Texas law adequately attempts to protect this right by providing that, where there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled, separate from the jury selected to determine guilt or innocence of the defendant, to determine defendant's competency to stand trial." (footnote omitted)).

and/or a jury trial on competency when the trial court received evidence sufficient for a

competency trial, and appellate counsel prejudiced Mr. Lizcano by failing to raise these issues.

   **D.   Appellate Counsel Labored Under a Conflict Of Interest.**

   89.   A petitioner who shows that "his attorney labored under an actual conflict which

adversely affected his lawyer's performance" establishes a violation of his Sixth Amendment

right to counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (footnote omitted). Thus, in

addition to showing deficient performance and prejudice under *Strickland*, a petitioner has a

claim of ineffective assistance of appellate counsel ("IAAC") when: (1) appellate counsel had a

conflict of interest; and (2) "some plausible defense strategy or tactic might have been pursued

but was not, because of the conflict of interest." *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir.

1996); *see also McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990) (explaining that,

when an attorney has "inconsistent interests," a petitioner demonstrates an actual conflict by

showing "that the attorney made a choice between possible alternative courses of action, such as

eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." (quoting

*Smith v. White,* 815 F.2d 1401, 1404 (11th Cir. 1987)) (quotation marks omitted)).

   90.   Here, Mr. Lizcano's appointed appellate counsel openly participated as a member

of the trial team. *See generally* NT 9/28/07 (Mr. Tatum arguing pretrial motions); NT 11/6/12 at

32 (trial counsel explaining: "I get an appellate attorney, but we use them throughout the trial for,

you know, a third legal mind and just more assistance in—in the Defense."); *id.* at 151 ("Mr.

John Tatum was appointed as appellate counsel to help us with any appellate issues that he might

perceive and to help us with motions and legal research."); NT 11/7/12 at 13 (Mr. Tatum

describing himself as "part of the [defense] team").

   91.   Conflict and adverse effect arose during Mr. Lizcano's appeal. Raising on appeal

34

the trial court's failure to hold a sua sponte competency trial would have been adverse to defense counsel's decision to withdraw their motion for such a trial. Although Mr. Tatum indicated during state habeas proceedings that he "had no decision making" regarding competency, he went on to explain that he had been present during trial team discussions regarding competency and during in-chambers and on-the-record meetings with the trial court about competency, and did not "voice any vociferous objections" to the trial team's "strategy" to withdraw a motion regarding competency. NT 11/7/12 at 15–20. Mr. Tatum therefore needed to decide whether to raise meritorious claims in one proceeding (to satisfy Mr. Lizcano's interest on appeal) that would have undermined an assessment of his performance in a prior proceeding (contrary to his self-interest); he decided not to do so, protecting his self-interest and despite the meritorious claims having been apparent from the record, raised in other cases at the time, and stronger than the claims he repeated from an earlier appeal. *See Acosta v. State*, 233 S.W.3d 349, 354–35 (Tex. Crim. App. 2007) (explaining that "the appellant must show that an actual conflict of interest existed and that trial counsel actually acted on behalf of those other interests during the trial"); *Tabler v. Stephens*, 591 F. App'x 281 (5th Cir. 2015) (unpublished) (because state habeas attorneys were also petitioner's federal habeas proceedings, they faced a conflict of interest that could have prevented them from arguing that their performance in [petitioner's] competency hearing was deficient, and, accordingly, [the petitioner's] statutory right to counsel was violated.").

92.     As the Supreme Court observed in *Christeson*: "Counsel cannot reasonably be expected to make such an argument, which threatens their professional reputation and livelihood." *Christeson v. Roper*, 574 U.S. 373, 378 (2015); *see also id.* ("[A] 'significant conflict of interest' arises when an attorney's 'interest in avoiding damage to [his] own

35

reputation' is at odds with his client's 'strongest argument.'" (quoting *Maples v. Thomas*, 565

U.S. 266, 286 n.8 (2012))). Here, direct appeal counsel was in no position to raise the due

process competency issues that implicated his own ineffectiveness. *Cf., e.g.*, *Hatten v.*

*Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009) (analyzing conflicted counsel basis for cause to

excuse state court procedural default separately from IAAC basis for cause); *Manning v. Foster*,

224 F.3d 1129, 1134 (9th Cir. 2000) ("We have never considered whether a conflict of interest,

independent of a claim of ineffective assistance of counsel, should constitute cause where the

conflict caused the attorney to interfere with the petitioner's right to pursue his habeas claim. We

think that it must."); *Edwards v. Carpenter*, 529 U.S. 446, 458 (2000) (Breyer, J., concurring)

(recognizing "cause" independent of a claim of ineffective assistance); *Holland v. Florida*, 560

U.S. 631, 649 (2010) ("The Court of Appeals held that, where that is so, even attorney conduct

that is 'grossly negligent' can never warrant tolling absent 'bad faith, dishonesty, *divided loyalty*,

mental impairment or so forth on the lawyer's part.' But in our view, the Court of Appeals'

standard is *too rigid*." (emphases added) (citations omitted)); *Maples*, 565 at 281–82 & n.7

(citing *Holland* in a cause and prejudice analysis, and citing *Jamison v. Lockhart,* 975 F.2d 1377,

1380 (8th Cir. 1992), for proposition that "attorney conduct may provide cause to excuse a state

procedural default where, as a result of a conflict of interest, the attorney 'ceased to be

[petitioner's] agent'").

93.     Adverse effect is also evident from the appellate brief: it was silent as to

meritorious competency issues, but raised twenty-six claims that clearly were non-meritorious

because they had been pasted in verbatim from an earlier, unsuccessful appeal. *See Lizcano-1* at

60.

94.     Having established that appellate counsel labored under a conflict of interest and that he failed to raise a due process claim based on the trial court's failure to hold a *sua sponte* competency trial, Mr. Lizcano need not demonstrate *Strickland* prejudice. *Sullivan*, 446 U.S. at 349–50; *see also Perillo*, 79 F.3d at 447. However, because the Fifth Circuit previously limited *Sullivan* claims for which prejudice would be presumed to ones involving multiple representation, *see Beets v. Scott*, 65 F.3d 1258, 1272 (5th Cir. 1995) (en banc), Mr. Lizcano also satisfies this element as demonstrated in the ineffective-assistance-of-appellate-counsel analysis above. In the alternative, *Beets* is distinguishable and should not apply in cases in which a conflict arises from an attorney having to decide whether to raise a claim in one proceeding that would undermine an assessment of his performance in a prior proceeding. *See Tabler v. Stephens*, 591 F. App'x 281 (5th Cir. 2015) (unpublished) ("Because [a petitioner's] attorneys for his state habeas proceedings were also his attorneys for his federal habeas proceedings, they faced a conflict of interest that could have prevented them from arguing that their performance in [the petitioner's] competency hearing was deficient, and, accordingly, [the petitioner's] statutory right to counsel was violated." (citing *Christeson*, 135 S. Ct. 891)).[15]

**E.     State Habeas Counsel Were Ineffective.**

95.     As stated above, state habeas counsel unreasonably limited their investigation to

---

[15] *Beets* itself noted that it did not apply to cases involving "'the functional equivalent of a joint representation.'" *See Acosta v. State*, 233 S.W.3d 349, 354 (Tex. Crim. App. 2007) (quoting *Beets*, 65 F.3d at 1267, analyzing *Wood*, 450 U.S. 261). And *Christeson* relies on well-settled principles and applies to cases like Mr. Lizcano's: "Counsel cannot reasonably be expected to make such an argument, which threatens their professional reputation and livelihood." *Christeson*, 135 S. Ct. at 894. The Supreme Court also has observed that "a 'significant conflict of interest' arises when an attorney's 'interest in avoiding damage to [his] own reputation' is at odds with his client's 'strongest argument . . . .'" *Id.* (quoting *Maple*, 565 U.S. at 286, n.8); *see also id.* at 895 ("Even the narrower standard we rejected in [*Martel v. Clair*, 565 U.S. 648 (2012),] would have allowed for substitution where an attorney has a 'disabling conflict of interest.'" (quoting *Clair*, 565 U.S at 658)).

issues related to Mr. Lizcano's intellectual disability and thus did not conduct an objectively reasonable investigation into all potentially meritorious claims. *See* A476–48, ¶¶ 2–14. This failure to investigate caused counsel to omit certain claims altogether, and to fail to plead critical aspects of the few claims that were asserted, including this claim. *See id.* ¶¶ 2–6, 8–9, 11–12, 14. Specifically, although counsel raised a *Pate* claim in Mr. Lizcano's state habeas petition, they failed to allege appellate counsel's ineffective assistance and conflict of interest that prevented Mr. Tatum from asserting the violation on direct appeal. *See* A268–82.

96.     State habeas counsel acted unreasonably. The IAAC and conflict of interest claims were evident, available, and in fact raised by others at the time. State habeas counsel had no strategic basis for these failures. *See* A476–48, ¶¶ 2–6, 8–12, 14. Nor could counsel reasonably justify such failures; they needed to research and investigate all grounds for relief. *See Strickland*, 466 U.S. at 691; *Rompilla*, 545 U.S. at 389; *Wiggins*, 539 U.S. at 524; Tex. Code Crim. Proc. art. 11.071, Section 3(a); ABA Guidelines, Guideline 10.7; ABA Guidelines, Guideline 10.15.1; Texas Capital Counsel Guideline 12.2(B). Basic legal research would have revealed that a meritorious due process claim was at risk of being subject to a bar in state court for not having been raised on direct appeal. *See, e.g.*, *James v. Singletary*, 957 F.2d 1562, 1572 (11th Cir. 1992) ("*Pate* claims can and must be raised on direct appeal.").

97.     Prejudice is established where state habeas counsel defaults a substantial claims. *See Detrich*, 740 F.3d at 1246. Yet even if the Court were to review for state habeas prejudice, Mr. Lizcano had a reasonable probability of success—which would have reviewed for mere adverse effect from a conflict[16] or, for IAAC—had he raised the IAAC and conflict issues, as

---

[16] *See Acosta*, 233 S.W.3d at 356 ("[T]he proper standard by which to analyze claims of ineffective assistance of counsel due to a conflict of interest is the rule set out in *Cuyler v.*

explained above. The trial court failed to carry out state and federally mandated competency procedures upon receiving lay and expert evidence of Mr. Lizcano's incompetence; appellate counsel labored under a conflict of interest in not raising on appeal the trial court's harmful error; and appellate counsel failed to raise this meritorious claim on appeal, despite repeating verbatim other claims that had been rejected in another appeal. As discussed above, the lay and expert evidence adduced during state habeas from Mr. Lara, Ms. Nathan, and Dr. Llorente further demonstrated Mr. Lizcano's incompetency to stand trial.

98. Accordingly, state habeas counsel rendered ineffective assistance by defaulting Mr. Lizcano's IAAC and conflict of interest claims after his appellate counsel defaulted his state and federal due process claims. Counsel's conflict and ineffectiveness prevented Mr. Lizcano from having his claims heard on the merits, but the unique responsibility of a trial court under *Pate v. Robinson* and meritorious claims raised here demand review.

### F. State Court Proceedings

99. Mr. Lizcano raised a *Pate* claim in his initial state habeas application, but the state court imposed a procedural bar on the basis that the claim should have been raised on direct appeal. *Lizcano-2*, ¶ 184. If the State attempts to rely on that default, Mr. Lizcano is able to establish cause and prejudice. Although the Supreme Court denied review of an IAAC claim through *Martinez* in *Davila v. Davis*, 137 S. Ct. 2058 (2017), the underlying reasoning does not apply to the type of IAAC claim asserted here. In *Davila*, petitioner was attempting to raise

---

*Sullivan*, that is, the appellant must show that his trial counsel had an actual conflict of interest, and that the conflict actually colored counsel's actions during trial.").

IAAC for failure to appeal a jury instruction to which trial counsel could have objected. *Id.* at

2067. There was no cause to extend *Martinez* in such circumstances because, as the Court

explained:

> If trial counsel failed to preserve the error at trial, then petitioner's proposed rule
> ordinarily would not give the prisoner access to federal review of the error,
> anyway. Effective appellate counsel should not raise every nonfrivolous argument
> on appeal, but rather only those arguments most likely to succeed. . . . [And] [i]f
> an unpreserved trial error was so obvious that appellate counsel was
> constitutionally required to raise it on appeal, then trial counsel likely provided
> ineffective assistance by failing to object to it in the first instance. In that
> circumstance, the prisoner likely could invoke *Martinez* or *Coleman* to obtain
> review of trial counsel's failure to object.

*Id.* at 2067–68.

100. The claim at issue here is different, as Mr. Lizcano's trial counsel could not have

raised Mr. Lizcano's *Pate* claim at any point during trial; the trial court had a duty to act on its

own motion. Furthermore, direct appeal counsel's conflict uniquely warrants application of the

*Martinez* exception to cause and prejudice, as discussed above in Section II.C. But without

review in in these federal habeas proceedings, no court will hear the merits of the IAAC and

conflicted counsel claims, *or* the underlying claim of trial court error in carrying out its sua

sponte trial duty. *Cf. Martinez*, 566 U.S. at 11 ("Where, as here, the initial-review collateral

proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective

assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct

appeal as to the ineffective-assistance claim.").

101. The state habeas court alternatively addressed the merits of the due process claim,

but it had no opportunity to rule on unique IAAC and conflicted counsel claims (with their

reasonable probability of a different result or adverse effect analysis) and did not conduct

reasonable or proper state and federal law analyses. Instead, the state habeas court found that the

trial court's "informal inquiry" on September 17, 2007, sufficed under state and federal law. *See Lizcano-2*, ¶¶ 186–88. The trial court, however, did not make a competency determination after properly indicating on September 25 that it had sufficient evidence to hold a competency trial after its earlier inquiry. *See* NT 9/25/07 at 4–9; *Lizcano-2*, ¶¶ 39–43, 186. The state habeas court also found that the trial court had not held a competency trial in reliance on trial counsel's decision to withdraw the prior motion. *See Lizcano-2*, ¶¶ 189–90. And it found no evidence of moderate or severe intellectual disability. *See id.* ¶ 191. Yet reliance on trial counsel's withdrawal of a motion was beside the point; the trial court had a sua sponte duty to act on the basis of the evidence it had found sufficient for a competency trial, including of intellectual disability, as discussed above.

## III.   TRIAL COUNSEL INEFFECTIVELY LITIGATED PETITIONER'S CLAIM THAT THE STATE UNCONSTITUTIONALLY STRUCK PROSPECTIVE JUROR RICHARD HOWARD ON THE BASIS OF HIS RACE; STATE HABEAS COUNSEL FAILED TO RAISE PRIOR COUNSEL'S INEFFECTIVENESS.[17]

102.   Following weeks of individual voir dire, forty-seven venire members were found qualified to sit on Mr. Lizcano's jury: thirty-two were white, eight were African-American, six were Hispanic, and one was Indian. Of the eight African-American venire members, the State exercised peremptory challenges to strike six. Among these six was Richard Howard, a black male who stated during voir dire that: (1) he was in favor of the death penalty for the crime of murder generally; and (2) the murder of a police officer in particular is the "appropriate type of case for the death penalty," as "police officers have a high status and they are there to protect us." NT 8/14/07 at 27–28, 30–31. Mr. Howard also repeatedly affirmed his ability to follow the

---

[17] This claim was initially pled as Claim X of the supplemented and amended habeas petition filed on June 14, 2007. ECF No. 32–2.

law and any instructions delivered by the trial court. *See, e.g., id.* at 41, 44, 49, 58.

103.    While trial counsel raised a challenge to the striking of the six African-American venire members under *Batson v. Kentucky*, counsel ineffectively litigated the claim, particularly with regard to Mr. Howard. Specifically, counsel failed to present readily available evidence demonstrating that the State's purported race-neutral justifications for striking Mr. Howard were merely pretexts. As a result of counsel's deficient performance, Mr. Lizcano was denied relief on a meritorious claim.

**A.    *Batson v. Kentucky* and Its Progeny Prohibit the Exclusion of Even a Single Potential Juror on the Basis of Race.**

104.    The Equal Protection Clause of the United States Constitution forbids a prosecutor from striking any potential juror on the basis of race. *Batson*, 476 U.S. at 79; *Swain v. Alabama*, 380 U.S. 202 (1965); *Strauder v. West Virginia*, 100 U.S. 303 (1879). Several vital interests are protected by this rule. Clearly, a defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85–86. Likewise, potential jurors have an equal protection right—enforceable by the defendant—"to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994). As the Supreme Court has explained:

> The very fact that [members of a particular race] are singled out and expressly denied . . . all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

*Powers v. Ohio*, 499 U.S. 400, 408 (1991) (quoting *Strauder*, 100 U.S. at 308). Finally, "the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism

42

respecting the jury's neutrality and undermines public confidence in adjudication." *Miller-El v. Dretke*, 425 U.S. 231, 238 (2005) (*Miller-El II*) (internal citations omitted).

105.    *Batson* sets forth a three part test for analyzing claims of discrimination in the selection of a jury. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the court must determine whether the defendant has shown purposeful discrimination. *Batson*, 476 U.S. at 96–97; *see also* (*Miller-El I*), 537 U.S. at 328–29; *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009).

106.    Once a *Batson* challenge reaches the third step, "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Batson*, 476 U.S. at 96–97; *see also Miller El-II*, 545 U.S. at 240–66 (providing a list of non-exhaustive, yet illustrative factors useful in "ferreting out" the discriminatory pretext of peremptory strikes). For instance, a showing that the government's justifications for a strike are not supported by the record is strong evidence that the strike was impermissibly motivated by race. *See, e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 479–86 (2008) (prosecutor's assertion he struck black juror because of juror's conflicting obligations was pretextual where the juror discounted the conflict); *Miller-El II*, 545 U.S. at 244 (rejecting *Batson* explanations that "mischaracterized" the voir dire). Likewise, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241; *Hayes v. Thaler*, 361 F. App'x 563, 567 (5th Cir. Jan. 19, 2010) (same). In conducting such a comparative analysis, the fact that a stricken black juror shares a "particular characteristic" with

an accepted non-black juror "is evidence that the asserted justification was a pretext for

discrimination, even if the two jurors are dissimilar in other respects." *Reed*, 555 F.3d at 376.

Also relevant is whether the prosecutor employed disparate questioning during the voir dire of

black and non-black jurors. *See Miller-El II*, 545 U.S. at 255 ("The next body of evidence that

the State was trying to avoid black jurors is the contrasting voir dire questions posed respectively

to black and nonblack panel members."); *Rhoades v. Davis*, 852 F.3d 422, 435 (5th Cir. 2017)

(finding a "substantial showing of constitutional violation" in connection with the striking of a

black venire member based on, inter alia, evidence that the prosecutor "questioned her more

extensively than the previous, white jurors").

107.    Additionally, courts will consider "broader patterns of practice" that may confirm

the inference of intentional discrimination. *Miller-El II*, 545 U.S. at 253. For example, courts

often look to the proportion of qualified minority venire members peremptorily struck by the

government in a given jury selection. *See*, *e.g.*, *id.* at 240 (observing that "prosecutors used their

peremptory strikes to exclude 91% of the eligible African-American venire members" and that

"[h]appenstance is unlikely to produce this disparity"); *Chamberlin v. Fisher*, No. 15–70012,

2017 WL 1506408, at *5 (5th Cir. Apr. 27, 2017) (holding that the "pattern of strikes," which

included the State striking "nearly two times as many black jurors as it accepted," was not

dispositive, but was "compelling evidence of intentional discrimination"). Courts will also

consider more generalized evidence that the striking party had a practice of systematically

excluding minorities from jury service. *See*, *e.g.*, *Flowers v. Mississippi*, 139 S. Ct. 2228, 2245

(2019) (explaining that defendants "may rely on 'all relevant circumstances'" and that courts

"may still consider historical evidence of the State's discriminatory peremptory strikes"); *Miller-

El II*, 545 U.S. at 253 (concluding that "the appearance of discrimination" created through its

44

examination of other factors was "confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected").

108.     In the event that the defendant establishes that even a single juror was excluded on the basis of race, a new trial is warranted. *See Batson*, 476 U.S. at 100 ("If the trial court decides that the facts establish, *prima facie*, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed."); *Snyder*, 552 U.S. at 478 ("The Constitution forbids striking even a single prospective juror for a discriminatory purpose."); *Reed*, 555 F.3d at 381 n.12 (same).

### B.     The State's Justifications for Striking Venire Member Howard Were Pretextual.

109.     Mr. Lizcano's trial counsel requested a *Batson* hearing at the conclusion of jury selection and challenged, inter alia, the State's use of a peremptory strike against African-American venire member Richard Howard. In response, the State claimed that it struck Mr. Howard because: (1) he would hold the State to a burden higher than beyond a reasonable doubt; (2) he got "argumentative" with the prosecutor; and (3) he preferred a sentence of life imprisonment over the death penalty. NT 9/6/07 at 69. An examination of the voir dire record reveals that each of these reasons was a mere pretext, particularly when the characteristics assigned to Mr. Howard are compared side-by-side with those of non-black jurors accepted by the State. The pretextual nature of the strike is confirmed by broader evidence regarding the State's use of peremptory challenges in the seating of Mr. Lizcano's jury, as well as evidence that the Dallas County District Attorney's Office generally continued to engage in well-documented practices aimed at systematically excluding African-Americans from juries at the

45

time of Mr. Lizcano's trial.

> **1.    The State's justifications mischaracterized the record and were belied by the State's acceptance of similar non-black jurors.**

110.    The State's first justification—that Mr. Howard would hold the State to a higher standard of proof—constituted a misrepresentation of Mr. Howard's views. In fact, Mr. Howard *expressly and repeatedly* stated that he would need to be convinced only of guilt beyond a reasonable doubt:

> Q. . . . But between—is beyond a reasonable doubt high enough for you? Or do you need to be convinced beyond all possible doubt?
>
> A. I wouldn't say—I'll say reasonable doubt.
>
> Q. Okay. . . . So that's not going to be a burden that is higher than the assault case?
>
> A. Right.
>
> Q. You are going [to] hold us to that same level, the burden of proof, if we convince you of each and every element beyond a reasonable doubt, that is sufficient in your mind?
>
> A. Yes. Yes.
>
> Q. So it is still beyond a reasonable doubt, so there may be some other doubt. I mean, if you look at the wording of it, it is not beyond all possible doubt.
>
> A. Right.
>
> Q. That is good for you?
>
> A. That is good for me.

NT 8/14/07 at 38–39. These were not equivocal responses. Indeed, in light of this record, the trial court denied the State's motion to strike Mr. Howard for cause on the basis of his purported unwillingness to apply the proper burden of proof, *id.* at 81, which is further evidence that the justification was pretextual. *See, e.g.*, *Hayes*, 361 F. App'x at 572 (rejecting the State's race-neutral justifications for striking a juror, in part, because "the prosecutor attempted to challenge [the venire member] for cause on precisely these grounds before using a peremptory strike and the trial court ruled that [the venire member] remained qualified").

46

111.     Furthermore, while Mr. Howard did initially express some confusion as to the difference between "beyond a reasonable doubt" and "beyond all doubt," seated white juror Thomas Rau did the same. Specifically, Mr. Rau stated that he had never before thought of the difference between "reasonable versus all possible doubt," and then asked the prosecutor whether "all possible doubt [is] the same [as] without a shadow of a doubt?" NT 7/12/07 at 104–05. Moreover, when asked whether he could hold the State to the legally prescribed standard or a higher burden of proof, Mr. Rau responded only: "*I think* reasonable doubt." *Id.* at 105. Although this response was far less emphatic than the multiple answers given by Mr. Howard quoted directly above, the State asked Mr. Rau no follow up questions on the matter.

112.     The State's failure to follow up with Mr. Rau as to his views on reasonable doubt also casts substantial doubt on its second justification for striking Mr. Howard. Specifically, the State described Mr. Howard as "argumentative," but the record shows that, unlike with respect to Mr. Rau, the State repeatedly hammered Mr. Howard with repetitive questions after he had provided a clear answer. The record also shows that the State interrupted Mr. Howard as he was trying to get clarity on the difference between reasonable doubt and all possible doubt. *See* NT 8/14/07 at 33 (Mr. Howard saying: "Wait a minute. Let me finish."). The State's examination of Mr. Rau on the subject reads very differently, suggesting that the State employed disparate examination styles for the purpose of being able to later argue that Mr. Howard was "argumentative."

113.     Additionally, unlike the two other ostensibly race-neutral justifications forwarded by the State at the *Batson* hearing, the prosecution made no mention of Mr. Howard's

"argumentative" behavior when it moved to strike him for cause. *See id.* at 81.[18] The Supreme Court has previously expressed suspicion regarding similar later-asserted *Batson* justifications. *See, e.g.*, *Miller-El II*, 545 U.S. at 246 (purportedly race-neutral justification that was raised by the State only after its first justification had been called into question "reek[ed] of afterthought"); *Foster v. Chatman*, 136 S. Ct. 1737, 1754 (2016) (citing the government's "shifting explanations" for its strikes as further evidence of intentional discrimination).

114.    The State's final justification—that Mr. Howard purportedly preferred a life sentence over a death sentence—was as pretextual as the other two. The State's claim once again mischaracterized the prospective juror's views, as the trial court recognized in rejecting a challenge for cause based on the same claim. NT 8/14/07 at 81. In reality, Mr. Howard indicated on his juror questionnaire that on a scale of one-to-ten measuring how strongly he felt about the death penalty, with ten being the strongest in favor, he would be a four, because it was "kind of in the middle." *Id.* at 31. Juror Rau, meanwhile, marked the same question with *a three* and explained that he was "not . . . itching to convict someone and have them suffer the death penalty." NT 7/12/07 at 97. And, while a four may indicate that there would be *some* cases in which Mr. Howard would prefer life imprisonment, the same was true for seated white jurors like Jason Koshimahi, who expressly stated that there "definitely would be cases where [he] would be more inclined to life in prison and cases more inclined for the death penalty." NT

---

[18] Nor did the trial court agree with or otherwise give credence to the State's claim that Mr. Howard was argumentative when it was raised at the *Batson* hearing. *Cf. Snyder*, 552 U.S. at 479 (where the prosecutor provides multiple reasons for dismissing a juror, only one of which is demeanor-based, and the trial court rejects the *Batson* challenge without explanation, a reviewing court "cannot presume that the trial judge credited the prosecutor's assertion" regarding the juror's demeanor); *Hayes*, 361 F. App'x at 572 (holding that, where no finding as to demeanor was made by trial court, no deference could be given to the trial court's dismissal of *Batson* challenge based on the purported demeanor of the venire member).

8/14/07 at 203.

115.    Lest there be any doubt, Mr. Howard clarified during voir dire that, to the extent he would prefer a sentence of life imprisonment, it would be where the State's case was "not strong," *id.* at 32, revealing not a bias for a life sentence over a death sentence, but rather a considered and commonly held determination to be certain about any decision to impose the death penalty—a determination shared by American law itself.

116.    Notably, seated white juror Koshimahi also indicated that the strength of the State's case would influence his feelings on the appropriate penalty. Specifically, when asked what he thought about a life sentence as punishment for a capital murder, Mr. Koshimahi responded:

> I would probably go strictly by the facts, and then if it ever came down to a difficult decision where the facts were, you know, were real, real close and I had to make a difficult decision like that, was real, real close and you couldn't decide, I would vote for life imprisonment. . . . I would think I would need to feel comfortable about doing the death penalty.

NT 8/14/07 at 206. Moreover, Mr. Koshimahi later stated that, even after finding a defendant guilty of capital murder and determining that it was probable he would commit future acts of violence constituting a threat to society, he "*would lean more towards life in prison without parole*." *Id.* at 221 (emphasis added).

117.    Mr. Rau also indicated that the prospect that a person sentenced to death could later be exonerated by DNA evidence, or shown to have been represented by ineffective counsel, gave him "pause" when "thinking about the death penalty." NT 7/12/07 at 92. Thus, in Mr. Rau's view, "you better have strong convictions on the evidence that is presented that you feel comfortable with what has been presented to arrive at that decision." *Id.* Unlike Mr. Howard's views, Mr. Rau's and Mr. Koshimahi's views could readily be classified as communicating a

49

preference for life imprisonment over the death penalty, yet the State raised no challenges to Jurors Koshimahi and Rau.

> **2.     The appearance of discrimination is confirmed by broader patterns in the selection of Petitioner's jury and in the historical practices of the Dallas County District Attorney's Office.**

118.     The appearance of intentional discrimination demonstrated immediately above is confirmed by two additional factors: (1) the State's disproportionate use of its peremptory strikes to prevent persons who were not both white and male from sitting on Mr. Lizcano's jury, and (2) the Dallas County District Attorney's Office's well-established history of intentional discrimination in the selection of juries generally.

119.     As to the first factor, the most disturbing statistic is the State's use of its peremptory challenges to remove six of eight—or a full 75 percent—of the African-American venire members. By contrast, the State struck seven of the thirty-two white jurors, or 22 percent. Looked at from a different perspective, of the thirty-one jurors that the State found acceptable,[19] two were African-American, representing 6 percent. Meanwhile, the State did not strike a single white male venire member. Rather, in addition to the six African-Americans, the State struck two Hispanic males, one Indian female, and seven white females.[20] While such statistics are rarely deemed dispositive,[21] courts often find suspiciously disproportionate strike rates to be

---

[19] This figure includes the twelve jurors seated, the one alternate juror, and the eighteen jurors stricken by the defense.

[20] Of course, the Equal Protection Clause not only prevents the State from striking prospective jurors on the basis of race, but generally guarantees a defendant's right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *J.E.B.*, 511 U.S. at 128 (quoting *Batson*, 476 U.S. at 85–86).

[21] Such a finding is contemplated by the *Batson* decision, in which the Court recognized that "total or seriously disproportionate exclusion" of black jurors is "itself such an unequal application of the law" that it could show intentional discrimination. *Batson*, 476 U.S. at 93

"compelling evidence of intentional discrimination." *Chamberlin*, No. 15–70012, 2017 WL 1506408, at *5 (citing fact that State exercised 62 percent of its strikes on black jurors); *see also Miller-El II*, 545 U.S. at 240 (noting that prosecutors used peremptory strikes to exclude 91 percent of eligible black venire members); *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 516 (Tex. 2008) (describing one party's use of peremptory challenges to strike five of six African-Americans as "remarkable").

120.    The second factor that serves to confirm that Mr. Howard was struck on the basis of his race is that Mr. Lizcano was prosecuted by the Dallas County District Attorney's Office, an office with a long history of racial discrimination in jury selection practices. Indeed, the United States Supreme Court documented, and denounced, these practices in both the *Miller-El I* and *Miller-El II* decisions. *See Miller-El I*, 537 U.S. at 334–35; *Miller-El II*, 545 U.S. at 263–64. And while Mr. Miller-El's trial occurred in 1986, a detailed exposé published in the *Dallas Morning News* in 2005 revealed that the culture condemned by the Court remained largely intact under District Attorney Bill Hill, who led the office from 1999 through 2006. *See* Steve McGonigle et al., *A Process of Juror Elimination*, Dallas Morning News, August 21, 2005. The report was based on a two-year investigation into 108 non-capital felony cases tried in 2002, including interviews with prosecutors, defense lawyers, jurors, judges, and scholars, as well as a review of thousands of juror information cards and voir dire transcripts. Based on this information, the reporters concluded that "[p]rosecutors excluded eligible blacks from juries at more than twice the rate they rejected eligible whites." *Id.* It continued:

---

(internal quotation marks omitted); *see also Akins v. Texas*, 325 U.S. 398, 403–04 (1945) (a "purpose to discriminate" may be "proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination").

> In fact, being black was the most important personal trait affecting which jurors prosecutors rejected. . . . Jurors' attitudes toward criminal justice issues also played an important role, but even when blacks and whites answered key questions the same way, blacks were rejected at higher rates.

*Id.*

121.    The article also contained disturbing testament supporting its conclusions. For instance, District Judge Henry Wade, Jr., told the reporters that, although there may no longer be a formal policy, racial stereotyping remained "institutional" within the District Attorney's Office. *Id.* According to Judge Wade: "[I]nformally prosecutors talk and say, you know, 'What can we do to get minorities off the jury panel?'" *Id.* Supporting this view, Phillip Hayes, a prosecutor under Mr. Hill for five years, "said he learned from supervisors and more experienced peers to be wary of blacks." *Id.* Hayes continued: "No one ever came out and said it aloud—or put it in writing—but the pervasive side was that many didn't think that African-Americans made good jurors for the state." *Id.* And former prosecutor Jeanine Howard, who left the office in the late 1990s to work as a defense attorney, reported that she continued to see Mr. Hill's staff using the same "excuses" she had been taught to use in striking black jurors under Mr. Hill's predecessor. "Having been on both sides, I know what they're doing," Ms. Howard said. "They know there are techniques you can use." *Id.*

122.    Mr. Lizcano's voir dire began in June 2007, several months after Craig Watkins was elected to replace Bill Hill as Dallas County District Attorney. However, each of the three Assistant District Attorneys who participated in Mr. Lizcano's voir dire had joined the office by the year 2000, meaning each had served for all or nearly all of Mr. Hill's tenure, which began in 1999. *Cf. Miller-El I*, 537 U.S. at 347 ("Even if we presume at this stage that the prosecutors in Miller-El's case were not part of this culture of discrimination, the evidence suggests they were likely not ignorant of it. Both prosecutors joined the District Attorney's Office when assistant

district attorneys received formal training in excluding minorities from juries."). Thus, as in *Miller-El II*, there is evidence here of a "general policy of the Dallas County District Attorney's Office to exclude black venire members from juries" at the time of Mr. Lizcano's trial, and that evidence serves to confirm "the appearance of discrimination" established by a review of the voir dire record discussed immediately above. *Miller-El II*, 545 U.S. at 253.

123.    To the extent there is any doubt as to the prosecution's reasons for striking Mr. Howard, discovery and a hearing are appropriate. As the Supreme Court recently recognized in *Foster*, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial . . . evidence of intent as may be available." *Foster*, 136 S. Ct. at 1748 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Thus, in *Foster*, the Court considered documents and handwritten notes obtained from the prosecution's case file in assessing the petitioner's *Batson* claim. Mr. Lizcano's *Batson* claim should benefit from the same "sensitive inquiry" into any circumstantial evidence of racial intent as may be available. The Court has already ordered that Respondent file, within thirty days of filing a responsive pleading, "copies of all juror questionnaires answered by any and all members of the jury venire from which Petitioner's petit jury was selected." ECF No. 56, ¶ 8. Petitioner requests that Respondent also include any documents and handwritten notes from the prosecutor's case file relevant to jury selection.

### 3.    Conclusion

124.    In sum, Mr. Howard's attitudes towards the burden of proof and the circumstances under which he would "prefer" life imprisonment, in the abstract, were entirely appropriate and, in fact, more favorable for the State then the attitudes expressed by seated white jurors Rau and Koshimahi. And the record does not reflect any "argumentative" exchange with

53

Mr. Howard, though it does suggest that the prosecution may have been seeking one, again contrary to its approach with non-black jurors. Furthermore, the intentional discrimination apparent from a review of the record is confirmed by broader patterns in Mr. Lizcano's case and others prosecuted by the Dallas District Attorney's Office. Nevertheless, because both trial counsel and appellate counsel failed to present evidence demonstrating the pretextual nature of the State's justifications, the *Batson* claim was dismissed at trial and on direct appeal.

### C.   Trial Counsel Ineffectively Litigated the *Batson* Challenge.

125.    Professional standards of reasonableness required that trial counsel not only raise a *Batson* claim challenging the State's removal of Mr. Howard, but also that counsel effectively litigate that claim. *See, e.g.*, ABA Guidelines, Guideline 10.8(B)(1) ("Counsel who decide to assert a particular legal claim should . . . present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction."); *see also* Texas Capital Counsel Guidelines, 69 Tex. B.J. at 972 (Guideline 11.2(B)(1)) (same). Here, effectively litigating the claim required that counsel raise "all relevant circumstances" supporting "an inference of purposeful discrimination." *Batson*, 476 U.S. at 96–97; *see also United States v. Guerra-Marez*, 928 F.2d 665, 673 n.9 (5th Cir. 1991) ("When an allegation of pretext is raised, *the defendant* bears the burden of convincing the district court that the proffered reasons are pretextual by introducing evidence of comparability.") (quoting *United States v. Alston*, 895 F.2d 1362, 1374 (11th Cir. 1990) (Hatchett, J. concurring)) (emphasis in original).

126.    Trial counsel failed to comply with standards of professional reasonableness in litigating Mr. Lizcano's *Batson* challenge. In response to the State's assertion of purportedly race-neutral justifications for striking Mr. Howard, trial counsel merely cited to several responses

Mr. Howard wrote in his *juror questionnaire* that suggested he was a favorable witness to the prosecution. *See* NT 9/6/07 at 72–74. Such information was obviously irrelevant to exposing the State's justifications as pretextual mischaracterizations of the *voir dire* record. Moreover, counsel made no reference to the views of seated white jurors that were consistent with those attributed to Mr. Howard by the State and used as justification for its peremptory strike. And although trial counsel did highlight the fact that the State struck six of the eight qualified African-American venire members, they did not affirmatively argue that the State's purportedly race-neutral justifications should be examined for pretext against the backdrop of such statistical evidence. Nor did trial counsel make any mention of the Dallas County District Attorney Office's well-documented history of intentional discrimination against African-American venire members, let alone evidence that those practices were continuing at the time of Mr. Lizcano's trial.

127.    Mr. Lizcano was prejudiced. Given the substantial evidence suggesting that the State acted unconstitutionally in striking Mr. Howard, there is a reasonable probability that the *Batson* challenge would have been successful had counsel effectively litigated the issue. And, because the exclusion of even a single juror on the basis of race violates the Equal Protection Clause and requires a new trial, Mr. Lizcano's conviction would have been reversed. *Batson*, 476 U.S. at 89.

### D.    State Habeas Counsel Failed to Raise Prior Counsel's Ineffectiveness.

128.    For the reasons above, Mr. Lizcano's ineffective-assistance claim with regard to the State's peremptory strike of Mr. Howard is substantial. Yet state habeas counsel failed to raise it. No strategic basis could justify this failure, and state habeas counsel has stated there was in fact no strategic basis. A476–48, ¶¶ 4, 9. Thus, Mr. Lizcano can demonstrate cause to

overcome any procedural default. *See Trevino*, 829 F.3d at 347–49; *Martinez*, 566 U.S. at 14;

*Canales*, 765 F.3d at 570–71. He establishes prejudice because the defaulted claim was

meritorious. *See Detrich*, 740 F.3d at 1246.

**IV. THE PROSECUTOR'S CLOSING ARGUMENT WAS GROSSLY IMPROPER; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT AND STATE HABEAS COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE TRIAL COUNSEL'S ERROR IN FAILING TO OBJECT TO THE PROSECUTOR'S MISCONDUCT.[22]**

129.     The prosecutor engaged in pervasive misconduct throughout his closing argument

in the guilt phase of Mr. Lizcano's trial. In particular, he inflamed the passions of the jury by

warning them that a "not guilty" verdict would directly impact their safety by making it likely

that nobody would ever join the police force again and impugned defense counsel. Trial counsel

failed to object to these improprieties, and state habeas counsel neglected to raise trial counsel's

failure to do so. The prosecutor's conduct "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974).

130.     In assessing prosecutorial misconduct claims, the Fifth Circuit employs a two-step

analysis, determining (1) "whether or not the prosecutor made an improper remark[,]" and (2)

whether the improper remark "affected the substantial rights of the defendant." *United States v.

Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999). Improper remarks made by a prosecutor

may be grounds for reversal where such remarks are "so prejudicial that the . . . trial was

rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth

Amendment." *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988). To meet this burden, the

---

[22] This claim was initially pled as Claim XI of the supplemented and amended habeas petition filed on June 14, 2007. ECF No. 32–2.

petitioner must demonstrate that "the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." *Id*. Here, the prosecutor's misconduct was persistent and pronounced, and Mr. Lizcano's right to effective assistance of counsel was violated by trial counsel's failure to object.

### A.   The State's Plea on Behalf of Law Enforcement and Request that Jurors "Send a Message" Exceeded Constitutional Limits.

131.   During guilt phase closing, the prosecutor w asked the jurors to place themselves in the role of possible victims by emphasizing how dependent they are on police protection. He argued that police officers "aren't the dangers. They're the ones out there protecting you and I from the dangerous individuals like this man right here (indicating), Juan Lizcano, who's out of control." NT 10/9/07 at 74. He described the victim as someone who worked "to protect you and I who works to insure our safety was the one that ended up with the bullet in his body" and as "the Brian Jackson who was trying to protect every one of us." *Id*. at 10–11, 20–21.

132.   The prosecutor stated that he hoped "the 12 of y'all hope we have more officers like Officer Jackson. I hope everyone in the county wishes we had more officers like Officer Jackson." *Id*. at 20. "Send a message to defendants like this. Send a message to everybody in the courtroom. Send a message to every citizen in Dallas County, you can't go around killing Dallas police officers. You can't go around shooting at Dallas police officers. You can't go around threatening and shooting at civilians. We don't do that here." *Id*. at 24.

133.   The prosecutor compounded this error by explicitly calling attention to the large number of police officers present in the courtroom during closing argument: "Ladies and gentlemen, these officers put on that uniform, that blue uniform—*you see a lot of them out here today*—put it on every day, every single day to protect you and me and Dallas County and the

57

citizens in this county. They, those men and women in blue, showed amazing restraint." *Id.* at 72 (emphasis added).

134.    The prosecution's closing guilt phase argument was also improper because it invoked the juror's loyalty to the police department. *See United States v. Goff*, 847 F.2d 149, 164 (5th Cir. 1988), *opinion modified on reh'g* (July 18, 1988) ("The role of the prosecutor in closing argument is to assist the jury in analyzing, evaluating, and applying the *evidence*. It is not to invoke jurors' loyalty to their country or its government as a reason for convicting the accused."). The prosecution invoked this duty by saying that defense counsel had "the audacity, after their client gunned down Officer Brian Jackson . . . to defend him . . . by accusing these officers of being liars and cowboys[.]" NT 10/9/07 at 74. "Confronted with such argument, jurors could be expected to feel that in order to find appellants innocent they would have to abandon confidence in the integrity of government." *Goff*, 847 F.2d at 164.

135.    These arguments were improper emotional pleas and invitations for jurors to see themselves as possible victims. *See Bradly v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985) (inviting jurors to think about how they would feel if they lost their children was an improper "plea for abandonment of objectivity"). These emotional entreaties to the jury "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

   **B.    The Prosecution Improperly Impugned Defense Counsel during Guilt Phase Summation.**

136.    During guilt phase closing statement, the prosecution also directly attacked the integrity of defense counsel, stating:

> Ladies and gentlemen, I hate to use adages, but this case just cries out for it. You heard the saying where a person stands on an issue depends on where they sit? Now, Mr. Sanchez and Ms. Busbee sit right next to the Defendant, Juan Lizcano.

> It's a little wonder why they got up here and looked you in the eye and told you
> some of the things they told you. It sounded like they weren't even in this trial.

NT 10/09/07 at 66. The prosecutor was telling the jury that defense counsel would say anything

simply because they were representing Mr. Lizcano.

137.    The prosecutor expressed outrage at defense counsel's cross-examination of

certain witnesses, saying, "That's the best they got, ladies and gentlemen. I guess when you

don't have anything, you just go on the offensive and you attack, attack, attack." *Id.* at 67–68.

Referring to questions defense counsel had asked during the trial regarding possible excessive

force, the prosecutor asked the jury, "Don't you think that's pretty offensive?" *Id.* at 72. He went

on to ask, while pointing at defense table, "[C]an you believe what you heard from that table?"

*Id.*

138.    The prosecution continued to lament the "offensiveness" of trial counsel, saying

"[t]hey have the audacity, after their client gunned down Officer Brian Jackson . . . to defend him

here in this courtroom by accusing these officers of being liars and cowboys. That's offensive."

*Id*. at 73. The prosecutor speculated as to why counsel chose to question the officers' veracity,

again suggesting that her proximity to Mr. Lizcano affected her judgment: "I don't know why

they did it. I guess she felt tremendous—since she's sitting beside him, her client, Juan Lizcano,

who had already fired a weapon into Marta Cruz's ceiling." *Id*.

139.    The prosecutor also implied that defense counsel had made false accusations

during cross-examination:

> And I want you to also remember, ladies and gentlemen, because Defense counsel
> basically accused every civilian witness that came to testify about INS permits,
> about the State calling one of its witnesses a whore for hanging out with someone
> younger. About someone who had been drinking the whole night. Remember they
> said, well, didn't you tell my investigator so and so? Well, ladies and gentlemen,
> her investigator's sitting in the front row right there (indicating). Her investigator,
> as you know, could have taken the stand and testified to any of this and could

59

have said any of that. But they didn't do that.

*Id.* at 22. The implication was that defense counsel, in cross-examining certain witnesses, was making false accusations.

140.    Defense counsel did not object to any of these improper arguments.

141.    A "prosecutor may not challenge the integrity and ethical standards of defense counsel[.]" *United States v. Murrah*, 888 F.2d. 24, 27 (5th Cir. 1989). By arguing to the jury that defense counsel was making "offensive" arguments and doing so because of the fact that they chose to "sit right next to the Defendant," the prosecution was impugning counsel's integrity. The prosecutor's comment on counsel's failure to call their investigator to the stand implied that the defense team was hiding something. This comment was "damaging to counsel's credibility before the jury" and thus improper. *Id.* at 27.

142.    Texas courts have long criticized argument that "strikes at the accused over the shoulders of his counsel." *Lopez v. State*, 500 S.W.2d 844, 846 (Tex. Crim. App. 1973). An argument attacking defense counsel in an effort to inflame the minds of the jury to the accused's prejudice can not be condoned."); *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (prosecutor's argument that defense counsel wanted the jury "to take a side road, a series of side roads, rabbit trails, and a rabbit trail that would lead you to a dead-end" was inappropriate); *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995) ("We have consistently held that argument which strikes at a defendant over the shoulders of defense counsel is improper.").

143.    The repeated implications that defense counsel were somehow untrustworthy because of the very fact they were representing Mr. Lizcano was an improper attack on their character and ethics. *See Lewis v. State*, 529 S.W.2d 533, 534 (Tex. Crim. App. 1975) (reversible

60

error for prosecution to argue that prosecutors "have taken a solemn oath to God to seek justice. . . . No such oath bears on either one of these attorneys" and asking jury whether defense counsel "want the truth in here before you[.]"); *Crutcher v. State*, 481 S.W.2d 113 (Tex. Crim. App. 1972) (improper for prosecutor to state that "wherever [defense counsel] has gone, he is not down on his knees praying to his God. I can assure you that . . ."); *Bray v. State*, 478 S.W.2d 89, 89 (Tex. Crim. App. 1972) (reversible error where prosecutor argued: "[O]ur client is not here to confer with us, we represent you folks. . . . I am grateful and I shall be eternally grateful that you are the people that are my employers and not the likes of [defendant]."); *Dykes v. State*, 325 S.W.2d 135, 136 (Tex. Crim. App. 1959) (reversing conviction due to improper argument by prosecutor that he represented "the folks who pay my salary; I think I am a little prouder of that than I would be being a mouthpiece for a bunch of rapists, thieves and murderers").

144.     In *Bray*, the CCA reversed a conviction where the prosecutor had argued to the jury:

> Our client doesn't sit here at the counsel table with us and our client is not here to confer with us, we represent you folks . . . . That's who are (sic) employer is and suffice it to say Ladies and Gentlemen I am grateful and I shall be eternally grateful that you are the people that are my employers and not the likes of. . . .

*Bray*, 478 S.W.2d at 89. In reversing the conviction, the court noted that indigent defense was "in the finest tradition of the Texas and American Bars," that defense counsel has a duty to her client, and that "these canons of ethics are not generally understood by the public from which the members of the jury panel are drawn." *Id.* at 90. Thus, criticizing defense counsel for representing a criminal defendant was both improper and prejudicial. Here, the prosecutor invited the jury to judge defense counsel based on the fact that they represented Mr. Lizcano. The prosecutor twice did this explicitly—when he referred to the saying that "where a person stands on an issue depends on where they sit" and again when he said that defense counsel was

questioning force used in this arrest because "I guess she felt tremendous—since she's sitting beside him, her client, Juan Lizcano." NT 10/09/07 at 66, 73. "It is axiomatic that the State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity." *Wilson v. State*, 938 S.W. 2d 57, 60 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 78 S.W. 3d 352 (Tex. Crim. App. 2002) (quoting *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984)).

145.    The prosecution's guilt phase argument "struck at the defendant over the shoulders of his counsel" and violated his due process rights, and counsel should have objected.

### C.    The Cumulative Effect of the Prosecutor's Misconduct Deprived Mr. Lizcano of a Fair Trial.

146.    Both individually and taken together, the improper remarks distracted jurors from the evidence before them. *See United States v. Socony-Vacuum Co.*, 310 U.S. 150, 240 (1940) (prosecutor's repeated improper remarks were "cumulative evidence of a proceeding dominated by passion and prejudice"). The misconduct was "pronounced and persistent, with a probably cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger*, 295 U.S. at 88.

### D.    Trial Counsel and State Habeas Counsel Were Ineffective for Failing to Raise Prosecutorial Misconduct Claims.

147.    Trial counsel were ineffective for failing to object to the prosecutor's improper closing argument and for failing to seek a mistrial or, at a minimum, a curative instruction. *See Strickland*, 46 U.S. at 695. There is no reasonable trial strategy that would allow the prosecutor to so inflame the passions of the jury. Counsel's failure to object meant that the prosecutor's inflammatory rhetoric went unchecked. Jurors deliberated on Mr. Lizcano's guilt having been exhorted by the prosecutor to consider defense attorneys as biased and unethical. They weighed the appropriate verdict with the prosecutor's exhortations to support law enforcement and

62

maintain law and order in their community. Without an objection to rein in his improper argument, the prosecutor introduced pervasive improprieties to his summation. By the end of closing argument, no instruction would have been sufficient to remove the taint, and the prosecutor's improper statements rose to the level of a due process violation.

148.     State habeas counsel also failed to raise Mr. Lizcano's claim of trial counsel ineffectiveness based on counsel's failure to object. Mr. Lizcano's his ineffective-assistance claim is substantial. While state habeas counsel focused narrowly on the intellectual-disability issue, they tried to include as many issues as possible and did not exclude any issues for strategic reasons. A476. The prosecutor's improper closing was plain from the trial transcript, to which state habeas counsel had access. State habeas counsel deprived Mr. Lizcano of the opportunity to have this claim heard by a state court. Any procedural default here can be excused by state habeas counsel's ineffectiveness. *See Trevino*, 829 F.3d at 347–49; *Martinez*, 566 U.S. at 14; *Canales*, 765 F.3d at 570–71.

## V.   MR. LIZCANO'S CONVICTION IS UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF PRIOR COUNSEL'S INADEQUATE REPRESENTATION AND THE TRIAL COURT'S DENIAL OF DUE PROCESS; STATE HABEAS COUNSEL INEFFECTIVELY FAILED TO RAISE A CUMULATIVE ERROR CLAIM.[23]

149.     Petitioner's conviction and sentence were the product of multiple, egregious constitutional violations by prior counsel and the trial court. As set out above, each of these violations was of such magnitude as to undermine the reliability of the verdict and require relief. However, even if the Court determines that Petitioner failed to meet his burden to prove the prejudice resulting from any one of these violations, it is well established that the Court must

---

[23] This claim was initially pled as Claim XIII of the supplemented and amended habeas petition filed on June 14, 2007. ECF No. 32–2.

also examine whether the cumulative effect of these errors violated Petitioner's right to due process of law. *See, e.g.*, *Spence v. Johnson*, 80 F.3d 989, 1000–01 (5th Cir. 2004) (relief is warranted for cumulative error when "the constitutional errors committed in the state trial court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness'"); *Taylor v. Kentucky*, 436 U.S. 478, 487–88 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

150.    State habeas counsel failed to raise a cumulative error claim. No strategic basis could justify this failure. Thus, Mr. Lizcano can demonstrate cause to overcome any procedural default. *See Trevino*, 829 F.3d at 347–49; *Martinez*, 566 U.S. at 14; *Canales*, 765 F.3d at 570–71.

**REQUEST FOR RELIEF**

Petitioner Juan Lizcano respectfully requests that the Court grant the following relief:

A)      That Mr. Lizcano be granted such discovery as is necessary for a full and fair resolution of the claims contained in his Petition;

B)      That leave to further amend his Petition, if necessary, be granted;

C)      That an evidentiary hearing be conducted on all claims involving disputed issues of fact; and

D)      That Mr. Lizcano's conviction be vacated.


Respectfully submitted,

| | |
|---|---|
| */s/ Debra J. McComas* | */s/ Shawn Nolan* |
| Debra J. McComas | Shawn Nolan |
| State Bar No. 00794261 | PA Bar No. 53565 |
| Debbie.McComas@haynesboone.com | Chief, Capital Habeas Unit |
| Stephanie Sivinski | Federal Community Defender for the |
| State Bar No. 24075080 | Eastern District of Pennsylvania |
| Stephanie.Sivinski@haynesboone.com | Suite 545 West, The Curtis |
| HAYNES & BOONE, LLP | 601 Walnut Street |
| 2323 Victory Ave. Suite 700 | Philadelphia, PA 19106 |
| Dallas, TX 75219 | (215) 928 0520 |
| Telephone: (214) 651-5000 | shawn_nolan@fd.org |
| Fax: (214) 651-5940 | **Counsel for Juan Lizcano for Part B** |
| **Counsel for Juan Lizcano for Part A** | |

Dated: January 5, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2021, the foregoing document was filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served on all counsel of record via e-service.

W. Erich Dryden
Attorney General of Texas
Capitol Station
PO Box 12548
Austin, TX 78711-2548

/s/ Shawn Nolan
Shawn Nolan