UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JUAN LIZCANO, §
§
　　　　Petitioner, §
§
v. §
§   No. 3:16-CV-1008-B-BN
§
BOBBY LUMPKIN, Director, Texas §
Department of Criminal Justice, §
Correctional Institutions Division, §
§
　　　　Respondent. §

<u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Juan Lizcano filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his state court conviction for capital murder. For the reasons set forth below, all relief requested in Lizcano's second amended federal habeas corpus petition is denied and Lizcano is denied a Certificate of Appealability on all of his claims for relief.

## I. BACKGROUND

### A. The Offense

A detailed account of Lizcano's capital offense appears in the Texas Court of Criminal Appeals' opinion affirming Lizcano's conviction on direct appeal. *Lizcano v. State,* AP-75,879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010).

For purposes of this cause, it is sufficient to explain that on November 13, 2005, Juan Lizcano fatally shot Dallas police officer Brian Jackson. That fact is unassailable. Just weeks before the fatal shooting, while he was being booked by a different officer on a charge of driving while intoxicated, Lizcano angrily announced to a roomful of police officers and other witnesses

that the next time he encountered a police officer he would kill that officer.  The Dallas police did not take Lizcano's threat seriously, did not press charges for making a terroristic threat, and did not alert federal immigration authorities to Lizcano's status as an undocumented Mexican citizen.  As explained below, Lizcano later made good on his threat.

The events of the night in question are also not seriously in dispute.  Lizcano went to the home of one of his girlfriends, Marta Cruz, and demanded to know why Cruz had not answered his phone calls that evening.   When he became dissatisfied with Cruz's answer, Lizcano threatened Cruz and fired a shot into the ceiling of her bedroom before he fled the scene.  Cruz called police, who arrived shortly thereafter.  Police left the scene after taking Cruz's statement and being assured by her that she planned to go stay with a friend.  Minutes after police left Cruz's residence, however, Lizcano called Cruz, who informed Lizcano that she had called the police.  Lizcano responded that he was watching her residence and could see that the police had left.  Cruz hung up on Lizcano, called the police again, and hid inside a closet in her home.

When police arrived at Cruz's residence the second time, they observed Lizcano's vehicle parked in front of Cruz's home with Lizcano's acquaintance Jose Fernandez (a/k/a Yayo) asleep inside.  The police conducted a search for Lizcano in the area near Cruz's home.  At one point during that search Lizcano fired multiple shots at a group of uniformed officers searching an alleyway.  None of the officers were hit or returned fire.  Very shortly thereafter as officer Jackson walked around a home not far from where Lizcano had attempted to ambush other officers, Lizcano fired multiple shots at officer Jackson, one of which struck the uniformed officer in the right arm and then the right armpit.  Lizcano's bullet traversed officer Jackson's right lung, heart,

2

aorta, and left lung before lodging in his back muscles.  The shot proved fatal.  Evidence at the crime scene suggested officer Jackson managed to get off a few rounds with his rifle as he fell at the spot where he had been fatally wounded.  Lizcano was uninjured by officer Jackson's return fire.  He was arrested at the scene.  His empty handgun was recovered only a few feet from where he was hiding.

## B. Trial Court Proceedings[1]

### 1. Indictment

On December 5, 2005, a Dallas County grand jury indicted Lizcano on a charge of capital murder for fatally shooting officer Jackson while in the lawful discharge of his official duties when Lizcano knew officer Jackson was a peace officer.  Clerk's Record of pleadings, motions, and other documents filed in Dallas County cause no. F-0559563 (henceforth "C.R."), at 2-3, 6-7.

### 2. The Prosecution's Guilt/Innocence Phase Evidence

The guilt-innocence phase of Lizcano's capital murder trial commenced on October 1, 2007.  Marta Cruz testified about her encounter with Lizcano the night of officer Jackson's murder as well as Lizcano's subsequent telephone call to her.  Testimony of Marta Cruz, 42 R.R. Trial 165-218; 43 R.R. Trial 7-19.  The Dallas police officer who responded to a disturbance call at Cruz's residence testified she was at the station when Cruz's second call came in about forty minutes after the first call.  Testimony of Lori Rangel, 43 R.R. Trial 36-58.  The officers who

---

1. Throughout Lizcano's trial and state habeas corpus proceedings, a number of experts and other witnesses testified extensively regarding the issue of whether Lizcano is "mentally retarded" or suffers from "mental retardation."  Consistent with the terminology included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, this court will employ the terms "intellectually disabled" and "intellectual disability," respectively.  *See Hall v. Florida*, 572 U.S. 701, 704 (2014) (recognizing the change in terminology in federal statutes necessitated by the change in terminology in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition).

responded to the second call from Cruz testified about their search for Lizcano, his attempt to ambush officers searching a nearby alleyway, and their arrest of Lizcano.  Testimony of David Hodges, 43 R.R. Trial 59-86; Testimony of David Owen Gilmore, 43 R.R. Trial 86-111; Testimony of Brad Ellis, 43 R.R. Trial 119-55; Testimony of Richard Rivas, 43 R.R. Trial 156-226; Testimony of Francis Scott Crump, 44 R.R. Trial 6-58; Testimony of Raymond Michael McClain, 44 R.R. Trial 59-114; Testimony of Walter Clifton, 44 R.R. Trial 115-35; Testimony of Victoria Stonaker, 44 R.R. Trial 136-44.  A Dallas paramedic testified officer Jackson had no pulse and was not breathing when he arrived at the scene.  Testimony of Jamie Escobedo, 44 R.R. Trial 146-53.

A resident of the neighborhood who witnessed officer Jackson being fatally shot testified he recognized officer Jackson as a law enforcement officer as he walked toward the scene, he was directly across the street when he saw three flashes and heard three shots fired by someone kneeling, he saw the officer fall back, and he heard a second volley of three shots as the officer fell.  Testimony of Sergio Nava, 44 R.R. Trial 156-93.

Lizcano's hands tested positive for gunshot residue following his arrest.  Testimony of David Walker Spence, 45 R.R. Trial 50-70.  A firearms and toolmark examiner testified the bullet removed from officer Jackson's body during autopsy was fired by the revolver found at the crime scene.  Testimony of Heather Thomas, 45 R.R. Trial 74-88.  The medical examiner testified officer Jackson died from a single gunshot wound which entered his upper right arm, traversed the biceps, and re-entered officer Jackson's body on the right side of his chest; the bullet went through the right lung, through the right side of the heart, then the aorta, through

4

the pulmonary trunk, into the left ventricular cavity, through the left lung, and embedded in the left back; while officer Jackson was likely not rendered unconscious immediately from his wounds, he very likely died within seconds of being shot; and there was too much damage for any amount of medical care to have saved officer Jackson.  Testimony of Dr. Jeffrey Barnard, 45 R.R. Trial 88-115.

Lizcano's acquaintance Jose Fernandez testified that he and Lizacano went out drinking on the night in question; Lizcano had no difficulty driving them; Lizcano drove then to Cruz's residence after stopping at Lizcano's apartment; Lizcano threatened to kill Cruz if he discovered she had been out with another man; Lizcano returned to his pickup truck and informed Fernandez that he had fired a shot inside Cruz's residence; Cruz called Fernandez, told him that Lizcano had fired his weapon, reported that she had notified police, and asked Fernandez to take Lizcano home; Fernandez handed his phone to Lizcano, who informed Cruz that he did not care that she had called police; and Lizcano then drove back to Cruz's residence.  Testimony of Jose Fernandez, 44 R.R. Trial 203-39.

### 3. The Defense's Guilt/Innocence Phase Evidence

Lizcano's trial counsel called the residents of the home where officer Jackson was shot, who testified they heard gunfire and witnessed a hectic scene outside the home on the night in question; they heard a thump against the side of his house shortly thereafter; and the next morning they found a stain on the side of his house.  Testimony of Edward Vega, 46 R.R. Trial 5-28; Testimony of Jesus Vega, 46 R.R. Trial 29-36.  A chemist testified the stain he collected from the side of the house appeared to be blood.  Testimony of Byron Max Courtney, 47 R.R. Trial 28-

68.   A DNA expert testified blood found on the stain from the side of the house matched Lizcano's blood.  Testimony of Jodi Hrabel, 47 R.R. Trial 70-76.

#### 4. Guilt/Innocence Phase Verdict

On October 9, 2007, the jury returned its verdict at the guilt-innocence phase of trial and unanimously found Lizcano guilty of capital murder as charged in the indictment.  48 R.R. Trial 84-86; CR 260.

#### 5. Prosecution's Punishment Phase Evidence

The punishment phase of Lizcano's capital murder trial commenced later on October 9, 2007.  Several Dallas police officers testified about the shots Lizcano fired on them while they searched an alleyway not far from Cruz's residence and the location where Lizcano later shot officer Jackson.  Testimony of Richard Rivas, 48 R.R. Trial 87-93; Testimony of Francis Scott Crump, 48 R.R. Trial 93-97; Testimony of Raymond McClain, 48 R.R. Trial 98-103.

Several Dallas police officers testified about an incident on or about September 16, 2005 in which Lizcano was stopped for driving erratically, Lizcano could not produce a driver's license or proof of insurance, Lizcano could not follow instructions and failed a field sobriety test, and was arrested for driving while intoxicated.  Testimony of Eric Morales, 48 R.R. Trial 104-22; Testimony of Robert Wilcox, 48 R.R. Trial 123-61.  Multiple eyewitnesses also testified that when Lizcano was being booked on his DWI charge, he was belligerent and threatened in English to kill an officer.  Testimony of Robert Wilson, 48 R.R. Trial 143-49; Testimony of Anthony Wayne Foster, 48 R.R. Trial 161-75; Testimony of Thomas Fortner, 48 R.R. Trial 175-85; Testimony of Cecilia Kazemi, 48 R.R. Trial 184-91.

A Dallas police officer testified about an arrest of Lizcano in June 2004 on a charge of public intoxication. Testimony of Melquiades Irizarry, 49 R.R. Trial 36-42. A different Dallas police officer testified about an incident in December 2004 in which the officer responded to a disturbance call; she discovered Lizcano bleeding from the right side of the head; Lizcano refused medical treatment and refused to give officers any information about what had happened to him; and Lizcano was released to his aunt. Testimony of Brandi Kramer, 49 R.R. Trial 43-52.

An assistant warden of a Texas Department of Criminal Justice ("TDCJ") unit testified that, unlike inmates housed on death row, inmates housed in the TDCJ's general inmate population had lots of interaction with guards and other inmates and many opportunities to engage in acts of violence; weapons or materials from which weapons can be fashioned are available within TDCJ facilities; alcohol can be fermented from a wide variety of substances found within TDCJ facilities; and TDCJ staff have been seriously injured by even death row inmates. Testimony of Melodye Nelson, 49 R.R. Trial 75-107.

### 6. Defense's Punishment Phase Evidence

One of Lizcano's former teachers from Mexico testified Lizcano could not read and was slow compared to other student but nonetheless was graduated from sixth grade at age fifteen because he was too old to remain in school. Testimony of Prof. Aleida Reyes Lucio, 49 R.R. Trial 115-29. A nurse who knew Lizcano in Mexico testified there was no doctor in Lizcano's home town hospital; no prenatal care was available to Lizcano's family; Lizcano suffered from deficient nutrition growing up; and she had examined Lizcano three times – for flu, back pain, and a headache. Testimony of Rosa Maria Rodriguez Rico, 49 R.R. Trial 131-39.

A female acquaintance of Lizcano from Wichita Falls testified she met Lizcano in Dallas in January or February 2005; Lizcano was able to follow her directions and drive to Wichita Falls to see her multiple times, including the week before officer Jackson's shooting; she visited Lizcano in Dallas several times; Lizcano called her almost every night and they saw each other on the weekends; she did not know Lizcano could speak English; she never saw Lizcano count his change; she believed Lizcano was in love with Marta Cruz but she continued to see Lizcano; she never considered Lizcano to be mentally slow and considered him to be "very bright"; Lizcano was very responsible and she had never seen him out of control when drinking. Testimony of Jessica Barron, 49 R.R. Trial 141-69.

The next-door neighbor of Marta Cruz testified he was unable to talk with Lizcano because Lizcano shut down when Marta was around and Lizcano would not acknowledge him; Lizcano and David Huerta did not have a good relationship. Testimony of Quenton Edward Thomas, 52 R.R. Trial 11-24. Another witness described David Huerta's reputation for truthfulness as bad. Testimony of Jennifer Gutierrez, 52 R.R. Trial 8-10.

The defense called Lizcano's sixty-year-old mother who testified through an interpreter that Lizcano's father had been dead for 27 years; she gave away many of her children; she could not recall exactly what Lizcano was born; there was no running water, electricity, or floor in the family home back in La Lobera; she did not make enough money to feed her children; many times Lizcano went to bed without eating; there was only one bed in their home and Lizcano slept on the floor; Lizcano was never violent growing up; Lizcano was sent away to earn money; Lizcano sent her things and money, including after he was arrested; Lizcano sent money to her

nieces and nephews as well; she often spoke with Lizcano on the phone; and Lizcano was given a horse when he was young which he cared for growing up.  Testimony of Alejandra Ruiz Campos, 52 R.R. Trial 25-55.

One of Lizcano's older brothers testified their family slept on blankets on the bare floor; their family huddled together to stay warm; there was very little food, mostly tortillas and rice; he worked at a community store; and Lizcano cared for a horse growing up.  Testimony of Reyes Lizcano Ruiz, 52 R.R. Trial 56-62.

Lizcano's younger brother testified he and Lizcano grew up and played together as children even though they had different fathers; Lizcano was a good brother and a good uncle who sent a TV to him from the U.S.; Lizcano had a love of animals growing up and cared for a lot of animals, including chickens and orphan goats.  Testimony of Lucia Lizcano Ruiz, 52 R.R. Trial 63-69.

The wife of Lizcano's mother's brother testified that she grew up in La Lobera and met Lizcano when he was four years old; Lizcano's mother was very poor and did not have enough food or clothes for her children; the Lizcano family scraped cactus to earn money; Lizcano was a shy and quiet boy who cared for goats; Lizcano sang Christmas carols at the town's Pastorela; Lizcano had a dog growing up; Lizcano sent his mother money and kids' toys from the U.S. Testimony of Josefina Sandoval Aguirre, 52 R.R. Trial 70-74.  A resident of Houston testified that she knew Lizcano through her husband; Lizcano lived with them for about three or four months when he first came to the U.S. around 2000; Lizcano was good to her two-year-old daughter when he lived with them.  Testimony of Veronica Llanos Banda, 52 R.R. Trial 76-81.

A Dallas County Jail employee testified Lizcano had behaved normally and exhibited no problems during the two years since his arrest.  Testimony of Devesh Amin, 53 R.R. Trial 7-19. A second Dallas County jail employee testified Lizcano had caused no problems in jail, maintained good hygiene, and showed no sign of being mentally impaired.  Testimony of Jeffrey Gartrell, 55 R.R. Trial 63-66.

Recalled to the stand by the defense, Marta Cruz testified Lizcano could not read a clock so she bought him a digital watch; Lizcano was unhappy with his relatives' drinking; she had to show him how to program his cell phone; Lizcano did not speak English, could not work a VCR, but did enjoy watching Spanish-language kids TV shows; Lizcano bought a truck but had no driver's license; she taught Lizcano how to shower and wash his ears; Lizcano could not coordinate his clothes and purchased clothing that was too big for him; Lizcano planted flowers for her; Lizcano is a very nice and caring person when not drinking; she encouraged Lizcano to find a younger girlfriend and settle down; on September 11, 2005, after she advised Lizcano to find a younger girlfriend, Lizcano pulled a steak knife on her, grabbed her cell phone from her hand, called 911, then hanged up;  police arrived and arrested Lizcano but she refused to press charges; Lizcano was simple and uneducated but not retarded; in September 2005 Lizcano left threatening messages on her phone; on one occasion, Lizcano threatened her neighbor after the neighbor asked Lizcano to calm down and mentioned calling the police; Lizcano was jealous of her children when they came to visit her; Lizcano wrote and called her from jail and sent her his drawings; Lizcano called her from jail after his DWI arrest and asked her to get him out on bond before INS found he was in jail.  Testimony of Marta Cruz, 53 R.R. Trial 19-80.

A cousin of Lizcano testified that he came to the U.S. in 1980; even though he had no documents when he arrived eventually he managed to learn English and become a U.S. citizen; Lizcano's family was even poorer than his own; Lizcano's father suffered a stroke and was thereafter partially paralyzed; Lizcano lived with his family when Lizcano first came to the U.S.; Lizcano was sent to the U.S. by his family because he was responsible and could be relied on to send money back to the family; Lizcano's other brothers all drank; Lizcano often wore the same pants for weeks straight and could not afford new shoes or other clothes; he never saw Lizcano drink when he was in Houston.  Testimony of Juan Lizcano Aguirre, 54 R.R. Trial 27-51.

A former co-worker of Lizcano at a Houston construction company testified that Lizcano arrived from Mexico untrained and had difficulty learning the skills he tried to teach him; for example, Lizcano was unable to learn to put up road signs at their work sites at the proper distances, could not set angles on a table saw, and never mastered how to use a tape measure (because Lizcano could not grasp the concept of fractions); Lizcano had a kind heart and was in love with Marta Cruz but did not understand why it was inappropriate for him to date someone so much older than he was; Lizcano often misunderstood jokes and thought people were making fun of him; Lizcano did not speak English and left his job because he did not like their boss yelling at people; Lizcano was able to divide his paycheck to send a set amount back to his family in Mexico; Lizcano required the assistance of his cousin to perform his work duties in Houston. Testimony of Nario Alvarez, 54 R.R. Trial 52-73.  One of Lizcano's supervisors with a Dallas area landscaping company testified Lizcano did not speak English and was a slow learner who needed detailed instruction to perform basic tasks but otherwise seemed normal.  Testimony of Jose Luis

Uribi, 54 R.R. Trial 74-86.

A researcher with a doctorate in criminal justice testified that, based on actuarial factors, including Lizcano's clean disciplinary history during his pretrial detention, in his opinion Lizcano posed a low risk of further violence if incarcerated.  Testimony of Dr. Johnathan Sorenson, 55 R.R. Trial 68-124.  A psychologist testified that, based upon his research into the operations of the TDCJ and its employee training practices, he believed TDCJ was a well-regulated institution capable of controlling violence in prisons and would be able to control Lizcano's propensity for violence.  Testimony of Dr. Mark Vigen, 55 R.R. Trial 125-73.

Outside the presence of the jury a clinical psychologist testified at great length that he had personally evaluated Lizcano; Lizcano had four test scores indicating significantly subaverage intellectual functioning; and based upon his evaluation and his review of historical information gathered by the defense team from witnesses in Mexico, including Lizcano's history of malnutrition and difficulty learning, he diagnosed Lizcano as mildly intellectually disabled with depressive disorder; he also suspected Lizcano displayed a possible adjustment disorder with mixed anxiety disorder and depressed mood; adaptive skills areas in which Lizcano displays deficits include communication, academic skills, safety, home functioning, and cognitive skills. Testimony of Dr. Gilbert Martinez, 55 R.R. Trial 184-242.  Dr. Martinez opined that mildly intellectually disabled individuals such as Lizcano are fully capable of living independently and functionally indistinguishable from individuals at the lower end of the borderline range.  *Id.*, at 209-15.  After Dr. Martinez testified that he was unfamiliar with the standard for determining competence to stand trial and, while he suspected Lizcano might possibly be incompetent, he

could offer no professional opinion on that subject, the trial court ruled Dr. Martinez's opinions regarding competence set forth in a document previous transmitted to the court by defense counsel were not admissible.  *Id.*, at 240-42.

A clinical neuropsychologist testified there is a serious problem with non-Spanish speaking mental health practitioners attempting to evaluate Spanish-speaking patients through interpreters; based upon his evaluation and testing of Lizcano, and his review of the materials compiled by the defense's mitigation specialist, he believed Lizcano was functionally illiterate in English, displayed deficits in health, safety, and reasoning, and is mildly intellectually disabled; Lizcano lives day-to-day without any long term plans; Lizcano displays organic brain impairments due to frontal lobe issues.  Testimony of Dr. Antonio Puente, 56 R.R. Trial 19-102.

A psychologist testified she did a clinical interview of Lizcano through an interpreter, reviewed Lizacano's test scores on instruments administrated by other mental health professionals, administered a Comprehensive Test of Nonverbal Intelligence, and concluded Lizcano is mildly intellectually disabled.  Testimony of Dr. Kristi Compton, 56 R.R. Trial 103-34.

### 7. Prosecution's Punishment Phase Rebuttal Evidence

Recalled yet again, this time by the prosecution, Marta Cruz testified that Lizcano had revealed to her that after he broke up with another woman, Lizcano encountered the other woman at a club and, when she refused to talk with him, he went out to his car and got a knife. Testimony of Marta Cruz, 56 R.R. Trial 158-60.

The car lot dealer who sold Lizcano a pickup truck testified Lizcano was the co-buyer of the vehicle in question and Lizcano thereafter made weekly payments of $120 in cash on the

vehicle.  Testimony of Mariano Valdivia, 56 R.R. Trial 161-69.

The Dallas police officer who rode from the crime scene to the police station with Lizcano immediately after officer Jackson's fatal shooting testified Lizcano slept while being transported.  Testimony of Michael Adam Nunez, 56 R.R. Trial 171-73.

The prosecution also offered victim impact testimony from officer Jackson's parents, who both testified they suffered from severe depression and that officer Jackson's mother was no longer capable of working as a dental hygienist after their son's murder.  Testimony of Valarie Jackson, 57 R.R. Trial 4-8; Testimony of John Jackson, 57 R.R. Trial 8-11.

## 8.  Punishment Phase Verdict

On November 1, 2007, the jury returned its verdict at the punishment phase of trial, finding that (1) Lizcano failed to establish by a preponderance of the evidence that he was intellectually disabled; (2) unanimously and beyond a reasonable doubt there was a probability Lizcano would commit criminal acts of violence that would constitute a continuing threat to society; and (3) there were not sufficient mitigating circumstances sufficient to warrant the imposition of a sentence of life imprisonment without the possibility of parole.  59 R.R. Trial 4-7; C.R. 268-70.  The state trial court imposed the sentence of death.  59 R.R. Trial 7; C.R. 271-74.

## C. Direct Appeal

Lizcano appealed his conviction and sentence.  Lizcano's state appellate counsel, attorney John Tatum, filed his appellant's brief in the Texas Court of Criminal Appeals on January 26, 2009, asserting 79 points of error, including (1) six *Batson* claims; (2) thirteen points of error relating to jury selection (i.e., nine points of error asserting the state trial court erroneously

14

denied the defense's challenges for cause to various jury venire members, two points of error asserting the state trial court erroneously granted the prosecution's challenges for cause to a pair of venire members, and two points of error asserting that his jury was biased); (3) a pair of points of error arguing the state trial court erred in ordering Lizcano to submit to a mental health evaluation by a prosecution expert; (4) a point of error arguing the state trial court should have empaneled a separate jury to determine whether Lizcano was intellectually disabled; (5) twenty-two points of error challenging state trial court rulings admitting or excluding evidence or denying the defense's motions for continuance; (6) a point of error challenging the Texas Court of Criminal Appeals' refusal to engage in sufficiency of the evidence review with regard to the jury's answer to the mitigation special issue; (7) two points of error attacking the state trial court's denial of Lizcano's motion for new trial and refusal to hold an evidentiary hearing on the motion for new trial; (8) five points of error attacking the state trial court's failure to disregard the jury's verdict and impose a sentence of life without parole; (9) a point of error attacking the trial court's failure to permit the defense to open and close at the punishment phase of trial; (10) a point of error challenging the sufficiency of the evidence supporting the jury's affirmative answer to the future dangerousness special issue; (11) ten points of error attacking the state trial court's failures to grant the defense's requests for various instructions in the punishment phase jury instructions; (12) a dozen points of error attacking the constitutionality of various aspects of the Texas capital sentencing special issues; and (13) a cumulative error point.

The Texas Court of Criminal Appeals ("TCCA") affirmed Lizcano's conviction and sentence. *Lizcano v. State*, AP-75,879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010). On

15

June 18, 2011, the United States Supreme Court denied certiorari review. *Lizcano v. Texas*, 562 U.S. 1182 (2011).

### D.  State Habeas Corpus Proceedings

On December 23, 2009, Lizcano's state habeas counsel attorneys David R. Dow and Alma Lagarda, filed his initial state habeas corpus application, asserting claims that (1) his trial counsel rendered ineffective assistance by failing to pursue a competency hearing; (2) the state trial court erred in failing to hold a competency hearing *sua sponte* as required by *Pate v. Robinson*, 383 U.S. 375 (1966), and *Dusky v. United States*, 362 U.S. 402 (1960); (3) his trial counsel rendered ineffective assistance during voir dire by failing to inquire if potential jurors could give meaningful consideration to evidence of intellectual disability, mental illness, and other mitigating evidence; (4) adverse pretrial publicity deprived Lizcano of a fair and impartial trial under the standard of *Irvin v. Dowd*, 366 U.S. 717 (1961); (5) a pervasively hostile courtroom atmosphere led to a due process violation; (6) Lizcano is exempt from execution under the Supreme Court's holding in *Atkins v. Virginia*, 526 U.S. 304 (2002); (7) his trial counsel rendered ineffective assistance during the punishment phase of trial by failing to investigate Lizcano's background thoroughly and present all available mitigating evidence; (8) Lizcano's due process rights were violated at the punishment phase of trial when the prosecution knowingly presented false testimony regarding the TDCJ's inmate classification policy.

The state habeas trial court held an evidentiary hearing on November 6-9 and December 13, 2012 on Lizcano's initial state habeas corpus application. The state habeas trial court heard extensive testimony from Lizcano's state trial counsel, one of Lizcano's older brothers, multiple

16

mental health experts, a DNA analyst, and Lizcano's mitigation specialist at trial.  On June 16, 2016, the state trial court issued its findings of fact and conclusions of law (henceforth "FFCL") and recommendation that all of Lizcano's claims for state habeas corpus relief be denied.  The TCCA denied Lizcano's initial state habeas corpus application in an unpublished Order in which it expressly adopted most, but not all, of the trial court's findings and conclusions.  *Ex parte Lizcano*, WR-68,348-03, 2015 WL 2085190 (Tex. Cim. App. April 15, 2015) (adopting all findings and conclusions save for nos. 78-82 & 261-69).

On June 16, 2018, the TCCA remanded Lizcano's intellectual disability claim to the state trial court for further development and reconsideration of new standards for evaluating intellectual disability.  *In re Lizcano*, WR-68,348-03, 2018 WL 2717035 (Tex. Crim. App. June 16, 2018).

The TCCA subsequently adopted the state trial court's recommendation and granted Lizcano a modified sentence (of life imprisonment without the possibility of parole) based upon its conclusion that Lizcano qualified as intellectually disabled.  *In re Lizcano*, 607 S.W.3d 339 (Tex. Crim. App. 2020).

Contemporaneously, the TCCA summarily dismissed under state writ-abuse principles a host of claims Lizcano also presented in a subsequent state habeas corpus application.  *Ex parte Lizcano*, WR-63,348-04, 2020 WL 5568625 (Tex. Crim. App. Sept. 16, 2020).  Among the claims the TCCA summarily dismissed under the Texas writ-abuse statute were claims that the state trial court failed *sua sponte* to order a competency trial; his state direct appeal and state habeas counsel labored under a conflict of interest; his trial counsel rendered ineffective

assistance by failing to adequately litigate a *Batson* claim; his state appellate counsel rendered ineffective assistance by failing to request a rehearing on cumulative error claims; and he was entitled to habeas relief based on the cumulative effect of the ineffective assistance of his state appellate and state habeas counsel.

### E.  Proceedings in this Court

On April 13, 2016, Lizcano filed his original petition for federal habeas corpus relief (ECF no. 1), asserting therein claims that (1) Lizcano's due process rights were violated when the prosecution presented false testimony at the punishment phase of trial; (2) Lizcano is exempt from execution under the Eighth Amendment because he is intellectually disabled; and (3) his trial counsel rendered ineffective assistance by failing to (a) pursue its request for a competency hearing and (b) adequately investigate Lizcano's background and present all available mitigating evidence.

In an Order issued October 6, 2017, the District Court accepted the Magistrate Judge's recommendation and granted Lizcano's motion to stay these proceedings to permit Lizcano to return to state court and litigate new claims as well as seek reconsideration of the denial of Lizcano's claim that he is intellectually disabled (ECF no. 51).

After returning to state court and obtaining a new sentence, on November 5, 2021, Lizcano filed his second amended petition in this court, asserting claims that (1) his state trial counsel rendered ineffective assistance by withdrawing his request for a competency hearing after filing same; (2) the state trial court erred in failing sua sponte to order a competency hearing; (3) Lizcano's state appellate counsel suffered from a conflict of interest in that said counsel failed to

object to other trial counsels' withdrawal of Lizcano's request for a competency hearing, failed to object to the trial court's failure sua sponte to order a competency hearing, and failed to assert a point of error on direct appeal complaining about the trial court's failure sua sponte to order a competency hearing; (4) his state habeas counsel rendered ineffective assistance by failing to assert claims based on the conflict of interest and ineffective assistance of Lizcano's state appellate counsel; (5) his trial counsel rendered ineffective assistance by failing to challenge the prosecution's racially biased use of a peremptory challenge against venire member R___ H___; (6) his trial counsel rendered ineffective assistance by failing to adequately litigate his *Batson* challenge to the prosecution's striking of venire member R___ H___; (7) the prosecution engaged in improper jury argument at the guilt-innocence phase of trial; (8) his state habeas counsel rendered ineffective assistance by failing to assert an ineffective assistance claims premised upon trial counsel's and state appellate counsel's failure to assert timely objections and points of error addressing the prosecution's improper jury arguments; and (9) he is entitled to federal habeas corpus relief based upon the cumulative effect of the prosecution's improper jury argument and the ineffective assistance of his state trial and state appellate counsel (ECF no. 57).

On July 6, 2021, Respondent filed its answer, arguing that except for Lizcano's first claim for relief in his second amended petition, all of Lizcano's claims are time-barred, as well as procedurally defaulted; and the state habeas court reasonably concluded that Lizcano's trial counsel had not rendered ineffective assistance in withdrawing their request for a competency hearing because two court-appointed experts had concluded Lizcano was competent to stand

trial and proceeding with a competency hearing would necessarily have required the defense to turn over to the prosecution the entirety of the defense's mitigation evidence several months prior to the start of trial on the merits, thus diminishing the potential benefits of that mitigating evidence and opening the door to the prosecution rebutting same (ECF no. 63).

On September 20, 2021, Lizcano filed his reply brief, arguing that his state trial counsels' strategic decision to withdraw their request for a competency hearing was based on an inadequate investigation into Lizcano's competency; there was cause for his procedural default, specifically the ineffective assistance of his state appellate and state habeas counsel; the factual basis for his complaint about the state trial court's sua sponte failure to hold a competency hearing was the same as the factual basis underlying his ineffective assistance claim; and he was entitled to equitable tolling for his otherwise time-barred claims due to a conflict of interest involving his pro bono state habeas counsel and federal habeas counsel (ECF no. 75).

## II.  AEDPA STANDARD OF REVIEW

Because Lizcano filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Lizcano federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *See Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable

application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of ... clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. This inquiry focuses on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the

time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. § 2254(d)(2) provides that federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *See Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

And 28 U.S.C. § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *See* 28 U.S.C. §2254(e)(1); *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El

rebuts the 'presumption of correctness by clear and convincing evidence.'").

It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *See* 28 U.S.C. § 2254(b)(1); *Davila v. Davis*, 583 U.S. 521, 527 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first affording the state courts an opportunity to correct a constitutional violation). But this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in

24

the courts of the State."); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless).

In those instances in which the state courts failed to adjudicate a claim on the merits that Lizcano presents to this Court – such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or other Texas rules of procedural default or (2) that Lizcano failed to fairly present to the state courts – this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

## III.  INEFFECTIVE ASSISTANCE RE COMPETENCY HEARING

### A. The Claim

In his first claim for relief in his second amended petition, Lizcano argues that his trial counsel rendered ineffective assistance by withdrawing their request for a competency hearing. (ECF no. 57, 6-21).

### B. State Court Disposition

Lizcano presented the same ineffective assistance claim as his first claim for relief in his initial state habeas corpus application (State Habeas Application, 25-34).  The state habeas trial court

heard extensive testimony from Lizcano's trial counsel, Lizcano's mitigation specialist, and multiple mental health experts and issued highly detailed findings of fact and conclusions of law, including findings that:

- Under Texas law, a criminal defendant is presumed competent, and the burden of proof is on the defense to prove incompetency by a preponderance of the evidence.

- A criminal defendant is incompetent to stand trial under Texas law if they do not have (1) sufficient present ability to consult with their attorney with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against them (citing Texas Code of Criminal Procedure [henceforth "T.C.C.P."] Article 46B.003(a)). Evidence relevant to the issues included whether they can (1) understand the charges against them and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify (citing T.C.C.P. Article 46B,024).

- On suggestion of either party or the trial court that the defendant may be incompetent to stand trial, the trial court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent (citing T.C.C.P. Article 46B.004(a),(c)). If after an informal inquiry the court determines that evidence exists to support a finding of incompetency, the court shall order a competency examination and empanel a jury to conduct a competency trial (citing T.C.C.P. Article 46B.005(a),(b)).

- A competency trial is not required unless the evidence is sufficient to create a bona fide doubt in the mind of the judge whether the defendant met the test of legal competence. Generally, a bona fide doubt about a defendant's legal competence is raised only if the evidence indicates recent severe mental illness, moderate mental retardation, or truly bizarre acts by the defendant.

- The trial court is not required to hold a competency trial if neither party requests a trial on that issue, neither party opposes a finding of incompetency, or the court does not, on its own motion, determine that a trial is necessary (citing T.C.C.P. Article 46B.0050(b),(c)).

- On September 14, 2007, Lizcano's trial counsel filed a motion suggesting Lizcano was incompetent to stand trial and requesting an examination of Lizcano. Attached to said motion was an affidavit from Lizcano's co-counsel attorney Juan Carlos Sanchez

26

in which Sanchez stated that he believed Lizcano was not competent to stand trial based on Lizcano's inability to provide input regarding the defense team's strategy during individual voir dire or their use of peremptory strikes.  Also attached to the motion was a neuropsychological evaluation from Dr. Antonio Puente in which he concluded that Lizcano's neuropsychological test performance ranged from mildly impaired to normal and Lizcano's IQ was in the mildly intellectually disabled range.  But Dr. Puente included no conclusion regarding Lizcano's incompetency to stand trial.

· At a hearing on September 17, 2007, Lizcano's lead trial counsel advised the court that she believed Lizcano's intelligence quotient of 64 rendered him incompetent *per se* to stand trial.  The trial court ruled that it would appoint a neutral expert to examine Lizcano and the court advised the parties of its intention to empanel a jury for a competency trial on September 25, 2007.

· On September 19, 2007, the trial court appointed Dr. Antoinette McGarrahan as a neutral expert to conduct a competency examination of Lizcano.

· On September 20, 2007, Dr. McGarrahan examined Lizcano and found him to be competent to stand trial.  She conveyed her findings to the trial court orally via telephone.  Later that date the trial court discovered a potential conflict of interest involving Dr. McGarrahan.  The trial court appointed Dr. William Flynn as a new neutral expert to examine and conduct a competency examination of Lizcano.

· On September 21, the trial court invited defense counsel to supplement its evidence in support of the competency hearing motion but defense counsel stated that it wished to let the motion stand "as it is."  The trial court requested to asked Lizcano some questions but his defense counsel objected to the trial court doing so in the prosecution's presence.  The trial court then ruled there was insufficient basis to proceed with a competency trial.

· On September 24, 2007 Dr. Flynn examined Lizcano and found him to be competent to stand trial.  Dr. Flynn found that Lizcano (1) was able to understand the proceedings in the courtroom and the possible consequences or penalties, legal defenses, and possible outcomes; (2) understood the role of key personnel in the courtroom; (3) understood the severity of the charges against him and his legal defenses; (4) was able to communicate with his counsel; and (5) had the capacity to plan legal strategy.  In addition, Dr. Flynn found Lizcano did not qualify for a diagnosis of intellectual disability because Lizcano did not have a significant limitation in adaptive functioning.

· On September 21, 2007, Lizcano's trial counsel tendered an additional letter from Dr.

Gilbert Martinez in which he stated that, based on a neuropsychological examination conducted September 10, 2007, he believed Lizcano "does not have sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding, nor does he have a rational or a factual understanding of the proceedings against him."  Dr. Martinez stated that he also based his opinion on an earlier evaluation performed by Dr. Puente and several mitigation reports generated by Debbie Nathan.

· During an in chambers conference with counsel for both parties, Dr. Flynn called the trial court and orally reported his findings to the court and parties.  His written report was transmitted to the trial court later the same date.

· During the in chambers meeting, the trial court advised defense counsel that if they wished to proceed with a competency trial and planned to use the testimony of Dr. Martinez, the defense would have to turn over to the prosecution all of the reports and date Dr. Martiinez relied upon in making his evaluation of Lizcano as well as Ms. Nathan's mitigation reports.

· The parties then proceeded to open court, where the trial court advised the parties that the additional evidence presented by the defense was sufficient to proceed with a competency trial if the defense wished to do so.  Lizcano's lead counsel advised the court that after learning Dr. Flynn's findings and conferring with both Lizcano and the defense's experts, the defense believed Lizcano was competent to stand trial and wished to withdraw the request for a competency trial.

· Lizcano's trial counsel reasonably chose to withdraw their request for a competency trial, i.e., made a sound strategic decision, based upon (1) their belief Lizcano was competent to stand trial; (2) the fact Dr. Martinez's opinion regarding competency was based on his clinical observations and not based upon the Texas statutory criteria; (3) the low standard for legal competency under existing Texas law; (4) the opinions of both Dr. McGarrahan and Dr. Flynn that Lizcano was competent to stand trial; (5) Dr. Martinez's statement to defense counsel that he was "shaky" with regard to his opinion on competency; (6) their belief that Dr. Martinez was reluctant to testify under oath that Lizcano was incompetent to stand trial; (7) foregoing a competency trial would avoid the necessity for the defense to turn over to the prosecution essentially the defense's entire case in mitigation, i.e., all of the data underlying the expert opinions of its testifying experts as well as all of the defense's mitigation reports generated by its mitigation specialist; (8) its belief that Dr. Martinez would not have been a more credible witness than Dr. Flynn; (9) the fact that Dr. Flynn conducted a statutorily mandated competency evaluation including questions designed to explore Lizcano's understanding of the proceedings against him and ability to assist the defense while Dr. Martinez did not conduct such an inquiry.

28

- The affidavits of Deborah Nathan and Luis Lara Escobedo submitted by Lizcano's state habeas counsel in support of the state habeas application were not credible; Lizcano's trial counsel denied in their testimony during the state habeas corpus proceeding that either of these individuals raised any issue regarding Lizcano's competency to stand trial with trial counsel. Moreover, these affidavits are conclusory and do not furnish any additional evidence of Lizcano's incompetency to stand trial.

- Lizcano failed to show that his trial counsels' decision to withdraw their request for a competency trial was objectively unreasonable.

- Lizcano failed to show there was a reasonable probability that, but for the decision of his trial counsel to withdraw their request for a competency trial, the outcome of Lizcano's trial would have been different.

- There was no evidence Lizcano did not understand the proceedings against him or could not rationally confer with his counsel. The statements of Lizcano's counsel on the record as well as the opinion of Dr. Flynn confirms this conclusion.

- Even if Lizcano's trial counsel had proceeded with a competency trial, there is no reasonable probability that Lizcano would have been found incompetent to stand trial. Dr. Martinez could not offer a firm opinion on Lizcano's incompetency when called to testify at trial during a Rule 705 hearing. Thus Dr. Martinez could not rebut the opinion of Dr. Flynn. There was no evidence Lizcano was moderately intellectually disabled, suffered from a recent mental illness, or engaged in bizarre behavior.

State Habeas Trial Court's Findings of Fact, Conclusions of Law (henceforth "FFCL"), at 28-40, ¶¶ 28-76.

The TCCA expressly adopted all of the foregoing findings and conclusions when it denied Lizcano's initial state habeas corpus application. *Ex parte Lizcano*, WR-68,348-03, 2015 WL 2085190 (Tex. Crim. App. Apr. 15, 2015). This court has independently examined the entire record from Lizcano's trial, direct appeal, and state habeas corpus proceedings and finds the factual findings adopted by the TCCA were fully supported by the evidence before that court.

## A.  Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable

probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter*, 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were

adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (citations omitted).

## B. AEDPA Analysis

### 1. No Deficient Performance

The state habeas court's conclusion that Lizcano failed to satisfy the deficient performance prong of *Strickland* was objectively reasonable. Lizcano argues in this court that his trial counsel should have persisted in their request for a competency hearing and cites the opinions of Dr. Puente, Dr. Martinez, and Dr. Antonio Llorente in support of his contention that he was incompetent to stand trial. Unfortunately for Lizcano, this court independently examined all of the testimony from Lizcano's trial and also from the lengthy evidentiary hearing held in Lizcano's state habeas corpus proceeding, all of which fully supports the state habeas court's findings and conclusions detailed at length above.

It is undisputed that two mental health experts appointed by the state trial court (i.e., Dr. McGarrahan and Dr. Flynn) independently examined Lizcano and reported to the state trial

judge that they found Lizcano to be competent to stand trial. While Lizcano's federal habeas counsel argue that Dr. McGarrahan's potential conflict of interest made her an unlikely witness at a state competency trial, they ignore the reality confronting Lizcano's trial counsel: two court-appointed mental health experts had evaluated Lizcano shortly before trial and both found him competent to stand trial. Lizcano's federal habeas counsel also criticize Dr. Flynn for employing an interpreter during his competency evaluation of Lizcano. This complaint ignores the state habeas court's finding that, unlike an evaluation for intellectual disability, the types of questions involved in a competency evaluation did not require that the evaluator be a Spanish speaking individual. Lizcano cites no legal or clinical authority requiring that a mental health clinician conduct an evaluation for competency, as opposed to intellectual disability, without the use of an interpreter.

It is important to remember that, during a competency trial, under Texas law, the burden of proof rests squarely with defense. Lizcano's lead and co-counsel, attorneys Brook Busbee and Juan Carlos Sanchez, respectively, were both appointed to represent Lizcano not later than early 2006. Thus, the timing of Lizcano's request for a competency trial must be considered in proper context. Attorney Busbee, who is not a native Spanish speaker, did testify that she had some difficulty communicating with Lizcano when he called her from jail and, for that reason, she often relied on a Spanish speaking employee to speak with Lizcano when he called. 4/12 R.R. State Habeas Hearing 94. Neither of Lizcano's trial counsel, however, identified any problem they had communicating with Lizcano about either the facts of his offense or the nature of the proceedings against him until after they had engaged in more than a year

and half of pretrial communications with Lizcano.  Likewise, neither of Lizcano's trial counsel nor his mitigation specialist testified they experienced any communication problems with Lizcano which prevented them from fully investigating Lizcano's background (in a search for mitigating evidence) in a timely manner.

Attorney Busbee testified that she spoke Spanish but was not as fluent as attorney Sanchez, who established good rapport with Lizcano.  4/12 R.R. State Habeas Hearing 93-94. She testified further that she was not confident the defense could carry its burden and prove Lizcano's incompetence because both court-appointed experts had found Lizcano competent and all of the defense's mental health experts (i.e., Dr. Puente and Dr. Martinez) expressed a lack of confidence in their own ability to testify that Lizcano was incompetent to stand trial (i.e., Dr. Martinez described his own evaluation of Lizcano for competence as "iffy" at best).  *Id.*, 70-71, 79-83, 86-87, 89-91, 127-28, 133-34, 141-42.

Attorney Sanchez's testimony at Lizcano's state habeas hearing was that he noticed that Lizcano was mentally "slow" fairly early on during their interactions and conversations, but he did not begin to suspect Lizcano was incompetent to stand trial until the defense began exercising its peremptory challenges during jury selection, at which time he tried without success to solicit suggestions from Lizcano on how best the defense should utilize its peremptory challenges.  4/12 R.R. State Habeas Hearing 156-65, 184, 208-10, 213-14.  Sanchez testified that when he asked Lizcano for his thoughts about using the defense's peremptory strikes, Lizcano simply told Sanchez to do what he thought was best.  *Id.*, 159-60, 208-09.

Unlike most capital murder defendants, Lizcano was unfamiliar with the U.S. criminal

justice system's jury selection process. Defense mitigation specialist Debbie Nathan testified without contradiction during Lizcano's state habeas corpus proceeding that Mexican trial courts do not employ juries. 7/12 R.R. State Habeas Hearing 40, 105. She testified further that, while Lizcano was unable to repeat to her the questions his trial counsel had asked prospective jurors during voir dire, Lizcano was able to relate to her the fact that prosecutors were telling potential jurors how terrible the conditions were under which death row inmates were housed in Texas prisons. *Id.*, 76-77.

There was no evidence Lizcano had ever been on trial in an American court or that he had ever witnessed a trial in a U.S. court, either in person or on television. Lizcano was raised in rural Mexico in a dirt-poor family. He spoke little to no English. He had very little formal education and was described at trial by multiple defense witnesses as functionally illiterate. To expect him to be able to listen to weeks of mind-numbing voir dire testimony and then make informed suggestions on which potential jurors should be stricken during jury selection strikes this court as objectively unreasonable, if not patently absurd. Instead, Lizcano's unwillingness to second guess or offer his own suggestions regarding the jury selection decisions of his experienced trial counsel and instead to rely upon their experience and expertise seems to this court to have been an eminently reasonable decision on Lizcano's part. It does not reflect an inability to understand the proceedings against him or an inability to confer intelligently with his trial counsel.

Dr. Antonio E. Puente testified during Lizcano's state habeas corpus proceeding that he did not evaluate Lizcano for competency but could have. 5/12 R.R. State Habeas Hearing 47-48,

97.  While he testified that competence could have been an issue for Lizcano at the time of trial, Dr. Puente did not opine that Lizcano was, in fact, incompetent to stand trial in 2007.  Nor did he opine that he had ever reached a firm conclusion that Lizcano was, in fact, mentally incompetent.  *Id.*  He simply testified that he had difficulty communicating with Lizcano on the two occasions on which he evaluated Lizcano in 2006 and 2007.

Dr. Gilbert Martinez testified during Lizcano's state habeas hearing that he could have testified in 2007 that he believed Lizcano was incompetent to stand trial.  6/12 R.R. State Habeas Hearing 13-14, 18.  On cross-examination, however, Dr. Martinez admitted that he was not a trained forensic psychologist; Lizcano's low IQ did not necessarily render Lizcano incompetent to stand trial; he was only vaguely familiar with the Texas standard for determining competence to stand trial; he did not conduct an evaluation of Lizcano's competence to stand trial;  he did not ask Lizcano any questions designed to ascertain whether Lizcano had a rational understanding of the proceedings against him or whether Lizcano was able to discuss the facts of his offense with his trial counsel; instead he relied upon Lizcano's responses during his clinical interview (which reflected poor communications skills generally) and Lizcano's low standardized test scores to support his opinion that Lizcano was incompetent to stand trial.  *Id.*, 34, 80-86, 88-97, 109-10. More significantly, during the Rule 705 hearing held during Lizcano's trial, Dr. Martinez testified that while he questioned Lizcano's competence, he could not label Lizcano incompetent to stand trial.  55 R.R. Trial 242.

Dr. Antolin M. Llorente testified during Lizcano's state habeas hearing that, based upon Lizcano's "impaired" test scores during a November 2012 clinical interview, Lizcano's low

educational level and poor verbal skills, Lizcano's lack of familiarity with the American criminal justice system (including Lizcano's lack of familiarity with principles underlying the *Miranda* rule and unfamiliarity with the burden of proof beyond a reasonable doubt), the fact Lizcano falsely asserted to Dr. Flynn that he had a driver's license, the fact Lizcano's trial counsel reported to Dr. Flynn that Lizcano was "not helping" them during trial, and the fact Lizcano responded to a question from Dr. Flynn asking for a definition of a trial by stating that it was "when you get an IQ test," he believed Lizcano was incompetent to stand trial in 2007.  6/12 R.R. State Habeas Hearing 178-79, 185, 190, 192, 197, 215, 222, 232-36.

The fact that Lizcano's state habeas counsel were able to locate an expert in 2012 who was willing to testify that he believed Lizcano was incompetent to stand trial in 2007 does not render objectively unreasonable the decision by Lizcano's trial counsel to withdraw their request for a competency trial.  Lizcano's trial counsel reasonably relied on the expert opinions of Dr. Puente and Dr. Martinez, neither of whom could offer a firm opinion regarding Lizcano's competence to stand trial, the opinion of Dr. Flynn (an independent court-appointed expert) that Lizcano was competent to stand trial, as well as their own experience interacting with Lizcano for more than a year prior to the start of jury selection.  Lizcano does not identify any evidence available to Lizcano's state trial counsel in 2007 that rendered objectively unreasonable their decision to forego a competency trial based on their own observations of Lizcano and the opinions related to them by Dr. Puente and Dr. Martinez.  Defense attorneys are ordinarily allowed to rely on the opinions of their own experts without scouring the earth for a more favorable opinion: it is well-settled that defense counsel are permitted to rely upon the accuracy

and efficacy of the objectively reasonable opinions and other information conveyed to them by their own experts. *See Murphy v. Davis*, 901 F.3d 578, 592-93 (5th Cir. 2018) (absent a red flag, it is unreasonable to expect counsel to second-guess their own expert's testimony or objectively reasonable evaluations and opinions); *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (holding the same).

Moreover, nothing in the ex post facto testimony of Dr. Martinez or Dr. Llorente in 2012 rendered objectively unreasonable the strategic decision in 2007 by Lizcano's trial counsel to avoid a competency trial that would have necessitated the defense turning over virtually the defense's entire case in mitigation to the prosecution weeks or even months prior to trial on the merits. Attorneys Busbee and Sanchez testified without contradiction during Lizcano's state habeas hearing that they did not want to hand over the reports of their mental health experts, as well as the detailed mitigation reports of their mitigation specialist to the prosecution. 4/12 R.R. State Habeas Hearing 89-91, 122-23, 162-64, 210. Lizcano has failed to establish that it was objectively unreasonable for his 2007 trial counsel to rely on the problematic nature of the opinions of Dr. Puente and Dr. Martinez when choosing to withdraw Lizcano's motion for a competency hearing. Both of the *independent* mental health experts who evaluated Lizcano shortly before trial in 2007 found him to be competent to stand trial. The defense's own mental health experts were clearly less than sanguine in their support for an incompetency defense. Dr. Martinez informed Lizcano's trial counsel that such a defense was "iffy" at best. Neither Dr. Puente nor Dr. Martinez testified in 2007 that he had conducted an evaluation of Lizcano for competence to stand trial which conformed to the Texas statute defining incompetence to stand

trial. It is undisputed that proceeding with a competency trial would have required Lizcano's defense team to turn over to the prosecution virtually the entirety of the defense's case in mitigation.

The evidence of Lizcano's guilt was overwhelming. There was no genuine dispute at trial that Lizcano fired the shot which killed officer Jackson. Lizcano has never contended otherwise. There was no serious dispute over the prosecution's assertion that Lizcano intentionally fired that shot. While Lizcano's trial counsel did present evidence establishing that Lizcano had been drinking on the night in question, in Texas, voluntary intoxication does not constitute a defense to the commission of crime. *See Thomas v. Lumpkin*, 995 F.3d 432, 452 (5th Cir. 2021) (citing § 8.04(a), TEX. PEN. CODE); *In re Davilla*, 888 F.3d 179, 187 (5th Cir. 2018) (citing § 8.04(a), TEX. PEN. CODE). Likewise, under Texas law, evidence of voluntary intoxication does not negate the element of specific intent required for capital murder. *See Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000). Under Texas law, alcoholism may not be the basis for an involuntary intoxication defense. *See id.* In sum, Texas does not recognize a diminished capacity defense predicated upon voluntary intoxication. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas."). Section 8.01(a) of the Texas Penal Code provides: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Battaglia v. State*, 537 S.W.3d 57, 61 n.3 (Tex. Crim. App. 2017). Lizcano has not alleged any facts nor presented this or any other court with any evidence showing that he did not appreciate the wrongfulness of

his conduct when he shot officer Jackson.

Officer Jackson was in full uniform at the time he was fatally shot. It is undisputed that Lizcano attempted to shoot several other officers in an alleyway only moments before he fatally shot officer Jackson. Nor was it disputed that, while in police custody only weeks before, Lizcano threatened to kill the next officer he encountered. In sum, the outcome of the guilt-innocence phase of Lizcano's capital murder trial was never seriously in question.

Lizcano's trial counsel could reasonably have believed that attempting to save Lizcano's life at the punishment phase of trial through a substantial case in mitigation was preferable to making a risky "Hail Mary" pass attempt against what would likely have been a stout prevent defense. Both of Lizcano's trial counsel testified they were well-aware of the prosecuting attorney's reputation for presenting a thorough and well-prepared case. 4/12 R.R. State Habeas Hearing 94, 162-64, 196, 210. Under such circumstances, the state habeas court reasonably concluded that adopting a trial strategy which allowed the defense to conceal from the prosecution for as long as possible the sum and substance of the defense's rather substantial case in mitigation was preferable to pushing forward with a competency trial about which the defense's mental health experts were unenthusiastic and which would have forced the defense to furnish the prosecution with virtually the defense's entire case in mitigation.

Viewed objectively, the evidence before Lizcano's trial counsel in 2007 and any additional evidence that might have been made available through additional mental health evaluations at that time did not require Lizcano's trial counsel to surrender their case in mitigation weeks or even months prior to trial on the merits in the hope that a jury might find Lizcano (whom

40

defense experts repeatedly insisted was only "mildly" intellectually disabled) to be incompetent to stand trial. Both at trial and during the state habeas hearing, the defense's mental health experts repeatedly emphasized that Lizcano was fully capable of learning a number of skills, including how to drive a truck and live independently with some assistance. *See, e.g.,* 55 R.R. Trial 209, 215 (Dr. Martinez testified mildly intellectually disabled individuals such as Lizcano are capable of living independently); 56 R.R. Trial 36, 60-74 (Dr. Puente emphasized that Lizcano is only mildly intellectually disabled and displayed a number of adaptive skills); 56 R.R. Trial 132 (Dr. Compton testified mildly intellectually disabled persons such as Lizcano can mask their intellectual disability); 5/12 R.R. State Habeas Hearing 98-100, 117 (Dr. Puente testified that Debbie Nathan's notes indicated Lizcano was fully capable of explaining to her the fundamentals of his trial, including the roles of the jury and prosecution, and that mildly intellectually disabled individuals are capable of learning); 6/12 R.R. State Habeas Hearing 54, 74-75 (Dr. Martinez testified individuals with mild intellectual disability are capable of living independently with some assistance); 6/12 R.R. State Habeas Hearing 227-28 (Dr. Llorente testified Lizcano is mildly intellectually disabled). Thus, Lizcano offered the state habeas court no evidence showing that he is severely or even moderately intellectually disabled.

Lizcano's trial counsel faced a daunting task – to convince the jury by a preponderance of the evidence that Lizcano was *mildly* intellectually disabled. There was no objectively reasonable trial strategy available that would have enabled them to obtain a "not guilty" verdict at the guilt-innocence phase of trial. Their decision to forestall disclosure of their case in mitigation for as long as possible was objectively reasonable given the circumstances. Proceeding with their

request for a competency hearing with their own experts less than sanguine in support of that strategy would have required the defense to disclose virtually its entire case in mitigation to the prosecution weeks or even months before the start of a trial on the merits.   Under such circumstances, the state habeas court reasonably concluded that Lizcano's trial counsel engaged in objectively reasonable behavior when they chose to withdraw their request for a competency trial.

## 2.  No Prejudice

The state habeas court also reasonably concluded the decision by Lizcano's trial counsel to withdraw their motion for a competency hearing did not prejudice Lizcano within the meaning of *Strickland*.   Contrary to the implication underlying Lizcano's first claim for federal habeas relief, a finding by a jury that Liacano was incompetent to stand trial would not have been a life-long "get out of jail free" card for Lizcano.   Instead, it would have resulted only in Lizcano's transfer to a state-run mental health facility where he would have been medicated and evaluated until such time as the staff at that facility deemed him competent to stand trial.   At that point, Lizcano would have been transferred back to state court for either a new competency trial or a trial on the merits.   T.C.C.P. Arts. 46B.071-46B.081.

Simply put, proceeding with, and prevailing in, a competency hearing would *not* have immunized Lizcano forever from standing trial for his capital offense.   Had Lizcano prevailed at a competency hearing, under Texas law, he would have been committed to the care of a mental health facility until such time as he was deemed competent to stand trial.   No evidence before this court shows that Lizcano continued to remain incompetent to stand trial at the time of

Lizcano's state habeas hearing in 2012. In fact, it is readily apparent that even as late as 2012, neither Dr. Martinez, Dr. Puente, nor Dr. Llorente had yet personally conducted a legitimate forensic evaluation of Lizcano's competence to stand trial, i.e., an evaluation which included questions designed to elicit hard information regarding Lizcano's ability to communicate the facts and circumstances surrounding his capital offense or to comprehend the nature of the proceedings against him. The fact that Lizcano was unfamiliar in 2007 with the details of the *Miranda* rule and the burden of proof in an American criminal trial does not establish that he was incompetent to stand trial within the meaning of applicable Texas law. There was no evidence presented during Lizcano's trial, or state habeas proceedings showing that Lizcano's attorneys, mental health experts, or mitigation specialist, or any other person ever made a good faith effort prior to trial to educate Lizcano about the details of the *Miranda* rule or the burden of proof in an American criminal trial. When the state trial court proposed to question Lizcano in connection with the defense's motion for a competency trial, attorney Busbee objected.

As best this court can tell from their testimony during Lizcano's state habeas hearing, neither Dr. Martinez, Dr. Puente, nor Dr. Llorente ever personally asked Lizcano to explain the facts and circumstances surrounding his capital offense to them or questioned Lizcano regarding his understanding of the criminal proceedings against him. Instead, all three defense experts appear to have relied on (1) their clinical evaluations of Lizcano's low IQ, poor communication skills generally, and lack of familiarity with the American criminal justice system generally and (2) cherry-picked answers Lizcano gave to Dr. Flynn during his clinical evaluation of Lizcano to speculate about Lizcano's ability to communicate with his trial counsel and rationally

comprehend the nature of the proceedings against him.

There was considerable evidence before the state habeas court in the testimony of Lizcano's trial counsel, mitigation specialist (and her reports), as well as the testimony of numerous defense mental health experts from which the state habeas court could reasonably find that Lizcano (1) was only mildly intellectually disabled; (2) was fully capable of learning a wide range of skills; (3) fully understood his jury would determine whether he lived or died; (4) fully understood that the prosecution was opposed to him; and (5) fully understood that his fate depended in large part upon the success of his mental health experts in convincing the jury that he was intellectually disabled. Thus, the state habeas court reasonably concluded that, had Lizcano's trial counsel proceeded with their motion for a competency trial, that motion was unlikely to prevail. After all, Lizcano's mental health experts were unable to persuade the jury during the punishment phase of his trial that Lizcano was intellectually disabled.

Assuming that Lizcano had been able to convince a jury that he was at that point in time incompetent to stand trial, rather than resulting in a dismissal of all charges against him, Lizcano would have merely faced a delay of weeks or months before he was again compelled to convince a trial court of his incompetency to stand trial. The evidence of his guilt would have every bit as overwhelming on a later date as it was in the Fall of 2007. At best, a successful a competency hearing would only have bought Lizcano time – time during which some or all of Lizcano's mitigation fact witnesses may have become unavailable (many may have been forced to return to Mexico because they were in the U.S. on limited duration visas) and during which the prosecution could have poured through the entirety of the defense's case in mitigation in an

effort to rebut same. Such delay would not necessarily have benefitted Lizcano strategically.

Furthermore, two independent mental health officials examined Lizcano shortly before trial and reported to the state trial judge that they found Lizcano to be competent to stand trial. Attorney Sanchez's testimony at Lizcano's state habeas hearing was that he noticed that Lizcano was mentally "slow" fairly early on during their interactions and conversations. But he did not begin to suspect Lizcano was incompetent to stand trial until the defense began exercising its peremptory challenges during jury selection, at which time he tried without success to solicit suggestions from Lizcano on how best the defense should utilize its peremptory challenges. Sanchez testified that when he asked Lizcano for his thoughts, Lizcano simply told Sanchez to do what he thought best. 4/12 R.R. State Habeas Hearing 159-60. Sanchez testified further that Lizcano was effective at masking his low intelligence and it initially took Sanchez several days of conversation with Lizcano before he understood Lizcano was intellectually disabled. *Id.*, 184.

Unlike many capital murder defendants with lengthy criminal records prior to their commission of capital offenses, Lizcano was unfamiliar with the U.S. criminal justice system's jury selection process. No evidence has been presented showing that Lizcano had ever been to trial in an American court prior to his indictment for his capital offense. He was raised in rural Mexico by an extremely poor family in a dirt-floor home that lacked electricity and running water. He spoke little to no English. As explained above, to expect Lizcano to be able to listen to weeks of voir dire testimony and then make informed suggestions on which potential jurors should be stricken during jury selection strikes this court as objectively unreasonable. Instead, Lizcano's unwillingness to second guess or offer his own suggestions regarding the jury selection

45

decisions of his experienced trial counsel and instead to rely upon their experience and expertise seems to this court to have been an eminently reasonable decision.

Dr. Puente testified during Lizcano's state habeas corpus proceeding that he did not evaluate Lizcano for competency but could have. 5/12 R.R. State Habeas Hearing 47-48. While he testified that competence could have been an issue for Lizcano at the time of trial, Dr. Puente did not opine that Lizcano was, in fact, incompetent to stand trial in 2007. *Id.*, 48, 97-100, 117. Nor did he opine that he had ever reached a firm conclusion that Lizcano was, in fact, mentally incompetent. *Id.* He simply testified that he had difficulty communicating with Lizcano on the two occasions on which he evaluated Lizcano in 2006 and 2007. *Id.*, 47.

During the evidentiary hearing on Lizcano's state habeas corpus application, his trial counsel testified that they made the strategic decision to withdraw their request for a competency hearing because (1) the two mental health experts appointed by the court to evaluate Lizcano for competence (i.e., Dr. McGarrahan and Dr. Flynn) had each reported back to the trial judge that they believed Lizcano was competent to stand trial; (2) their own expert (Dr. Gilbert Martinez) was less than confident or "iffy" with regard to his opinion on whether Lizcano was incompetent; and (3) the state trial judge had made it clear that if a competency hearing took place, the defense would be required to turn over to the prosecution all of the materials reviewed by any defense expert who testified at such a hearing and that material consisted of the sum and substance of the defense's case in mitigation. 4/12 R.R. State Habeas Hearing 70-72, 80-81, 86-87, 89-91, 127-28, 141-42, 161-64, 210, 214, 217. Lizcano's trial counsel reasonably did not want to turn over to the prosecution months before trial on the merits the entirety of their

mitigation evidence.  They believed that, if given sufficient time to do so, the prosecution would pour over their mitigation evidence and find ways to rebut portions of that evidence.  The state habeas court reasonably concluded the foregoing were objectively reasonable reasons for the decision to withdraw the defense's request for a competency hearing.

As explained above defense mental health expert Dr. Martinez testified during Lizcano's state habeas corpus hearing that he was prepared to testify in 2007 that Lizcano was incompetent to stand trial.  The rest of his testimony at Lizcano's state habeas hearing and his *actual* testimony during a hearing outside the jury's presence belie that assertion, however.  More specifically, during the state habeas hearing, Dr. Martinez repeatedly emphasized that he was not a forensic psychologist familiar with the legal standards applicable to proceedings such as a competency hearing.  6/12 R.R. State Habeas Hearing 34, 80-85, 89-95, 109-10.  Dr. Martinez also candidly admitted that he had not questioned Lizcano specifically or in any detail about whether Lizcano was familiar with or understood the nature of the participants or procedures involved in his capital murder trial.  *Id.*  The only specific questions Dr. Martinez stated that he asked Lizcano in that regard were (1) whether Lizcano understood what his jury would do – he reported that Lizcano replied that the jury would decide whether Lizcano lived or died and (2) what the role of the prosecution would be at trial – he reported Lizcano replied that the prosecution was opposed to him.  *Id.*, 80-85, 88-91, 109-10.  Dr. Martinez did not testify that he made any direct inquiry into whether Lizcano understood the nature of his approaching capital murder trial but, instead, simply relied on Lizcano's low IQ and clinical impressions he formed while interviewing Lizcano to conclude Lizcano was incompetent to stand trial.  *Id.*, 81-85, 90-92, 93-97, 103, 108-10.

Likewise, Dr. Martinez offered no testimony suggesting that he had ever made any inquiry into whether Lizcano knew and could communicate with his trial counsel regarding the details of the facts of Lizcano's offense. *Id.*, 81-85, 97, 103, 108-10. Dr. Martinez admitted that he himself knew only the barest outline of the circumstances surrounding Lizcano's capital offense (i.e., that Lizcano fatally shot a police officer near the home of Marta Cruz). *Id.*, 109-10. Dr. Martinez apparently made no effort to engage Lizcano in a discussion of the facts or circumstances of Lizcano's offense. *Id.* Instead, Dr. Martinez undertook an inquiry into whether Lizcano possessed general communication skills and concluded, based on Lizcano's low IQ and communications deficits, that Lizcano would be unlikely to be able to communicate the details of his offense to trial counsel. *Id.*, 80-85, 90-97, 103, 108-10. This is a highly speculative conclusion, especially considering the fact that Lizcano's trial counsel testified during the state habeas proceeding that, while they recognized early on in their representation of Lizcano that he was quite possibly intellectually disabled (and retained experts to evaluate Lizcano for that purpose of proving same at trial), they nonetheless had no significant problem communicating with Lizcano until they attempted to solicit input from Lizcano on how best to employ the defense's peremptory strikes during jury selection.

Lizcano reportedly responded to attempts by his trial co-counsel to solicit input from Lizcano on jury selection by telling co-counsel to employ his own experience and opinion when choosing Lizcano's jurors. As explained above, rather than indicating a lack of rational understanding of the proceedings against him, Lizcano's decision to defer to his veteran trial attorneys when it came to selecting a cross-section of the community to sit on Lizcano's jury

appears to this court to be an eminently reasonable decision, especially considering the fact that Lizcano had zero experience with the U.S. criminal justice system and the process of selecting a jury for a capital murder trial.  As many courts have noted, selecting a jury is more art than science.  *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989) ("the selection of a jury is, inevitably, a call experience and intuition.  The trial lawyer must draw upon his own insight and empathic abilities."); *Jasper v. Thaler*, 765 F.Supp.2d 783, 821 (W.D. Tex. 2011) (jury selection is more art than science).  Lizcano's unwillingness to inject himself into a complex process with which he had zero experience was not evidence of his incompetence to stand trial.

Under such circumstances, the state habeas court reasonably concluded there was no reasonable probability that the outcome of the guilt-innocence phase of Lizcano's trial would have been any different if Lizcano's trial counsel had chosen not to withdraw their request for a competency trial.  An unsuccessful competency trial would have disclosed virtually the entire mitigation case prepared by Lizcano's defense team to weeks or months of intense pretrial scrutiny by the prosecution and furnished no strategic benefit to Lizcano's defense team.  A successful competency trial would, in all reasonable likelihood, merely have delayed the commencement of Lizcano's capital murder trial without furnishing any strategic benefit or changing in any way the inevitable verdict of guilty at the conclusion of the guilt-innocence phase of his capital murder trial.  Such delay would not have altered the fact the evidence of Lizcano's guilt was overwhelming.

### 3. Conclusions

The Texas Court of Criminal Appeals's rejection on the merits during Lizcano's initial state habeas corpus proceeding of Lizcano's ineffective assistance claim arising from his trial counsels' withdrawal of their motion for a competency trial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Lizcano's trial and initial state habeas corpus proceedings. The TCCA's decision was wholly consistent with the deferential nature of the *Strickland* test. This Court thereforedenies relief on this claim under the AEDPA standard of review.

### A. No Relief Under *De Novo* Review

Furthermore, out of an abundance of caution, this court has undertaken *de novo* review of Lizcano's initial claim in his second amended federal habeas corpus petition, including all materials submitted to this court by Lizcano. This court concludes, for the same reasons discussed at length above, Lizcano has failed to satisfy either prong of *Strickland*. Even when examined under a *de novo* standard, Lizcano has not established that his trial counsels' decision to withdraw their motion for a competency trial was objectively unreasonable or that there is a reasonable probability that, but for that decision, the outcome of the guilt-innocence phase of Lizcano's capital murder trial would have been any different. Lizcano's guilty verdict was an inevitability.

In his reply to Respondent's answer, Lizcano argues that the subjective opinion of

Lizcano's trial counsel (that Lizcano was competent to stand trial) does not make their decision to withdraw the motion for a competency trial reasonable and should not be considered conclusive on the reasonableness issue (ECF no. 75, at 1-8).   What this argument ignores, however, is that Lizcano's trial counsel did not rely exclusively on their own opinions when they chose to withdraw Lizcano's motion for a competency trial.  As explained above, Lizcano's trial counsel also relied upon (1) the opinions of the court's two independent experts Dr. McGarrahan and Dr. Flynn (that Lizcano was competent to stand trial); (2) the fact that both Dr. Puente and Dr. Martinez, the defense's leading mental health experts, were unenthusiastic about their ability to testify persuasively based on their *clinical* evaluations that Lizcano was incompetent to stand trial; and (3) the fact that they and their experts could point to no *forensic* examination of Lizcano conducted in 2007 which concluded that Lizcano was, in fact, incompetent to stand trial.  In addition, it was undisputed that Lizcano suffered only from *mild* intellectual disability, which did not preclude him from learning new skills, such as how to drive a pickup truck.   Furthermore, the objective reasonableness of Lizcano's trial counsel must be viewed in light of the state trial court's order (which Lizcano has never challenged as erroneous) requiring the defense to turn over virtually its entire case in mitigation to the prosecution once Dr. Martinez testified at a competency trial.   Under these circumstances, the decision by Lizcano's trial counsel to withdraw their motion for a competency hearing was *objectively* reasonable regardless of the subjective opinions of Lizcano's trial counsel.

Finally, in light of the written report of Dr. McGarrahan regarding Lizcano's competence to stand trial in 2007, and the availability of Dr. Flynn to testify at a competency trial in a similar

manner to Dr. McGarrahan, the subsequent opinions of Dr. Llorente, which were not based on a *forensic* examination of Lizcano at or near the time of trial, do not undermine the objective reasonableness of the decision by Lizcano's trial counsel to withdraw their motion for a competency trial.  Nor do Dr. Llorente's ex post facto opinions and Lizcano's other new evidence establish a reasonable probability that, but for the withdrawal of Lizcano's motion for a competency trial, the outcome of the guilt-innocence phase of Lizcano's trial would have been different.  In 2007, Lizcano had no defense - factual or legal - to the charge that he intentionally murdered officer Jackson.  He still has none.

Even if viewed under a less deferential *de novo* standard, Lizcano's first claim for federal habeas relief does not satisfy the dual prongs of *Strickland* and does not warrant relief from his conviction.

## IV.  STATE TRIAL COURT'S *SUA SPONTE* FAILURE TO HOLD A COMPETENCY TRIAL

### A.  The Claim

In his second claim for relief in his second amended federal habeas corpus petition, Lizcano argues that the state trial court was confronted with sufficient facts to warrant holding a competency trial and violated his due process rights in failing to proceed to trial on the issue of Lizcano's competence to stand trial (ECF no. 57, 24-30).

### B. State Court Disposition

Lizcano presented essentially the same claim as his second claim in his initial state habeas corpus application (State Habeas Application, 35-39).  The state habeas trial court issued extensive factual findings and conclusions on this claim, determining that:

- Once the issue of competency is raised, the trial court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent.  T.C.C.P. Art. 46B.004(a), (c).  If after an informal inquiry the court determines that evidence exists to support a finding of incompetency, the court shall order a competency trial.  T.C.C.P. Art. 46B.005(a), (b).

- A competency trial is not required unless the evidence is sufficient to create a bona fide doubt in the mind of the judge as to whether the defendant meets the test of legal competence.  Generally, a bona fide doubt about a defendant's legal competence is raised only if the evidence indicates recent severe mental illness, moderate mental retardation, or truly bizarre acts by the defendant.

- Lizcano could have raised his due process claim on direct appeal because it was based solely upon facts and evidence contained in the trial record.  The record included a letter written to Lizcano's trial counsel by a defense mental health expert [Dr. Martinez] expressing the opinion that Lizcano did not have "sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding, nor does he have a rational or factual understanding of the proceedings against him."  The record on appeal also contained the report of the examination of the expert appointed by the court – Dr. William Flynn.

- There is no valid reason why Lizcano could not have raised this claim on direct appeal.  Indeed, the TCCA has shown that it is capable of examining procedural incompetency claims on direct appeal.

- Because Lizcano could and should have raised his due process claim on direct appeal, but did not, the claim is procedurally barred from being raised on habeas.  [Citing *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996)]

- Moreover, Lizcano failed to show that the trial court violated his due process rights by not holding a competency trial.  Once the issue of competency was raised by counsel's motion, the trial court conducted an informal inquiry into Lizcano's competency.  The court also appointed an expert to examine Lizcano and informed the parties that it planned to have a competency trial by jury on September 25, 2007.

- Lizcano's due process rights were protected by the trial court's inquiry into Lizcano's competency and by the court's compliance with T.C.C.P. Arts. 46B.004(a), (c) and 46B.005(a), (b).

- No competency trial was ultimately held because defense counsel made a strategic

decision not to proceed with a competency trial.  The day the competency trial was scheduled, attorney Busbee stated on the record her belief that Lizcano was competent to stand trial and withdrew her request for a competency trial. Because attorney Busbee was Lizcano's lead counsel and in position to know better than anyone whether Lizcano was capable of assisting in his defense and understanding the proceedings, it was reasonable for the trial court to rely on counsel's opinion regarding Lizcano's competency.

·   The facts and evidence known to the trial court were insufficient to create a bona fide doubt regarding Lizcano's competence to stand trial.  The trial court, Lizcano's attorneys, Dr. Flynn, and Dr. McGarrahan all believed that Lizcano was competent to stand trial.  There was no evidence that Lizcano had a recent severe mental illness, that he was moderately to severely intellectually disabled, or that he had exhibited bizarre behavior or committed bizarre acts.  As such, due process did not require any further action from the trial court.

·   Incorporating the foregoing as well as the factual findings and legal conclusions summarized in Section III.B. above, the trial court did not violate Lizcano's constitutional due process rights by not *sua sponte* conducting a competency hearing.

FFCL, 60-64, ¶¶ 176-93.

The TCCA expressly adopted all of the foregoing findings and conclusions when it denied Lizcano's initial state habeas corpus application.  *Ex parte Lizcano*, WR-68,348-03, 2015 WL 2085190 (Tex. Crim. App. Apr. 15, 2015).  This court has independently examined the entire record from Lizcano's trial, direct appeal, and state habeas corpus proceedings and finds all of the foregoing factual findings adopted by the TCCA were supported by the evidence before that court.

### A.  Clearly Established Federal Law

The Constitution prohibits the trial and conviction of a criminal defendant who is mentally incompetent to stand trial.  *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996); *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  There is a two-part test for ascertaining competence to

stand trial: (1) whether the defendant has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and (2) whether he has a rational as well as factual understanding of the proceedings against him. *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960); *Pate*, 383 U.S. at 378. As a threshold matter, a petitioner in a habeas proceeding claiming that he was incompetent at the time of trial must first come forward with "meaningful evidence" of mental incompetency. *Demosthenes v. Baal*, 495 U.S. 731, 736 (1990); *Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990).

## B. AEDPA Review

The issue of competence to stand trial may arise in two different contexts. First, a trial court is required to conduct an inquiry into the defendant's mental capacity *sua sponte* if the evidence raises a bona fide doubt as to competence; if the trial court received evidence, viewed objectively, which raises a reasonable doubt as to competence, yet fails to make further inquiry, the defendant is denied a fair trial; in such circumstances, a federal habeas court must consider whether a meaningful hearing can be held *nunc pro tunc* to determine retrospectively the defendant's competence at the time of trial; and if so the petitioner bears the burden of proving his incompetence by a preponderance of the evidence. *Pate*, 383 U.S. at 386-87; *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980). This type of competence inquiry is frequently referred to as a *Pate* inquiry, after the Supreme Court's decision in *Pate v. Robinson*, which established that procedure. Second, a federal habeas petitioner may simply assert that he was incompetent at the time of trial, thereby asserting a violation of the substantive right not to be tried while

55

incompetent, rather than the procedural guarantee of a competency hearing outlined above. *Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997); *Wood v. Dretke*, 386 F.Supp.2d 820, 864 (W.D. Tex. 2007). Having carefully reviewed Lizcano's pleadings, this court concludes that his second claim in his second amended petition does not assert a claim that he was actually incompetent to stand trial but, rather, is limited to a complaint that the state trial court should have held a competency hearing under *Pate*.

The facts in *Pate* are vitally important to understanding the state trial court's obligations under the Constitution. In *Pate*, four witnesses expressed the opinion that Robinson was insane. *Pate*, 383 U.S. at 383. There was also evidence in the record establishing that Robinson had previously been hospitalized in a state mental hospital where he was observed to have "symptoms of mental illness." *Id*, at 379-80. Robinson's defense at trial was that he was legally insane.

At the time Lizcano's trial counsel withdrew their request for a competency trial, the only hard evidence before the state trial court which supported a finding of incompetence consisted of attorney Sanchez's affidavit stating that Lizcano had declined to participate in the defense team's discussions regarding how best to exercise the defense's peremptory strikes and the conclusory letters furnished by Dr. Puente and Dr. Martinez declaring their opinions that Lizcano could not consult adequately with his defense counsel with a rational understanding of the facts of his case or the proceedings against him. As explained above, given Lizcano's lack of familiarity with the American jury system, much less the strategies underlying jury selection in a capital case, there was nothing irrational with Lizcano's decision to defer to his experienced trial counsel when it came to selecting his jury. Lizcano had only been in the United States for about five years at the

56

time of his arrest.  He had no formal training in American civics much less the jury system.  He came from a culture and society bereft of the advantages of the jury system.  There was no evidence showing that Lizcano had ever been hospitalized or otherwise diagnosed with any mental disease or disorder (other than *mild* intellectual disability).  Likewise, Lizcano identifies no bizarre or otherwise anomalous conduct on his part that would have alerted the trial court to the possibility Lizcano was unable to communicate with his attorneys or rationally understand the proceedings against him.  On the contrary, Lizcano's trial counsel had worked with him for over a year and a half without apparent issue at the time his trial counsel filed their motion for a competency hearing.

In the face of this evidence, the state trial court also had before it the opinions of two independent court-appointed mental health experts (Dr. McGarrahan and Dr. Flynn) both of whom concluded Lizcano was competent to stand trial.  The possibility Dr. McGarrahan would have been unable to testify at a competency trial due to a conflict of interest did not render unreasonable the state trial court's reliance on her conclusion that Lizcano was competent to stand trial.  This especially so because Dr. Flynn concurred in that conclusion.  Furthermore, the state trial court had the first-hand opportunity to observe Lizcano interacting with his trial counsel throughout the extended weeks of voir dire and other pretrial proceedings.  The state trial court found there was nothing in Lizcano's behavior which alerted it to the possibility Lizcano might be incompetent to stand trial.  Finally, faced with a difficult strategic choice, Lizcano's lead trial counsel withdrew the defense's motion for a competency trial and declared on the record that she believed Lizcano to be competent to stand trial.

Under such circumstances, the state trial court reasonably concluded there was no need to proceed with a competency trial.  *See Roberts v. Dretke*, 381 F.3d 491, 497-98 (5th Cir. 2004) ("we decline to adopt a *per se* rule that, as a matter of law, a trial court must doubt a capital punishment defendant's competency, or conclude that such a defendant does not understand the proceedings against him or appreciate their significance, or conclude that he cannot rationally aid his attorney in his defense simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty.").  Like the self-defeating conduct in *Roberts* which the Fifth Circuit concluded did *not* warrant a *Pate* hearing, Lizcano's decision to defer to his trial counsel's expertise and experience during jury selection did not mandate a *Pate* hearing.  Likewise, the state trial court reasonably placed more stock in its own observations of Lizcano's non-bizarre behavior, the declaration of lead defense counsel Busbee, and the opinions of Dr. McGarrahan and Dr. Flynn when it implicitly rejected the conclusory opinions of Dr. Puente and Dr. Martinez (both of whom later testified at trial they were unfamiliar with the Texas standard for competence to stand trial and had not conducted a *forensic* examination of Lizcano's competence).

The TCCA's alternative rejection on the merits of Lizcano's *Pate* claim during the course of Lizcano's initial state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Lizcano's trial and initial state habeas corpus

proceedings. This Court therefore denies relief on this claim under the AEDPA standard of review.

### C.   No Relief Under *De Novo* Review

Furthermore, out of an abundance of caution, this court has undertaken *de novo* review of Lizcano's second claim in his second amended federal habeas corpus petition, including all materials submitted to this court by Lizcano. As explained above, a trial court must *sua sponte* hold a competency hearing if there is reasonable cause to believe the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013); *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012). There is no specific threshold or quantum of evidence that requires the trial court to order a competency hearing; the court considers three factors: (1) the existence of a history of irrational behavior; (2) the defendant's demeanor at trial; and (3) prior medical opinion on competency. *Thomas v. Lumpkin*, 995 F.3d 432, 451 (5th Cir. 2021); *Mitchell*, 709 F.3d at 440. Significantly, the presence or absence of mental illness or brain disorder is not dispositive as to competency. *Mitchell*, 709 F.3d at 440 (citing *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000)). On collateral review, such as federal habeas review, the central question is whether, based on what was known to the state trial court, the failure to make further inquiry into the defendant's competence to stand trial denied the defendant a fair trial. *Thomas*, 995 F.3d at 451 (citing *Drope*, 420 U.S. at 174-75).

For the same reasons discussed above in Section IV.D., Lizcano's *Pate* claim lacks merit.

The state trial court did not violate Lizcano's due process rights by failing to hold a competency trial after Lizcano's trial counsel withdrew their motion for such a trial.  The state trial court's decision was fully justified in view of the opinions of Dr. McGarrahan and Dr. Flynn (that Lizcano was competent to stand trial), the declaration on the record by lead defense attorney Busbee (that Lizcano was competent to stand trial), and the trial court's own observations of Lizcano's non-bizarre behavior during weeks of voir dire examination and other pretrial proceedings.  There was no evidence before the state trial court showing that Lizcano had ever been hospitalized for a mental illness or that Lizcano had ever been diagnosed with any mental health disorder other than *mild* intellectual disability.  Under such circumstances, Lizcano's decision to decline his co-counsel's invitation to inject his uninformed opinions regarding the use of peremptory strikes by the defense did not mandate a *Pate* hearing, even in light of the conclusory opinions of Dr. Puente and Dr. Martinez.  *Roberts*, 391 F.3d at 497-98 (holding defendant's directives to trial counsel to steer the case in the direction of a conviction for capital murder and sentence of death did not mandate a *Pate* hearing).  Even under a less deferential *de novo* standard of review, Lizcano's second claim in his second amended petition does not warrant federal habeas relief.

60

## V. INEFFECTIVE ASSISTANCE BY STATE HABEAS COUNSEL

### A. The Claims

In his multifaceted second, third, fourth, and fifth claims in his second amended petition, Lizcano argues that his state habeas counsel rendered ineffective assistance by failing to assert claims in Lizcano's initial state habeas corpus application arguing that (1) Lizcano's state appellate counsel operated under a conflict of interest and rendered ineffective assistance by failing to assert a point of error raising Lizcano's *Pate* claim (ECF no. 57, 37-39); (2) Lizcano's trial counsel rendered ineffective assistance by failing to adequately challenge the prosecution's peremptory strike of venire member R___ H___ (ECF no. 57, 55-56); (3) Lizcano's trial counsel rendered ineffective assistance by failing to timely object to the prosecution's allegedly inappropriate closing jury arguments at the guilt-innocence phase of trial, which included a plea for law enforcement and impugned defense counsel's arguments (ECF no. 57, 63); and (4) the cumulative effect of all of the alleged errors in Lizcano's trial warranted state habeas corpus relief (ECF no. 57, 63-64).

### B. State Court Disposition

In his second state habeas corpus application, Lizcano argued in his second through fourth and sixth through tenth claims that his state habeas counsel rendered ineffective assistance by failing to assert a host of claims in Lizcano's initial state habeas corpus application, including numerous complaints of ineffective assistance by Lizcano's trial and state appellate counsel. The TCCA summarily dismissed all these claims as procedurally defaulted under the Texas writ-abuse statute. *Ex parte Lizcano*, WR-68,348-04, 2020 WL 5568625, *2 (Tex. Crim. App. Sept. 16,

2020).

## C. Clearly Established Federal Law

There is no constitutional right to the assistance of counsel in a state post-conviction proceeding. *Davila v. Davis*, 583 U.S. 521, 524, 529  (2017) (recognizing that the Supreme Court has never held the Constitution guarantees the right to counsel in state postconviction proceedings (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991), and *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-8 (1989).

## D. *De Novo* Review

Insofar as Lizcano argues that he is entitled to federal habeas corpus relief, as opposed to merely a disregard of his procedural default on a claim of ineffective assistance by his trial counsel, those portions of his second through fifth claims in his second amended petition which address alleged ineffective assistance by his state habeas counsel are *non sequitur*.  Infirmities in a state post-conviction proceeding, including allegations of procedural irregularities and complaints of ineffective assistance by state habeas counsel, do not furnish an independent basis for federal habeas corpus relief.  *Gilkers v. Vannoy*, 904 F.3d 336, 346 n.60 (5th Cir. 2018).  The Fifth Circuit has consistently applied this rule in a wide variety of contexts.  *See Rockwell v. Davis*, 853 F.3d 758, 761 n.5 (5th Cir. 2017) (state habeas court allegedly failed to adhere to Texas criminal procedural laws), *cert. denied*, 138 S. Ct. 215 (2017); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013) (state habeas court failed to hold an evidentiary hearing on petitioner's *Roper* claim);

*In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012) (state appellate court allegedly used flawed procedures to review state petitions for post-conviction review); *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (allegedly inadequate funding and staffing of the Mississippi Office of Capital Post-Conviction Counsel); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged ineffective assistance by initial state habeas counsel); *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005) (state habeas judge who issued findings of fact was not the same judge who presided over the petitioner's state habeas hearing); *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (alleged misapplication by state habeas court of state procedural rules did not furnish a basis for federal habeas relief because "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself" (quoting *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001)); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (Supreme Court precedent does not recognize a general right to effective assistance in a state post-conviction proceeding); *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (state habeas court held that an alleged violation of a petitioner's state statutory right to effective representation in an initial state habeas proceeding did not furnish a basis for relief in a subsequent state habeas proceeding); *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (petitioner denied access to the prosecution's file during state habeas corpus proceeding); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001) (state habeas court allegedly overburdened petitioner's state habeas counsel by assigning multiple state habeas cases to the same counsel at the same time); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001) (state habeas court's refusal to consider a supplemental state writ application); *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir.

1999) (an attack on a state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself and, therefore, will not furnish a basis for federal habeas relief (quoting *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995)); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (state habeas court adopted the prosecution's proposed findings of fact and conclusions of law only three hours after they were filed with the state court); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) (state court policy against considering challenges to prison disciplinary proceedings in state habeas corpus proceedings); *Nichols v. Scott*, 69 F.3d at 1275 n.36 (state habeas judge had been the prosecutor in one of the petitioner's prior convictions that was introduced into evidence at the punishment phase of petitioner's capital murder trial, state habeas judge failed to recuse himself *sua sponte*, and state habeas judge signed prosecution's proposed findings and conclusions without change); *McCowin v. Scott*, 67 F.3d 100, 102 (5th Cir. 1995) (petitioner proceeded *pro se* and without a copy of the transcript in his state habeas proceeding and state habeas court failed to hold an evidentiary hearing); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992) (state habeas court quashed subpoenas *duces tecum* served on County District Attorney, State Attorney General, and U.S. Marshal).

The rationale behind this rule is that attacks upon the propriety of a state post-conviction proceeding are collateral to, and do not directly undermine the validity of, the underlying state criminal proceeding which resulted in the federal habeas petitioner's conviction or the affirmation of same on direct appeal.  *Morris*, 186 F.3d at 585 n.6; *Nichols*, 69 F.3d at 1275.

Moreover, this court is statutorily precluded from granting federal habeas relief based on the complaints of ineffective assistance by Lizcano's state *habeas* counsel contained in the second

through fifth claims in Part B of his second amended federal habeas petition.  28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

After *de novo* review, the court concludes that insofar as Lizcano seeks federal habeas corpus relief based upon his claims that his initial state habeas corpus counsel rendered ineffective assistance during that proceeding, Lizcano's second through fifth claims are legally frivolous and do not warrant federal habeas relief.  All of Lizcano's complaints of ineffective assistance by his state habeas counsel are denied on the merits.

## VI.  INEFFECTIVE ASSISTANCE BY STATE APPELLATE COUNSEL

### A.  The Claim

In a portion of his second claim in his second amended petition Lizcano argues that his state appellate counsel operated under a conflict of interest and rendered ineffective assistance by failing to object to the state trial court's failure to hold a competency trial under the rule in *Pate* (ECF no. 57, 30-37).

### B.  State Court Disposition

During Lizcano's most recent state habeas corpus proceeding the TCCA summarily dismissed all of Lizcano's complaints of ineffective assistance by his state appellate counsel pursuant to the Texas writ-abuse rule.  *Ex parte Lizcano*, WR-68,348-04, 2020 WL 5568625, *2 (Tex. Crim. App. Sept. 16, 2020).

### C.

65

### D.  Clearly Established Federal Law

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal).  Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and whether appellate counsel's allegedly deficient performance "prejudiced" the petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of the petitioner's appeal would have been different. *Smith*, 528 U. S. at 285.  Appellate counsel who files a merits brief need not and should not raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal.  *Smith*, 528 U. S. at 288; *Jones v. Barnes*, 463 U. S. 745, 751 (1983).  The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Lizcano's case, state appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more nonfrivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy

66

*both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith*, 528 U.S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

To prevail on a claim of ineffective assistance by appellate counsel based on an unasserted point of error or claim, a petitioner must establish that the unasserted claim was plainly stronger than those actually presented in the appellate brief.  *See Davila*, 583 U.S. at 531-33 (declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court); *Smith*, 528 U.S. at 288 (to prove ineffective assistance on appeal for failure to raise a claim in a merits brief, a petitioner must show that a particular omitted nonfrivolous issue was clearly stronger than issues that appellate counsel did present).

## E.  *De Novo* Review

After de novo review, this court independently concludes there is no reasonable probability that, but for the failure of Lizcano's state appellate counsel to present a *Pate* claim in Lizcano's appellate brief, the outcome of Lizcano's direct appeal would have been any different. As explained at length above in Sections III and IV, in all reasonable likelihood, the state appellate court would have determined (as does this court) that Lizcano's *Pate* claim was without arguable merit.  The state trial court's decision to respect the decision by Lizcano's trial counsel

67

to withdraw their motion for a competency trial was eminently reasonable given the opinions of Dr. McGarrahan and Dr. Flynn (two independent court-appointed experts), the declaration of Lizcano's lead trial counsel, the late filing of Lizcano's motion for a competency trial (following more than a year of contact between Lizcano and his trial team), the problematic nature of the only fact-specific allegations contained in the affidavit of co-counsel attorney Sanchez, and the state trial judge's own first-hand observation of Lizcano's behavior throughout weeks of voir dire proceedings.  Thus, Lizcano's claim of ineffective assistance by his state appellate counsel fails to satisfy the prejudice prong of *Strickland*.

Nor does this claim satisfy the deficient performance prong of *Strickland*.  Lizcano's *Pate* claim was not "plainly stronger" than those actually presented by Lizcano's state appellate counsel, attorney John Tatum, in Lizcano's appellate brief.  Attorney Tatum could reasonably have determined that Lizcano's *Pate* claim had significantly less prospect of success on appeal than most of the 79 points of error he did include in Lizcano's exhaustive appellate brief. *Medellin v. Dretke*, 371 F.43d 270, 279 (5th Cir. 2004) (failure of appellate counsel to raise a meritless *Batson* claim on direct appeal was not ineffective assistance).

Lizcano attempts to avoid the foregoing findings by asserting in conclusory fashion that the fact attorney Tatum was appointed prior to trial and assisted Lizcano's trial counsel in some aspects of Lizcano's trial created a conflict of interest which eliminated Lizcano's duty to show prejudice under *Strickland* arising from the conduct of his state appellate counsel (ECF no. 57, 34-37).  Lizcano misapprehends the nature and impact of conflicts of interest in such circumstances.

In *United States v. Cronic*, 466 U.S. 648 (1984), decided the same day as *Strickland*, the Supreme Court held a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *Cronic*, 466 U.S. at 659. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45 (1932) (no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *Cronic*, 466 U.S. at 659-61. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *Cronic*, 466 U.S. at 661 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695-96 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell*, 535 U.S. at 697-98 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce

mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding). Simply put, garden variety ineffective assistance claims of the nature asserted by petitioner herein do not warrant application of the presumption of prejudice recognized in *Cronic*.

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell*, 535 U.S. at 697 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002) (holding the same); *Burdine v. Johnson*, 262 F.3d 336, 344 n.4 (5th Cir. 2001) (holding the same); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000) ("'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases involving the absence of counsel from the

courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing." (*citations and footnote omitted*)).

A lawyer's conflict of interest may be so flagrant as to constitute a violation of the Sixth Amendment. *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978), *United States v. Gentry*, 941 F.3d 767, 776 (5th Cir. 2019); *United States v. Simpson*, 645 F.3d 300, 310 (5th Cir. 2011). When a conflict of interest springs from multiple representation, a presumption of prejudice under *Cuyler* governs. *United States v. Palacios*, 928 F.3d 450, 455 (5th Cir. 2019); *Black v. Davis*, 902 F.3d 541, 547 n.2 (5th Cir. 2018); *Beets v. Scott*, 65 F.3d 1258, 1265-66 (5th Cir. 1995). Under this standard, a defendant must show that his counsel labored under an actual conflict of interest that adversely affected his performance at trial. *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *Palacios*, 928 F.3d at 455. An actual conflict of interest exists when defense counsel is compelled to compromise his duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *Palacios*, 928 F.3d at 455; *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An adverse effect may be established with evidence that some plausible alternate defensive strategy or tactic could have been pursued but was not because of the actual conflict impairing counsel's performance. *Palacios*, 928 F.3d at 455; *Perillo*, 205 F.3d at 781.

Where an attorney's alleged conflict of interest springs not from multiple client representation, however, but from a conflict between the attorney's *personal* interest and that of

71

his client, the standard of *Strickland* applies and the presumption of prejudice under *Cuyler* has no application. *Gentry*, 941 F.3d at 776-77; *Black*, 902 F.3d at 547 n.2; *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002); *Beets*, 65 F.3d at 1260. Lizcano alleges that his state appellate counsel experienced a conflict of interest arising from the fact attorney Tatum was forced to choose between divergent loyalties to Lizcano and himself and Tatum's working relationship with Lizcano's trial counsel – who withdrew Lizcano's motion for a competency hearing. This argument does not bring Lizcano's case within the scope of the multiple representation line of cases in this Circuit in which a presumption of prejudice is applicable.

Moreover, Licano's conflict of interest theory ignores the reality that attorney Tatum could have included a *Pate* claim in Lizcano's appellate brief without casting any aspersions upon himself or Lizcano's trial counsel. As explained above in Section IV, a *Pate* claim focuses on the *evidence before the trial court* and the reasonableness of the *state trial judge's decision* not to proceed *sua sponte* with a competency hearing. As demonstrated by Lizcano's second claim for relief in his second amended federal habeas corpus petition, the propriety of the state trial judge's decision not to proceed with a competency trial in Lizcano's case turned not exclusively or even primarily upon the fact defense counsel withdrew their request for a competency hearing. Nothing in *Pate* or its progeny make defense counsel's request for a competency hearing the *sine qua non* of a *Pate* claim. On the contrary, a fair reading of the Supreme Court's opinion in *Pate* leads to the conclusion that the constitutional duty imposed by *Pate* exists regardless of whether defense counsel makes a request for such an inquiry.

Attorney Tatum testified without contradiction during Lizcano's first state habeas proceeding that he agreed with the decision by attorney Busbee to withdraw the motion for a competency hearing after the defense learned Dr. Flynn had concluded that Lizcano was competent to stand trial. 5/12 R.R. State Habeas Hearing 16-18.  As explained above in Section III, both this court and the TCCA have concluded there was nothing ineffective with the decision of Lizcano's trial counsel to withdraw their motion for a competency trial.

## F.  Conclusions

Lizcano does not allege any facts showing that attorney Tatum ever represented any party with an interest adverse to Lizcano.  Under such circumstances, Lizcano's conflict of interest theory does not compel this court to ignore the dual prongs of *Strickland* when evaluating Lizcano's complaints about the performance of his state appellate counsel.  Lizcano must, therefore, satisfy the dual prongs of *Strickland*.  *Bernard*, 762 F.3d at 476; *Newell*, 315 F.3d at 516. For the reasons discussed at length above, Lizcano's complaint that his state appellate counsel failed to include a *Pate* claim in Lizcano's appellate brief does not meet this standard and, therefore, does not warrant federal habeas corpus relief under a *de novo* standard of review.

## VII.  ALLEGEDLY IMPROPER PROSECUTORIAL JURY ARGUMENT

### A. The Claims

In his fourth group of claims in his second amended petition, Lizcano argues (1) the prosecution engaged in improper closing jury argument at the guilt-innocence phase of trial by making a plea for law enforcement and attacking Lizcano's trial counsel (ECF no. 57, 56-62); (2) his trial counsel rendered ineffective assistance by failing to timely object thereto (ECF no. 57,

73

56, 62-63); and (3) his state habeas counsel rendered ineffective assistance by failing to raise a claim in Lizcano's first state habeas corpus application accusing Lizcano's trial counsel of ineffective assistance arising from that failure to object (ECF no. 57, 56, 62-63).

## B.  State Court Disposition

In his eighth claim in his subsequent state habeas application, Lizcano argued that his trial counsel rendered ineffective assistance by failing to timely object to various improper prosecutorial jury arguments at both phases of trial; his state appellate counsel rendered ineffective assistance in failing to raise points of error addressing improper prosecutorial jury argument; and his state habeas counsel rendered ineffective assistance in not including points of error in Lizcano's initial state habeas application asserting those same complaints of ineffective assistance  by his state trial and appellate counsel.  Subsequent State Habeas Application (filed Dec. 4, 2017), at 268-99.

The TCCA summarily dismissed all of the foregoing claims, which had been included in Lizcano's eighth claim in his second state habeas corpus application, based on the Texas writ-abuse statute, i.e., T.C.C.P. Article 11.071, § 5(a).  *Ex parte Lizcano,* WR-68,348-04, 2020 WL 5568625, *2 (Tex. Crim. App. Sept. 16, 2020).

## C.  Clearly Established Federal Law

When a prosecutor's allegedly improper jury argument infringes upon a specific right included in the Bill of Rights, such as the right to counsel or the privilege against self-incrimination, federal courts take great care to ensure the prosecution's conduct in no way

74

impermissibly infringed that right. *Donnelly v. DeChristoforo*, 416 U.S. 647, 643 (1974). But when the prosecution's allegedly improper remarks do not impact a specific right recognized in the Bill of Rights, they must be examined in proper context to determine whether the remarks made the defendant's trial fundamentally unfair. *Donnelly*, 416 U.S. at 643-45. Thus, improper jury argument by a prosecutor ordinarily furnishes a sufficient basis for federal habeas relief only if the prosecutor's improper comments are so prejudicial that they render the trial fundamentally unfair. *Id.*; *Romano v. Oklahoma*, 512 U.S. 1, 13 (1994) (citing *Darden v. Wainwright*, 477 U.S. 148, 178-81 (1986)).

### D. *De Novo* Review

### 1. The Substantive Claim

Lizcano argues in his fourth group of claims in his second amended federal habeas corpus petition that the prosecution improperly made a plea of law enforcement and attacked his trial counsel during closing jury arguments at the guilt-innocent phase of trial. This court has independently examined the entire record from the guilt-innocence phase of Lizcano's capital murder trial.

During its initial jury argument, the prosecution repeatedly made reference to the testimony establishing that officer Jackson was a law enforcement officer performing his duties at the time of his fatal shooting and repeatedly stated to the jury that it was grateful to officer Jackson for his service and hoped that others would continue to serve the same role as officer Jackson, i.e., to serve the community. 48 R.R. Trial 11, 15-17. For instance, the prosecution argued as follows:

You remember, I think the – the AR-15 training instructor and Officer McClain talked about how you're taught to fight until you can't fight no more. And that's how they're taught.  And I hope we have more officers like Officer Jackson, because you saw what he – what he – you heard what he did that night, and you heard how brave he was that night.  And even when he was shot and had ten to 15 seconds left of his life with that bullet going through his body, he still continued to fight as taught.  And he still tried everything in his power to get the man who basically defended [sic] his life and took shots at other officers and he threatened to shoot civilians in Dallas County.

That's the type [sic] man Officer Jackson is.  That's the type person he is. I hope the 12 of y'all hope we have more officers like Officer Jackson.  I know everybody in the county wishes we had more officers like Officer Jackson.
48 R.R. Trial 19-20.

      \*     \*     \*     \*     \*

Now, ladies and gentlemen Defense made a deal about the lighting that night and they talked about how well they didn't know if you could see that there was an officer.  You heard from every single witness who testified how bright it was that night.  You heard from every single witness, especially with Brian's scope light on, how the defendant definitely saw that Officer Brian Jackson was in uniform that night.  You also heard from that owner of the house who testified how bright that light was.  And you know by his own actions by all of what Marta told him, the cops are coming, by all of what his friend, Jose, the person said the cops are coming and the defendant's respect for the cops said, I don't care.  I don't care that they're coming.  Big deal.

He was forewarned the cops were going to be there.  He knew the cops were going to be there and when he came in contact with those cops, you know what happened next.  He was ready for them.  He had ten shots.  He was ready for them. He has his backup shots in his pocket.

And they also made a big deal about who fired first, or where everybody was standing.  There's not a single witness that came to testify in the past week and two days talking about who said the AR-15 went off first to further prove that Officer Jackson was ambushed.  Think about it.  Every officer who's trained in the AR-15 and every officer who carries a handgun said, you heard the handgun go off, and then you heard Officer Jackson's AR-15 return fire.  Even Sergio Nava, the neighbor down the street, heard the gun go off.  The – the defendant in the crouched position behind the house.  And then you heard the officers return fire. Every single witness.

And I want you to also remember, ladies and gentlemen, because Defense counsel basically accused every civilian witness that came to testify about INS permits, about the State calling one of its witnesses a whore for hanging out with someone younger.  About somebody who had been drinking the whole night. Remember they said, well, didn't you tell my investigator so and so and so and so?

76

Well, ladies and gentlemen, her investigator's sitting in the front row right there (indicating). Her investigator. As you know, could have taken the stand and testified to any of this and could have said any of that. But they didn't do that. They could have easily put her investigator on the stand to say did A, B and C tell you this? They didn't do that. So her questions, Ms. Busbee's questions to those witnesses, those are not evidence. None of this is evidence. Because not a single person said yes, I said that. I just want you to remember that.

And ladies and gentlemen, also, I have to bring it up because we talked about it in jury selection. You know sometimes a lesser-included offense comes in. I'm not going the [sic] spend much time on this because I don't think it's relevant at all. And I don't think you guys are going to think it's relevant. So basically if we prove – and I feel we have proven beyond all doubt defendant intentionally or knowingly killed Officer Jackson in the line of duty and he knew he was - was an officer based on everything you have heard and based on all the elements you heard, you stop right there and you find him guilty of capital murder. You don't go any further. You don't even consider the lesser-included until all 12 of y'all find him not guilty of capital murder.

But ladies and gentlemen, think about it. Did he intentionally and knowingly kill this man right there (indicating), Officer Jackson, who was acting as a Dallas police officer in the official line of duty and the defendant knew he was in the line of duty that night? That's clear, ladies and gentlemen. That's clear by his actions. That's clear by the defendant's actions.

Ladies and gentlemen, the evidence in this case dictates, demands that you find the defendant guilty of capital murder. Send a message to defendants like this. Send a message to everybody in the courtroom. Send a message to every citizen in Dallas County, you can't go around killing Dallas police officers. You can't go around shooting at Dallas police officers. You can't go around threatening and shooting at civilians. We don't do that here.

I appreciate your time. Thanks.

48 R.R. Trial 21-24.

Attorney Sanchez then began the defense's closing jury argument by (1) commenting on the fact the courtroom gallery was full of uniformed Dallas police officers; (2) instructing the jurors that they alone determined the definition of reasonable doubt; (3) reminding the jury that the prosecution bore the burden of proof and that the defense was not obligated to present any witnesses; (4) arguing that the statements numerous witnesses gave to police had not, in fact, established that officer Jackson was in the middle of the yard when he was shot or who fired the

first shot; (5) reminding the jury that the defense presented evidence showing that Lizcano's blood had been recovered from a side panel of the house where the shooting occurred; (6) argued this showed the police had done a poor investigation at the scene; (7) argued that prosecution witness Nava admitted on cross-examination that he told a detective that when he heard shots, he ran the other way; (8) argued the Dallas police should have called in an independent agency to investigate the case; (9) reminded the jury that it was the judge of the credibility of witnesses; (10) reminded the jury that most of the prosecution's witnesses were police officers who knew officer Jackson; (11) argued officer Jackson was aware that Lizcano was coming toward him from around the house and, therefore, officer Jackson would more likely have been standing by the side of the house instead of out in the middle of the yard; (12) argued the physical evidence and photographs supported his theory, as opposed to the prosecution's theory of the offense; (13) argued the defense's expert Mr. Courtney and the defense's fact witnesses the Vega brothers had testified to a different theory of the offense than the one offered by the prosecution; (14) argued the prosecution's police officer witnesses had testified falsely; and (15) encouraged each individual juror to stick to his or her opinion and not be swayed or enticed to negotiate their verdict. 48 R.R. Trial 25-40.

Attorney Busbee then concluded the defense's closing jury argument by (1) explaining that she had not called witnesses to rebut the testimony of prosecution witness because she did not want to turn the trial into a he said/she said battle over details; (2) argued the whole case was based on police testimony; (3) argued that virtually every police officer who had testified during trial had lied during their testimony; (4) argued several of the witnesses had been unable

to recall hearing which gun fired first; (5) argued Lizcano was not attempting to kill anyone when he fired at police officers but, instead, was firing over the heads of officers as he ran away from them;  (6) argued that none of the officers had testified that they ever yelled at Lizcano to stop or surrender; (7) argued it was illogical to believe officer Jackson had stood under the bright light in the front yard when he knew from fellow officers that Lizcano was heading toward him; (8) argued police officers lied when they testified none of them had assaulted Lizcano that night; (9) argued that police officers lied when they testified that Lizcano violently resisted arrest - because there was nothing in their original reports about Lizcano resisting arrest; (10) argued that police investigators negligently failed to determine the trajectory of the fatal bullet until after the defense retained its own expert to make that determination; (11) argued that the prosecution had coerced Marta Cruz and Lizcano's friend Jose Fernandez to testify against Lizcano; (12) argued the medical examiner had testified falsely about the path of the fatal bullet through officer Jackson's body; (13) argued multiple police officers testified falsely about the location of officer Jackson's body being under the bright light in the front yard; (14) argued the prosecution had failed to rebut any of the defense's witnesses; and (15) argued Lizcano had been blinded by the light on officer Jackson's rifle and could not tell that officer Jackson was a police officer.  48 R.R. Trial 41-65.

Attorney Busbee concluded her portion of the defense's closing jury argument as follows:

All this happened – you will have these things get twisted, all of these lies get told because the State can't get to capital murder without them.  There wouldn't be any other reason for them to do this if they could get to capital murder without it.  And that's why you heard all this evidence, they lied up here and everything else trying to make you think that Officer Jackson was making himself a target standing right out there as he was.

79

But that's not true.  And you know why – you know that's not true?  Well, for one thing, we've proved they've lied about something pretty darned dad gum significant.  If they lied about that, how can you have any confidence in anything else they say.  And we know that physical evidence doesn't support their position.  No matter how twisted, it doesn't support it.

But what we know about the defendant, all he was doing was running.  He's running away trying to get away.  What could they do as they do in any domestic violation – domestic violence situation?  Get the lady out of the house.  Take her to her friend's.  She said she had a place to go.  She said she had a place to go.  They couldn't find him.

Some people said they searched 15 – 15 minutes.  I don't know how long they were out there.  And issue a warrant for his arrest for shooting a gun in her house and pick him up.  Why did they have to go through our neighborhoods with assault rifles and nothing else, looking for this guy?  All of them, why?  What was the importance of it?  I don't even have a suggestion for you on that.  Just ask yourself, what was that all about?  Why?  Just bored?  It's fun?  A chance to get out your rifle and – and play cowboy?  Because that was dangerous.  That was dangerous what they were doing.  And how it ended is that somebody died.  And it ended up by all accounts a real nice man died because of this policy and what they were doing out there that night.  And nobody's telling him anything other than allegedly get down to him (indicating to the defendant) in English.

You know, all the lies and all the manipulation of evidence and all the tortured ways of trying to make this evidence fit their game plan, fit in scenarios, all of those lies and all of that, it doesn't get them to where they need to go, because we've proved that they have lied.  And we have proven that they have given you a silly explanation for the physical evidence and they couldn't rebut it.

So I'm going to ask you to go back to the jury room and – you know, what we say in argument – I'm sure that there will be lot of outrage about what I've just said to you.  And believe me, I don't like having to say this about police officers.  But it happens.  And there it is and it needs to be told.

Mock me.  Get mad at me, whatever you do, it doesn't matter because what I say isn't evidence.  And what the State says isn't evidence.  None of that's evidence.  But do – I mean, do – do it yourself.  It's just simple physical angles, and you will see what I'm talking about.  And go back there and do the right thing and ask yourselves what a scared man running is doing?  He's shooting over people's heads.  He's not trying to kill anybody.  He has no intent to kill a police officer.  He does not know because he cannot see that this is a police officer.  He shoots at the muzzle flash.  And by random shot, he – a tragic, tragic accident, this guy, this Officer Jackson, catches the bullet and it kills him.

And that is very, very sad.  But that's not going to make – convicting someone of something they haven't done isn't going to make that any better.  It makes it more tragic if anything.  So I'm going to ask you to go back there and

think about that.  He's not guilty of capital murder, because he couldn't see the officer.  Is he guilty of murder?  That's for you to decide, because you look at the definition of intent and you have to know things and you have to intend things.

See if you think he even its that.  So I charge you to – and you don't know how hard it is for a girl to not have the last word, but I don't get to talk again.  You'll have to listen to what the State says.  But I'm asking you now, when you go back there, you look at these things.  I think you'll see that – that we are right about that.  It's the only reasonable and logical explanation.  As Mr. Courtney said, the simplest explanation is usually the right one.  No need to take every little piece of physical evidence and turn it into some fantasy-type of "could have been," "might have been,: "could have been moved."  Those are suppositions.

The real evidence that we have right in hand, right in the pictures, right in everything else, is that this officer shot from a position where the defendant couldn't see him.  That's what we know from the physical evidence.  And I charge you for that, and make the right decision.

48 R.R. Trial 61-65.

The prosecution then concluded its portion of the closing jury argument at the guilt-

innocence phase of trial as follows:

Ms. Busbee had the nerve to get up here, look you in the eye and tell you Marta Cruz wasn't frightened.  She said listen to it.  And you just did.

\*       \*       \*       \*       \*

Ladies and gentlemen, I hate to use adages, but this case just cries out for it.  You heard the saying, where a person stands on an issue depends on where they sit?

Now, Mr. Sanchez and Ms. Busbee sit right next to the Defendant, Juan Lizcano.  It's a little wonder why they got up here and looked you in the eye and told you some of the things they told you.  Listening to it sounded like they weren't even in this trial.  They're the experts.  They told you what happened.  Mr. Sanchez told you nobody really saw what happened.

Ms. Busbee tells you, the entire testimony is based on police officers.  Sergio Nava, police officer?  So she discounts him.  She tells you through her cross-examination that he tells his [sic] investigator – their investigator that when the shooting started, he ran.  He denied that, but yet they can –

MR. SANCHEZ:  Your Honor, I have to object.  That's a mischaracterization of the evidence.  He stated –

THE COURT:  The jury will recall what the evidence is in – in this case.  The objection's overruled.

BY MR. KIRLIN:

Ladies and gentlemen, Sergio Nava told you he cooperated fully with the

police that morning. Gave a written statement that morning detailing exactly what he saw and what he heard those early morning hours of November 13th, 2005. And told you the same thing when he took the witness stand. And again, the Defense tries to characterize every State's witness by implying and impugning this table (indicating), the district attorney's office and law enforcement in general by saying, weren't you promised? Weren't you this? Weren't you that? And they said, no.

That's the best they've got, ladies and gentlemen. I guess when you don't have anything, you just go on the offensive and you attack, attack, attack.

Ms. Busbee tells you they lied, lied, lied. This was nothing but a bunch of lies. So myself, Ms. Judin, Mr. Healy, the district attorney's office, we conspired with the Dallas Police Department to fabricate a story that she tells that's so far from the evidence that you heard, it's amazing. She could have been in the courtroom across the hall.

Mr. Sanchez told you the State's case is all based on hypotheticals. And hypotheticals are what? Guesses. Well, ladies and gentlemen, I think the only hypotheticals and speculation you heard was from their expert, Max Courtney. His only opinion I asked him was what? You're going to try to position Officer Jackson out there that night? But it's speculation.

He gave you s – a 60-degree angle of her could have been anywhere in there. Ask yourself: Does it really matter? Obviously it does to the Defense. His – their expert, their only witness is all about speculation, hypotheses and guesses about where Officer Jackson was.

And again, I have to ask you, tell me why that matters. Because they're [sic] expert did tell you one thing that was impossible. I asked him on cross-examination and he said – we got past the semantics of facing him – he said it was impossible for Officer Jackson to have his body facing the defendant when he received those mortal wounds across his trunk. Impossible.

And, ladies and gentlemen, can't find it right now -- Senior Corporal Wommack, the trainer 30 plus years, he told you how he trains these officers. He's been at the range since 1981. He told you Brian was superlative. He did outstanding in his training. And they want you to believe, based on this closing argument, that Brian Jackson has his man targeted in. Was facing him. Because that's how Wommack told you they train them, to face your target.

So Brian was facing his target and I guess he just decided to turn to the side so that he can take a shot in the arm and rip through his body. That is the most ridiculous, ludicrous thing they could have got up here and said. They're implying that he wasn't trained by Sergeant Wommack. He did everything wrong because he knew – Brian Jackson knew the defendant was running up the side of the house.

48 R.R. Trial 66-69.

          *       *       *       *       *

Ladies and gentlemen, I probably should just sit down.  Mr. Healy did a fine job reciting the facts as they were presented in court.  And I can really dispense with the defense's argument posthaste because when you think about their entire argument, their basis and their supposition, their argument to you is on the Vegas, who Ms. Busbee just got through telling you, they saw everything.  They were important witnesses.

Ladies and gentlemen, unless – unless you heard it wrong, unless I heard it differently, they told you they came to the door and opened the door and they see Officer Brian Jackson being tended to in their front yard, after the fact.

They heard some shooting.  They were scared.  They got on the ground.  They went to take care of their mom.  And only after several minutes did they open the front door to see that on their front lawn with [sic] a uniformed DPO officer being administered life support and urging, come on, Brian.  Come on Brian.  Live.  Breathe, Brian, breathe, please.  That's what the Vegas witnessed.

They didn't see how this transpired, how it spiraled into their front yard.  But, of course, they want you to believe that because that's their witness.  They told you – I asked them on cross-examination, they were all planning on getting up and coming down here.  I made a decision not to call them because of the medical condition, and because of what they had to offer.  It was after the fact.  And I asked them did they ever put that in their statement, this story that they brought you this week about this scuffle?  It wasn't in their statement.

But, again, I ask you, they hang their entire hour argument, their cross-examination on this blood that was on the window sill and they characterize it as this beating, this assault that the officers denied.

And ladies and gentlemen, when you're asked in that tome, did you beat my client?  Did you assault my client?  Don't you think that pretty offensive?  And don't you know if they really wanted to beat him, the pictures that you saw that we presented would be a mot – a lot worse?

Ladies And gentlemen, these officers puy on that uniform, that blue uniform – you see a lot of them here today – put it on every day, every single day to protect you and me and Dallas County and the citizens in this country.  They, those men and women in blue, showed amazing restraint.

Can you believe what you heard from that table (indicating)?  That they beat, that they assaulted Juan Lizcano.  Their witness [sic], they called the Vegas, and the Vegas, the best they could do was there was a scuffle.  And they tell us he was resisting.  And Lt. Rivas told you that Officer Hedges used the amount of force necessary to control Juan Lizcano, because, you see, he was still defiant out there.  After he's shot at three officers in the alley, he pointed that weapon at Officers Gilmore and Pham in the backyard, and he had already shot and killed Officer Jackson, and yet he's still defiant out there.

He would not cooperate, so they had to get him to that squad car.  Again, scuffle, beating.  There's no evidence of that, of a beating.  There's no evidence.

Their expert couldn't say how that bloodstain got there. But yet they chose to spend their entire defense on something that happened after the fact. That's their choosing. We provided the pictures to them. They did what they did. They thought it was important because they can get up here and say these police officers lied. So if they lied about that, they lied about other things.

They have the audacity, after their client gunned down Officer Brian Jackson on the morning of November 13th, 2005, to defend him here in this courtroom by accusing these officers of being liars and cowboys. That's offensive. She asked, it's a dangerous situation out there with all these officers walking around with rifles. I don't know why they did it. I guess she felt tremendous – since she's sitting beside him, her client, Juan Lizcano, who had already fired a weapon into Marta Cruz's ceiling. Had already pointed a gun and Officer [sic] Gilmore and Pham. Who had already fired at Lt. Rivas, Sergeant Crump and Senior Corporal McClain, and who had already fell one of their comrades, Officer Jackson.

Let's see, why would they be out there? Because they're cowboys? Who is the danger out there, ladies and gentlemen? Who created this situation in the first place? Who created Marta Cruz's pleading with the 911 operator to send the police? The men and women who run to danger when we call for help. He put this in action. And the information that they had is he already fired that weapon. That's a dangerous situation. He's not in containment, so these AR-15 rifles were employed. Were put in place policy wise, Officer Wommack told you, because of the dangers out there on the streets here in Dallas County.

And, again, who is the danger? Ask yourself that. Was it Officer Jackson? Was it Officer McClaim? Was it Officer Crump? Who had been trained by Senior Corporal Wommack. And again, showed amazing restraint not firing their weapons out there that night.

They're not the dangers. They're the ones out there protecting you and I from the dangerous individuals like this man right here (indicating), Juan Lizcano, who's out of control. Who's mad. Who's jealous, because he thinks an ex-girlfriend has someone at his house – at her house.

Ladies and gentlemen, that's what this is about. They called four witnesses, the two Vegas, Max Courtney, and Cellmark. Again, every one of them are after the fact. None of those individuals changed the fact that this man, and only this man (indicating), ambushed, assassinated, shot and killed Officer Brian Jackson out there in those early morning hours of November 13th, 2005. This man alone (indicating).

The evidence is undisputed, ladies and gentlemen. You have State's Exhibit 168. Ladies and gentlemen, this is the weapon that fired the bullet that ripped through the body of Officer Brian Jackson and leaves him lifeless, nonresponsive within 10 to 15 seconds. This is the weapon that an hour before that this defendant, Marta Cruz told you, fired into her bedroom ceiling within an

hour of him shooting the three officers in the alley, and then shooting and killing Officer Brian Jackson.

48 R.R. Trial 70-75.

        \*     \*     \*     \*     \*

Again, the Defense had the audacity to get up here and tell you that the officers – it wasn't well-lit out there. I thought I spent too much time , but I didn't want to leave you 12 people any doubt about the lighting conditions out there that morning. Everybody testified, including the owners – I asked the owners of the house, "Have you had that light there on the front of the house?" It lights up the yard. There's no doubt about the lighting out there that night. I didn't think I'd have to address that.

They say the lighting was poor. They position Officer Jackson somewhere else. They want to put him closer to the porch, which puts him closer under the light, and they want to hang their – their whole case on the Vegas, again, Max Courtney and the blood. Ms. Busbee says the trajectory study, the key to the case. How is it the key to the case? What does it tell you? It doesn't tell you anything. Their expert couldn't tell you anything.

He told them on direct examination – they put him on the stand, and he said you got to be very, very cautious when you're trying to position people based on shell casings. And that's exactly what he did. He didn't go into the house next door where the defects were. And he said that would have helped a whole lot, when I asked him the questions that, if that would help him position it. So he falls back on what? He falls back on those casings out there. He just got finished telling you, you got to very cautious.

So their whole speculation of where Officer Jackson was standing is based on the casings, and you heard ample evidence, the officer that was through there. Does it really – again, I have to go back and ask, does it really matter? Because if you want to believe the Defense's story, you have to believe that Officer Jackson, trained, superlative in the use of that AR-15, had his target in sight and turned his side to the man right there (indicating).

Officer Jackson never saw him. He was in the shadows of the corner of that house that morning. Officer Jackson never heard that he was running to the front.

Ladies and gentlemen, it's a reasonable deduction from the evidence with everything going on out there, shots just rang out in the back, helicopter overhead, Brian never heard that. He trained. He's a veteran. That's why you know the truth of this is that Brian was ambushed. He didn't see the shots and yet he did what he was trained to do. You've been hit. You fight to the end.

He was out there with those mortal wounds inflicted, and he's doing his best to get his finger on that trigger and respond to the gunshot that was ripping through his body. And the best he could do in that situation with that fan of three shots that you heard about. But he was trying. He was giving it all he had

because he had nothing left because of what this man did to him (indicating).

Is there any doubt in your mind when the Defense starts asking for a lesser-included this man didn't know he was shooting at a uniformed officer that night?  Is there any doubt?  Mr. Healy's been over it, but I've got to repeat it because they – they want you to believe that he – Lizcano didn't know the police were out there that night.  The same man they don't want you to believe that it's just impossible to have seen Officer Brian Jackson in his uniform, along with all the other officers that responded in those early morning hours of November 13th, 2005, to 2415 Madera that were in distinctive Dallas Police Department uniforms.

Every officer that responded out there that morning responded in marked Dallas police squad cars.  The defendant told Marta Cruz on the phone that night when she was telling about the police looking for him.  "I don't give a damn."  And Yayo, his friend, Jose Fernandez, his interpretation, he remembers it, "I don't care."

But ladies and gentlemen, a reasonable deduction from the evidence they were sugar coating for you, because you know the defendant gets mad –

MR. SANCHEZ:  Your Honor, I'm going to object to arguing outside the record.

THE COURT:  The jury will recall what the evidence is and what the testimony is.

MR. KIRLIN:  Ladies and gentlemen, you know the evidence was that Juan Lizcano was already angry.  He was in his rage when he said, "I don't give a damn that police are coming."

He's the same one a few moments later that says to Marta Cruz on the phone, "You're lying.  There's no police here."  And moments later he's kicking and banging on the door.  You don't think he noticed the police officers.

48 R.R. Trial 77-81.

\*      \*      \*      \*      \*

Is there any doubt that he knew these were police officers?  Ladies and gentlemen, there should be no doubt.  Ms. Busbee talked about the defendant was not seeking confrontation, he was running.  He was running.  He was running.

He was not seeking confrontation?  I'm not sure what they call when he went home to get that gun out of his apartment, showed up [sic] the Marta Cruz's house threatening threatening her, pointing the gun, firing it in the ceiling, pointing it at her and saying, "Next time – the next one's for you."  Sound like confrontation to you?

Ladies and gentlemen, I ask you, please, please use your common sense.  The Defense tried as they could to attack this table (indicating), the Dallas police, by their questioning, their innuendos about this huge conspiracy that they all got up there and lied.  You 12 have the opportunity to go back there and say, Ms. Busbee, I don't know where you, but that's not the evidence we heard.

The credible, credible evidence in this case all cries out for you 12 people

86

sitting here today to find the defendant guilty of capital murder.
48 R.R. Trial 82.

In Texas proper prosecutorial jury argument consists of either (1) a summation of the evidence, (2) a reasonable deduction from the evidence, (3) a response to an opponent's argument, or (4) a plea for law enforcement. *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008); *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005); *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). Improper jury argument is a basis for federal habeas relief only if it is so prejudicial as to render the trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986); *Hughes*, 530 F.3d at 347 (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)). Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that in all probability but for the remarks no conviction would have resulted. *Geiger v. Cain*, 540 F.3d 303. 308 (5th Cir. 2008); *Hughes*, 530 F.3d at 347 (quoting *Harris*, 313 F.3d at 245).

The vast majority of the prosecutorial arguments about which Lizcano complains were clearly responses to arguments made by the defense counsel during closing argument at the guilt-innocence phase of trial. For instance, attorney Busbee made the following closing guilt-innocence phase jury argument in an apparent attempt to explain why she had aggressively cross-examined the medical examiner:

> And now, I want to talk to you about Dr. Barnard. And, yeah, you saw me get mad at him and I'll tell you why. He got up here on this witness stand and said something that didn't – wasn't reflected in his report. Because, ladies and gentlemen, this is what is very important. It hasn't been brought out to you at all. Dr. Barnard – and you'll get a chance to go back there and look at it – and it says that he – that it had to be – had to be at a 90 degree angle. And it had to be close to the body, okay?

87

But then when he gets in here, that doesn't match their portrayal of events, of course. So, I mean – I'm using the wrong arm. It was the right arm – so they take the evidence and as they have done with physical evidence – and I'm going the [sic] talk about that in a minute – they have twirked [sic] it and twisted it into an illogical fashion to make it fit their theory.

Now, this bullet did not take a straight path. You know how we know? Well, to get shot in this arm – and it's out here, right? The bullet, according to the medical examiner, is found – you can see it, and he made a slit and took it out right? Well, he gets shot here (indicating), and the bullet is found here (indicating), but it doesn't exit. Why is the back of his vest bloody? Because it bounced in the vest. That was what happened. The bullet bounced. It hit – it hit the vest, it bounced back in and did even more damage. That's how that happened. Otherwise, why would there be blood like that on that vest, which you weren't shown.

Take the medical examiner's report back there and look at it and figure out for yourself. I mean, it's physical. It had to have happened that way, but why are they saying this? Because they have to have Officer Jackson under the light. He has to be under the light – if he's not – the case is all about sight lines. That's what all this is about. What somebody could see. What's the sight line?
48 R.R. Trial 54-56.

The prosecution appropriately responded in kind as follows:

Again, the Defense – I – I struggle with even addressing some of their things because they're so ludicrous, but I just have to. I have to address Ms. Busbee's comments about the vest and why the vest is bloody. I guess she failed to listen to the trace evidence expert, State's Exhibit 205, and the medical examiner, Dr. Barnard. Dr. Barnard's photos don't show an exit wound. The bullet could have went [sic] through and bounced off the vest and went back inside and that caused all that blood. There's no evidence of that.
48 R.R. Trial 76.

The prosecution's pleas for law enforcement were wholly appropriate and unobjectionable. *Hughes*, 530 F.3d at 347. The same is true for the many prosecution arguments responding to defense counsels' closing arguments, including attorney Busbee's repeated assertions that all the police officers, in fact virtually all the prosecution witnesses, had committed perjury and that, on the night in question, Dallas police were behaving like a bunch

of "cowboys" while searching for Lizcano. The vast majority of the prosecutorial arguments about which Lizcano complains were either summations of the evidence, arguments for reasonable inferences drawn from the evidence, or justified responses to the defense's assertions of a vast conspiracy involving virtually every prosecution witness, including the medical examiner. In sum, the prosecution's occasionally derisive tone was fully justified as a response to the defense's conspiracy-laden closing argument.

As explained at length above in Section III, the evidence of Lizcano's guilt was more than compelling; it was overwhelming. There was no direct evidence presented at Lizcano's trial showing that any Dallas police officer committed perjury during their trial testimony about what they saw and heard in the moments leading up to and immediately after Lizcano's fatal shooting of officer Jackson. Instead, as explained above, attorney Busbee argued that the consistency of the testimony given by so many police department witnesses suggested a massive conspiracy to manipulate testimony. Nor was there any direct evidence of the vast conspiracy alleged by attorney Busbee during her closing jury argument. There was evidence showing Lizcano's blood was later recovered from a side panel of the house where the offense took place. But there was no evidence showing how Lizcano's blood got on the panel near the windowsill in question.

There was no direct evidence in the record showing that Lizcano intentionally fired his weapon *over the heads* of the three officers he shot at in the alley just before he fatally shot officer Jackson. There was no evidence at trial whatsoever suggesting that Lizcano was ever blinded by the light from officer Jackson's rifle. There was no genuine dispute regarding the brightness of the light in the front yard of the home where officer Jackson was shot and killed. Every trial

witness questioned about that subject described the area as very well lit.   At trial, neighbor Sergio Nava testified without contradiction that he recognized officer Jackson as a uniformed law enforcement officer as he approached from a respectable distance down the block.  44 R.R. Trial 170, 173.

Likewise, the prosecution's characterizations of the trial testimony of Marta Cruz and Jose Fernandez regarding Lizcano's response when he was informed by Cruz that she had called the police were fully accurate summations of their trial testimony. 42 R.R. Trial 187; 44 R.R. Trial 209-10, 216-17.  They were fully appropriate and not subject to a valid objection.

The same is true for the prosecution's calls for law enforcement and favorable comments about the role of law enforcement officers in the community.  It is hardly surprising that the prosecution repeatedly emphasized that officer Jackson and his colleagues were performing a service for the community when they searched for Lizcano that night.  One of the essential elements of the charge the prosecution was required to prove at the guilt-innocence phase of trial was that officer Jackson was a law enforcement officer performing his duties and that Lizcano was aware of same at the time he fired the fatal shot.  There was considerable testimony introduced addressing that element of the offense.   Both sides presented fact witnesses and experts addressing the location and orientation of officer Jackson at the moment he was fatally shot, the lighting situation in the front yard where officer Jackson was shot, and the location and condition of other physical evidence, much of which was reflected in crime scene photographs.

The prosecution's attacks upon the implausibility of defense counsels' arguments on those subjects were proper inferences drawn from the evidence and did not render Lizcano's trial

90

fundamentally unfair.  No witness who testified at Lizcano's trial offered any testimony based on personal knowledge or expert opinion suggesting that either (1) Lizcano was blinded by the flashlight on officer Jackson's rifle at the time Lizcano fired the fatal shot; (2) officer Jackson fired first at Lizcano, who responded with a volley of shots that included the fatal shot; (3) Lizcano deliberately fired his weapon over the heads of the law enforcement officers he encountered in an alley shortly before he fired at officer Jackson; or (4) Lizcano was unable to identify the multiple law enforcement officers he encountered and assaulted during the early   morning hours of November 13, 2005.  Defense counsels' attempts to convince the jury of each of the foregoing facts suffered from a lack of evidentiary support, which the prosecution was entitled to call to the jury's attention.  When a defense counsel makes a series of jury arguments which are not merely inconsistent with the physical evidence and unsupported by any testimony whatsoever but also refuted by multiple witnesses (such as the multiple witnesses at the scene who denied they heard officer Jackson fire his rifle *prior* to the sound of Lizcano's handgun firing in the front yard), the prosecution is fully justified in responding to such arguments by doing the equivalent of the Cotton Eyed Joe.

The prosecution's comments about defense counsel standing where they sat (i.e., next to the defendant) were neither persistent, pronounced, nor pervasive when viewed in the full context of the entire guilt-innocence phase closing jury arguments.  Viewed in proper context, the prosecution's negative comments about defense counsels' conspiracy and perjury laden jury arguments, cross-examination questions, and other innuendo-laden behavior did not render the guilt-innocence phase of Lizcano's capital murder trial fundamentally unfair.  Viewed in proper

context, the prosecution's negative comments were legitimate attacks on the defense's speculative theories based on the fundamental absence of any evidence in the record to support those theories. As such, even when viewed cumulatively, the prosecution's remarks about defense counsel standing where they sat, the audacity of the defense's conspiratorial arguments, and the lack of evidence supporting same were isolated islands in a vast ocean of highly appropriate arguments directing the jury's attention to the evidence and urging the jury to draw reasonable inferences from that evidence. They did not in any manner render Lizcano's trial fundamentally unfair.

Regardless of whether the prosecution's closing jury arguments are viewed individually or cumulatively, Lizcano's federal constitutional right were not violated by the prosecution's closing jury arguments at the guilt-innocence phase of trial. Lizcano's substantive claim addressing the prosecution's closing jury argument is denied.

## 2. Ineffective Assistance at Trial

Lizcano argues in a highly conclusory manner that his trial counsel should have objected to the prosecution's closing jury arguments (ECF no. 57, p. 60, ¶ 140 & pp. 62-63, ¶ 147). Conclusory assertions of ineffective assistance such as these do not furnish a basis for federal habeas relief. *Harper v. Lumpkin*, 19 F.4th 771, 778 (5th Cir. 2021) (citing *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)). Furthermore, the failure of Lizcano's trial counsel to make what would have been meritless or even frivolous objections did not result in deficient performance; nor was Lizcano prejudiced thereby within the meaning of *Strickland*. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir. 2012) (the failure to make a meritless objection cannot be grounds for a

finding of deficient performance (citing *Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991)));
*Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (failure to make a meritless objection
did not prejudice the defendant (citing *United States v. Kinder*, 167 F.3d 889, 893 (5th Cir.
1999))).

Lizcano's trial counsel argued, without any direct evidence in the record that virtually
every prosecution witness committed perjury and engaged in a conspiracy to turn a "tragic
accident" into a capital murder prosecution. The prosecution was fully justified in pointing out
the lack of any evidence in the record to support those defense arguments and labeling the
defense's innuendo about same as "audacious" and incredible in light of the overwhelming
evidence of Lizcano's guilt.

Had Lizcano's trial counsel made timely objections to the prosecution's allegedly offensive
comments about defense counsel standing where they sat, assuming the trial judge agreed the
comments were inappropriate, the most likely trial court response would have been either (1) an
instruction from the trial judge telling the jury to disregard the prosecution's comments or (2) an
instruction reminding the jury that what the attorneys said was not evidence. As shown above,
the latter is what happened when attorney Sanchez twice objected that the prosecution was
arguing facts not in evidence. There is no reasonable probability that, but for the failure of
Lizcano's trial counsel to object to any (or all) of the prosecutorial jury arguments identified by
Lizcano, the outcome of the guilt-innocence phase of his trial would have been any different.
Lizcano's ineffective assistance claim is without arguable merit and is denied.

93

## VIII.  *BATSON* CLAIMS

### A.  The Claims

In his third group of claims in his second amended federal habeas corpus petition, Lizcano argues that (1) the prosecution improperly used a peremptory strike against venire member R___ H___ in violation of the rule against race-based discrimination announced in *Batson v. Kentucky*, 476 U.S. 79 (1986) (ECF no. **57**, 41-54); (2) his trial counsel rendered ineffective assistance by ineffectively litigating Lizcano's *Batson* claim (ECF no. 57, 54-55, ¶¶ 125-27); and (3) his state habeas counsel rendered ineffective assistance by failing to assert a claim of ineffective assistance by Lizcano's trial counsel in Lizcano's initial state habeas corpus application (ECF no. 57, 55-56).

### B. State Court Disposition

### 1. Trial Court Disposition

On September 6, 2007, immediately after the parties exercised their peremptory challenges, the state trial court held a hearing to address any issues either party had with regard to the manner the opposing party had exercised their peremptory challenges.  Attorney Busbee testified under examination by attorney Tatum, the prosecution, and the trial judge that the defense had several problems with the way the prosecution conducted voir dire examination of the jury venire.  More specifically, attorney Busbee testified that (1) the prosecution's tone of voice when questioning black venire members, particularly the first week of individual voir dire examination, to be condescending and offensive; (2) the prosecution seemed to be attempting to build a case for dismissal for cause with every black venire member it questioned; (3) during individual voir dire examination the prosecution displayed a persistent pattern of treating black

94

venire members in a distinctly different manner from other venire members; (4) on one occasion, the prosecution spoke to a black female venire member who had a college degree in a tone so condescending it caused the venire member to cross her arms and glare at the prosecution; (5) attorney Busbee had attempted to obtain a transcription of the first week of individual voir dire examination but had only been able to obtain a portion of the record; and (6) the prosecution struck six of eight black venire members.  37 R.R. Trial 25-52.

Attorney Tatum ensured the juror questionnaires were made a part of the trial record for appellate purposes.  *Id.*, at 30-31.  Attorney Tatum moved, based on attorney Busbee's testimony, to have the trial court to quash the entire voir dire.  *Id.*, at 54.  The trial court denied that motion.  *Id.*  The state trial court then proceeded with the formal *Batson* inquiry.

The prosecution then offered testimony through one of the prosecuting attorneys explaining in detail why it had exercised each of its peremptory challenges, explaining that (1) the prosecution struck every member of the jury venire who answered a self-ranking question regarding their views on the death penalty found on the first page of the juror questionnaire with either a "three" or a "two"; (2) the "three" answer on the juror questionnaire was "I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances"; (3) five of the six black venire members whom the prosecution struck peremptorily answered the self-ranking question by checking option three; (4) with regard to the sixteen peremptory strikes exercised by the prosecution, of the venire members in question five circled option "two" on the questionnaire, eight answered the ranking "three," one answered "four," one answered "five," and one (who was adamantly opposed to being able to

95

participate) answered with a "six"; and (5) the prosecution did not strike any venire members based on race, but rather, relied on the questionnaire answers and the individual voir dire to justify its peremptory challenges.  37 R.R. Trial 56- 71.

Specifically, with regard to venire member 549, juror R___ H___, the prosecution furnished the following testimony:

> Juror 549, [R___ H___], a Black male.  When asked about the death scale, he said he had the only choice in the matter, he would rather put them away for life.  He said he preferred life a number of times throughout his questioning.  He got argumentative with the prosecutor over their discussion of beyond a reasonable doubt, which we feel alienated the juror.  He stated that he would hold the State to a higher burden than he had held the State in a previous criminal jury [sic], again all dealing with beyond a reasonable doubt.  He stated that he would lean toward life if the evidence was weak but still convinced him of guilt, and so again, he was another person that did not seem to understand the process after being – after having it explained by the Judge and the prosecutor, so based on his feelings about preferring life over death and the discussions about beyond a reasonable doubt and the interaction between Mr. H___ and the prosecutor, those were the reasons that Mr. H___ was struck.
>
> And just for the record, Judge, the three African-Americans who circled number two on their questionnaires, the State struck one, Mr. H___.  We did not strike Ms. M___, juror number 164, nor did we strike Mr. J___, juror number 667.

37 R.R. Trial 69-70.

Attorney Sanchez responded for the defense, arguing that (1) the ranking question on the first page of the juror questionnaire was just the starting point of the questionnaire and should have been just a small part of the reasoning the court should examine in evaluating the credibility of the prosecution's proffered rationale for its peremptory strikes and (2) all of the jurors who answered with a "three" indicated some hesitancy to impose the death penalty.  37 R.R. Trial 71-73.  Specifically with regard to venire member R___ H___, attorney Sanchez argues as follows:

As far as their explanations for each juror, I ask the Court to take into account, that that was the global reason given, but I want to zero in at this time on Mr. H___, who is somebody who they say – I'm looking at it – did rank himself a number two, on page one, and just from looking at the questionnaire and from looking at our notes, I don't believe he had a problem understanding the law. He understood it to qualify, yet he had – I think he realized the importance of the decision he might be asked to make.

He also indicated on his questionnaire, and I don't think he changed any of his answrs while he was here – just to show the kind of juror he was, Your Honor, that was struck by the State was somebody who believed that somebody should be given the death penalty for killing a police officer and he thought that the killing of a police officer should be looked at differently than any other murder. He agreed with the way the law – he understood that the law protected police officers in a greater way by making them death eligible, and even he thought that was correct, the killing of a police officer, says you don't follow the law, and the law is the same – when answering the question whether – on the questionnaire whether he thought somebody could be given the death penalty solely on the fact or circumstances of the case itself, regardless of their prior – or lack of prior acts, he said if the person is guilty, the lack of prior violence doesn't matter. That is what he wrote in his questionnaire.

He believed that -- his questionnaire when asked if he believes in life without possibility of parole, he said that he did, but in the narrow situation of someone who has committed a crime of passion, which would be somebody who may not even be guilty of murder itself, maybe a lesser of murder. He had indicated that to his mind, on his questionnaire, that life without parole should only be given to people who may have committed a crime of passion.

He also indicated on his questionnaire that he believed that officers are more likely to tell the truth than the average person, that he didn't think prisons were – rehab people and – and I believe in ranking himself, when asked to rank in order of importance to him, he ranked number one punishment, the type of jurors that the State indicated they want to serve on a jury like this.

Everything reflected in his questionnaire and what he said in court under questioning would indicate that he had similar views that the State would wants [sic] and did not strike.

Especially as to Mr. H___, we believe the reasons given for striking him are not race neutral.

THE COURT:  Anything further?

MR. SANCHEZ:  That's it.

THE COURT: Any response.

MS. JUDIN: Well, Judge, I think the record will reflect the questioning of Mr. H___, who almost immediately said he would rather put somebody away for life, and you know, just for the record, I mean, every person who circled three that

97

was in the three pool was struck, whether it was a starting point or not, whether –
it did not matter what race you were as far as you circled number three.

          THE COURT: Anything further?

          MR. TATUM: No, Your Honor, not from this side.

          THE COURT: The challenge will be denied.

37 R.R. Trial 73-75.

## 2. State Appellate Court

Lizcano's state appellate counsel asserted six points of error on direct appeal complaining that the prosecution's use of peremptory strikes violated *Batson*; the sixth of these points identified venire member R___ H___ as one of the venire members improperly struck by the prosecution. Appellate Brief, 32-34. Specifically, Lizcano's state appellate counsel quoted extensively from attorney Sanchez's argument during the trial court's *Batson* hearing, quoted from R___ H___'s voir dire testimony, argued the record from R___ H___'s voir dire examination did not support the prosecution's reasons for striking him, and argued that the prosecution's race-neutral reasons for striking R___ H___ were pretextual. *Id.*

The TCCA's opinion affirming Lizcano's conviction and sentence examined the proportionality argument and the comparative juror analysis in Lizcano's state appellate brief and ultimately concluded that neither analysis justified a finding that the state trial court's denial of Lizcano's *Batson* challenge regarding the striking of venire member R___ H___ was clearly erroneous. *Lizcano v. State*, AP-75,879, 2010 WL 1817772, *3-*4 (Tex. Crim. App. May 5, 2010). Thus, the TCCA denied Lizcano's sixth point of error *on the merits*.

## 3. State Habeas Corpus Proceeding

Lizcano's seventh claim in part B of his subsequent state habeas application argued that

his trial and state appellate counsel both rendered ineffective assistance by failing to adequately litigate Lizcano's *Batson* claim regarding venire member R___ H___ at the trial court and state appellate court levels.  Subsequent State Habeas Application (filed Dec. 4, 2017), at 247-67. The TCCA summarily dismissed Lizcano's seventh claim in his subsequent state habeas application based upon Texas writ-abuse principles.  *Ex parte Lizcano*, WR-68,348-04, 2020 WL 5568625, *2 (Tex. Crim. App. Sept. 16, 2020).

### A.  Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection.  *See Batson v. Kentucky*, 476 U.S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").  *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution.  *Foster v. Chatman*, 578 U.S. 488, 499 (2016); *Snyder v. Louisiana*, 552 U. S. 472, 476-77 (2008); *Miller-El v. Dretke*, 545 U. S.

231, 239 (2005); *Batson v. Kentucky*, 476 U. S. at 94-98.

## B.  AEDPA Review of Substantive *Batson* Claim

The TCCA denied Lizcano's *Batson* claim on the merits during the course of Lizcano's state direct appeal.  The Supreme Court's holdings in *Martinez v. Ryan,* 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), do not allow Lizcano to re-litigate with new evidence and new counsel his exhausted *Batson* claim in this Court.  The Supreme Court's holdings in *Martinez* and *Trevino* furnish a narrow avenue for circumventing a procedural default.  They require a showing that the performance of a federal habeas petitioner's state habeas counsel was so deficient as to *preclude* state court merits review of a meritorious claim of *ineffective assistance by trial counsel*, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of *ineffective assistance by state trial counsel.  See In re Edwards*, 865 F.3d 197, 207-08 (5th Cir. 2017) ("To show cause for procedural default under *Martinez* and *Trevino*, 'the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is "substantial" (i.e., "has some merit"); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application." (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (holding that the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel).

The Supreme Court has expressly declined to extend the holdings in *Martinez* and *Trevino* beyond the context of procedurally defaulted complaints of ineffective assistance by state

*trial* counsel. *See Davila v. Davis*, 583 U.S. at 528-31. The holdings in *Martinez* and *Trevino* do not furnish a vehicle for obtaining *de novo* federal habeas review of a substantive federal constitutional claim which the petitioner previously fully litigated before the state courts to a merits review denial, either through direct appeal or in a state habeas corpus proceeding.

In *Shinn v. Jenkins*, 142 S. Ct. 1718, 1732 (2022), the Supreme Court held that a federal habeas petitioner is not entitled to a federal evidentiary hearing or to have the federal habeas court consider new evidence in support of a claim based on the ineffective assistance of state habeas counsel. When a federal habeas petitioner has properly exhausted state court remedies on a federal constitutional claim through direct appeal or a state habeas corpus proceeding, federal habeas review of that claim is circumscribed in that the federal court is limited to reviewing the record before the state court that resolved the claim on the merits and the petitioner must establish that, under Supreme Court precedent, no fair-minded jurist could have reached the same result as the state court. *Id.* Lizcano filed a point of error on direct appeal complaining about the state trial court's denial of his *Batson* claim vis-à-vis venire member R___ H___ . Lizcano obtained a denial *on the merits* of that claim. Thus, this court's review of Lizcano's substantive *Batson* is limited to the narrow standard of review available under the AEDPA.

Having litigated his *Batson* claim to a merits resolution on direct appeal, Lizcano cannot circumvent the AEDPA by re-asserting his substantive claim in a state habeas corpus application in a form that results in a summary dismissal pursuant to state writ-abuse principles. Thus, this court's review of Lizcano's *Batson* claim is limited to the state court record, i.e., the evidence,

101

that was before the TCCA at the time that court denied Lizcano's *Batson* claim regarding venire member R____ H____ on the merits.

As explained above, the prosecution asserted four facially race-neutral reasons for striking venire member R____ H____: (1) he indicated early in his voir dire testimony that he had a preference for a life sentence; (2) he became argumentative with the prosecutor examining him; (3) he stated that he would hold the State to a higher burden of proof than he had held the State in a prior criminal trial that had ended with an acquittal; and (4) he stated that he would lean toward a life sentence if he felt the evidence was weak.  37 R.R. Trial 69.

During his voir dire examination by the prosecution, venire member R____ H____ testified in pertinent part as follows:

> Q:  * * * What are your feelings about serving on a jury, knowing that the decisions that you make may lead to the execution of someone?
> A: *I don't like it, but if I had to, I would do it.*
> Q: Okay.  You know, a number of jurors have told us, you know, I would be a great on a regular murder case or any other type of offense, but when I'm talking about making decisions on whether or not somebody is going to live or die, I just can't participate in that, but do you think you would be able to, after listening to the evidence?
> A: Yes, I do.
> Q: Okay.  On your questionnaire, the first page there, this first question that we asked you, we asked if you were in favor of the death penalty, you said yes, and then, you know, when we asked you to please explain your answer, you said, depending on the severity of the crime.
> Could you expound on that a little more?  When you think of a death penalty type case, what type of cases come to your mind?
> A: Where – where you can prove that a person, say, killed a lot of individuals, you know, something that's, I guess, sensational.  You know, the guy that – those people that went into the lawyer's home and killed them.  If they can prove they did it, that would be one that I think would be – that would apply.
> 25 R.R. Trial 26-27 (emphasis added).
> *        *        *        *        *
> Q: Okay.   All right.   When we asked you on page four of your

102

questionnaire, if you believe in the death penalty, how strongly on a scale of one to ten, do you believe hold that belief?

A: And I answered four?

Q: Yes.  Talk to me how you came up with the number four?

A: Well, it is kind of in the middle.  I think, to me, to be fair, *I think I would rather put them away for life, you know, instead of putting them – having them killed if I have the only choice in the matter.*

Q: Okay.  And talk to me a little bit more about that.  You know, that is the two options you are going to have –

A: Right.

Q: -- if you find somebody guilty of capital murder.

A: If your case is strong enough and you can prove beyond a shadow of a doubt, then, yes, I think I'm capable of saying yes to that, yes.

Q: But your preference would be to put them in life – to prison for life?

A: *Knowing nothing about the case and if your case is not strong, then I would go that way.*

Q: Okay.  But if you believe – I think you said beyond a shadow of a doubt?

A: Uh-huh.

Q: Let me just tell you what the law is.  The law says the State has to prove the person's guilt beyond a reasonable doubt, which is not beyond a shadow of a doubt.  I mean, beyond a reasonable doubt, there is no definition.  It's left up to you.  But we know that it does not mean beyond all possible doubt.

However, some jurors have told us, if we are talking about death penalty, I have to be – I'm going to hold you to a higher burden.  I want to be convinced beyond all possible doubt.   But the law says, you know, jurors have to be convinced beyond a reasonable doubt.

What are your feelings about that?

A: *I think you will be – you are being a little nit-picky.*

Q: Like on a [sic] your assault jury, when you were on that –

A: *Wait a minute.  Let me finish.  You have somebody's like here, so if they want to hold you to a little higher standard, then I think that is reasonable.*

Q: Okay.

A: *I mean, if you can prove to me, in my mind, that I have no doubt, and yeah, I can give you capital murder, but if there is some reason, then I have no problem going with life.*

Q: Okay.  We are talking guilty right now.

A: Okay.

Q: -- so it would be guilty or not guilty.

A: Yeah, but that is life or death.

Q: Well, it's not life or death until you answer the questions, the questions you are going to get to –

A: All right.

103

Q: -- but I'm just talking about the first phase of the trial.

A: Right.

Q: What burden would you hold the State to?  Is beyond a reasonable doubt high enough for you, or do you want it to be beyond all possible doubt?

A: Define all possible doubt.

Q: You want to be 100 percent certain.

A: In my mind?

Q: Yes, sir.

A: Okay.  And all reasonable doubts?

Q: Beyond a reasonable doubt is not defined for you.  It is left up to your definition, but we do know –

A: But how would you define it?

Q: Really, at this point, I have got limited time. So I'm going to let you tell us what you think.

A: *I would go with the 100 percent certainty in my doubt – for me.*

Q: Okay.  So you would – like I said, the only definition – the only guidelines that we have in the law that we know it means, it does not mean beyond all possible doubt.  So you would be [sic] need to be convinced beyond all possible doubt, is what I hear you saying –

A: *Given the choice, yes.*

Q: Okay.  Well, that's – it is up to you.  You as an individual juror can you decide, you know, in a death penalty case, I need – I will hold the State to a higher burden than I did in that assault case, the domestic violence case that you did.  That was the same level of proof.  The State had to prove their case beyond a reasonable doubt –

A: Right.

Q: If he [sic] they didn't, not guilty.  And whether it is a speeding ticket, an assault case, a DWI, a murder or a capital murder, that burden of proof is the same.

A: Uh-huh.

Q: You know, beyond a reasonable doubt.

A: A reasonable doubt, right.

Q: But some jurors have said, those other offenses aren't talking about somebody's life.

A: *Exactly.*

Q: In this particular type of case, I'm going to hold the State to a higher burden of proof.  I have got to be convinced beyond all possible doubt before I could convict somebody of capital murder.  And that's – you know, if that is how you feel, that is fine.

A: *I think that would be yes.  In my case, I would say that.*

Q: Okay.  And so you would need – you know, there is no definition of beyond a reasonable doubt.  It's what you say it is, and the only way that you

104

could be 100 percent certain is probably if you were going to be called as a witness to the case, but some jurors might say, well, then, I need to feel like I was a witness to the case, I need to be convinced beyond all possible doubt.

A: No, it wouldn't be to that extreme.

Q:  Okay.  So you – I guess what I'm trying – and what the Judge is going to need hear [sic] is beyond a reasonable doubt is what the law says our burden of proof?  Are you going to ask that we prove to you beyond all possible doubt the Defendant's guilt?

A: You keep going back from reasonable to – how do you –

Q: All possible doubt.

A: All possible.  And to me, you know, that's – it depends on how you define it.

My definition of it is – a reasonable doubt, if you present the facts to the case and in my mind I'm not convinced that your facts stand up to what they present, then that's reasonable.

Now, you say all possible doubt is like you want videotape of him or whoever doing something where there is no possible way that he can be found innocent, and I'm assuming that you don't have that.

Q: I can't go into the facts.  The law doesn't allow me to discuss any facts.

A: *So in that case, I have to determine, you know, from the facts you give me and, yes, I will hold you to higher standard than domestic violence, but I won't go to the other extreme either and say that, yeah, I have got to have him say, I'm guilty of something in order to make a decision.*

Q: Let me ask you a little bit – when you said you are going to hold us to a higher burden than the assault case –

A: *A little higher, yes.*

Q: Well, any –

A: *To me, it's more serious.*

Q: Absolutely.  That is why some jurors tell us that burden is not high enough, it needs to be beyond all possible doubt.  That is – the legal definition that the Judge is going to give you in the charge is that it is not beyond all possible doubt.  Some jurors feel because of consequences, I am going to have to be convinced by that, and it is left up to you as an individual juror –

A: Yes.

Q: -- to decide what burden you are going to hold us to.  You just have to be able to tell us you are going to hold us to the higher burden of proof than beyond a reasonable doubt.

A: Okay.  *Let's go back to this – on a scale of ten, I answered four.  On the reasonable doubt and possible doubt, I would probably give you a six or a seven.*

Q: Okay.  I don't – we can't have a scale for the Judge –

A: Okay.

Q: What I have to hear from you is that you will hold us, the State –

105

A: To a reasonable doubt.

Q: -- to beyond a reasonable doubt and not a higher burden of proof. However, if you want a higher burden of proof, that is fine, but you just have to tell us what you as – in your heart feel like you are going to need to be convinced of?

A: I'm going to need some proof, some facts.

Q: Right.  But between – is beyond a reasonable doubt high enough for you?  Or do you need to be convinced beyond all possible doubt?

A: I would say – I'll say reasonable doubt.

Q: Okay.  So you – okay.  So that's not going to be a burden that is higher than the assault case?

A: Right.

Q: You are going to hold us to that same level, the burden of proof, if we convince you of each and every element beyond a reasonable doubt, that is sufficient in your mind?

A: Yes.  Yes.

Q: So it is still beyond a reasonable doubt, so there may be some other doubt.  I mean, if you look at the wording of it, it is not beyond all possible doubt?

A: Right.

Q: That is good for you?

A: That is good for me.

Q: That is what I just want to clear up.  All right.  So assuming we prove our case beyond a reasonable doubt in the guilt stage, then the jury would move to the punishment stage.

A: Uh-huh.

25 R.R. Trial 31-39 (emphasis added).

\*     \*     \*     \*     \*

Q: So now that we have kind of gone through the special issues, and knowing that no, yes, no means a death sentence, any other combination means life, before you mentioned that you were kind of leaning towards a life sentence –

A: *Yes.*

Q: -- do you –

A: *Now I would say, if your case is not strong, then I would go against life – if you proved enough to me saying yes, he did it, but you don't have – like you say, the eyewitnesses – you don't have – you know, your circumstantial evidence, then I would probably go that.*

Q: Okay.  But if we proved to you beyond – you wouldn't be to those questions unless you are convinced beyond a reasonable doubt –

A: Right.

Q: But you are saying if you weren't maybe to that all possible doubt, then you would be leaning towards the life versus the death?

A: *Yes.*

106

Q: So you would want us – like on that second special issue, we have got to convince you beyond a reasonable doubt. Are you going to be leaning towards, at this point I have got to be at the all possible doubt?

A: No, I'm not at the all possible doubt.

Q: All right. So it is just, if you are – you can still find somebody guilty but you are going to be leaning towards life if it is just [sic] circumstantial evidence case; is that fair to say?

A: I'm saying if your circumstantial evidence isn't strong, you have got to give me something to work with, I mean. I'll be looking for something – say for this trial, if his mental retardation – I'll be looking for something, I want history, I want something in the past that says that, yes, this happened, this happened, this happened, you know, something that's continuous, you know. Like in 1999 this went here or went there, you know, you want history.

Q: Okay. But your – I guess when you were talking about – okay. I guess when you were – you are leaning towards life. You are going to answer these questions just as – you are going to call it like you see it, if the evidence is there, you are going to answer them, no, yes, no?

A: Right.

Q: And be able to have no qualms about assessing the death penalty – I won't say no qualms, but you could – if the evidence dictates it, you could answer those questions no, yes, no, knowing that means the death penalty?

A: I think I could.

Q: For the Judge's purpose, I have got to have you say I could or I could not. The "I think", we have to be more definitive. Yes or no. If you are convinced that the answers should be yes – no, yes, no, could you answer the questions in that way, knowing that a death sentence would be given to the Defendant?

A: Provided the evidence is strong enough, yes.

25 R.R. Trial 60-62 (emphasis added).

During his voir dire examination by the defense, venire member R___ H___ testified in pertinent part as follows:

Q: You said earlier, in your mind you are leaning toward a life sentence without knowing more about the case, right?

A: *As I answered that question there, yes.*

25 R.R. Trial 64.

At the conclusion of venire member R___ H___'s voir dire examination the prosecution made a challenge for cause based on this venire member's testimony that he would hold the

prosecution to a higher burden of proof than beyond a reasonable doubt; the state trial court denied that challenge.  25 R.R. Trial 81.

The passages quoted at length above fully support the prosecution's first and fourth race-neutral reasons for striking venire member R___ H___.  On multiple occasions during his voir dire examination this venire member clearly indicated that he favored a life sentence and was leaning toward same, especially if he considered the prosecution's evidence to be weak.

With regard to the question of whether he would hold the prosecution to a higher standard of evidence than "beyond a reasonable doubt," venire member R___ H__ was a quintessential vacillating juror.  In such circumstances, it is particularly important that a federal habeas court pay deference to the state trial court's evaluation of the prosecution's credibility. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal"); *Blanton v. Quarterman*, 543 F.3d 230, 246-47 (5th Cir. 2008)  (recognizing that the state trial court's acceptance of the prosecution's race-neutral reasons for striking a venire member involve, at least in part, a credibility determination (citing *Goodwin v. Johnson*, 224 F.3d 450, 457 (5th Cir. 2000) (recognizing the high burden that a habeas petitioner faces in order to reverse an initial fact-finder's credibility determination)); *Ortiz v. Quarterman*, 504 F.3d 492, 502 (5th Cir. 2007) (noting that Texas appellate courts pay particular deference when a prospective juror's answers are vacillating, unclear, or contradictory and holding that a federal habeas court's respect for such a finding "certainly should be no less").

While it is far from clear from the dry record of the voir dire examination whether R__

H__ "became argumentative" with the prosecutor, it is clear that, at one point, he did interrupt the prosecutor in mid-question and accuse the prosecutor of "nit-picking."  Thus, the state trial court reasonably could have determined that the record from that venire member's voir dire examination fully supported all of the prosecution's four reasons for striking the venire member.

This is not a case in which the prosecution sought to strike all black members of the jury venire.  Two black venire members were not stricken by the prosecution and served on Lizcano's petit jury.  Likewise, two Hispanic venire members also served as jurors.  Lizcano has not alleged that the prosecution exhausted all its peremptory challenges prior to the names of any of those four minority members of the venire being called during the hearing on September 6, 2007.

Lizcano argues the Dallas County District Attorney's Office has a demonstrated history of racial discrimination during jury selection, particularly in capital cases, citing the Supreme Court's opinions in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (henceforth "*Miller-El II*"), and *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (henceforth "*Miller-El I*").  Those two opinions addressed jury selection during Miller-El's 1986 capital murder trial.  The Supreme Court concluded the lower courts had erred in denying federal habeas relief on a *Batson* claim involving the striking of ten of eleven black venire members.  The evidence relied upon by the Supreme Court to find the prosecution's proffered reasons for the strikes of such a high percentage of black venire panelists were pretextual was compelling: (1) the prosecution requested and obtained a jury shuffle which moved at least four black venire members significantly back in the order in which they were to appear for individual voir dire; (2) a side-by-side comparison showed a contrasting pattern of voir dire questions for black and non-black  venire members (i.e., 6% of

109

white panelists received a graphic script describing the methods of execution available under Texas law while 53% o black panelists were read the graphic script describing the execution process; 27% of white panelists received trick questions while 100% of black panelists received trick questions); (3) side-by-side comparisons of the answers given by black venire members who were stricken with the questionnaire answers of non-black venire members allowed to sit on the jury showed similarities on the very questions identified by the prosecution as justifying its strikes (i.e., three of the prosecution's proffered race-neutral rationales for striking black jurors applied just as well to some white panelists who were not challenged and who did serve as jurors); and (4) numerous former employees of the Dallas County District Attorney's Office, including a pair of former Dallas County judges, testified about (a) an official policy of excluding blacks from Dallas County juries existed in the late-1950's to the early-1960's; (b)  a systemic policy of excluding blacks from Dallas County juries still existed in 1976-78; and (c) a training manual created in 1968 which explained the reasons the Office excluded minorities from criminal juries was still circulating within that Office until at least 1976 and was available to at least one prosecutor at the time of Miller-El's 1986 trial.  *Miller-El II*, 545 U.S. at 240-66; *Miller-El I*, 537 U.S. at 331-35.

In contrast, Lizcano does not identify any jury shuffle which potentially disadvantaged black venire panelists.  While the record from Lizcano's *Batson* hearing does include attorney Busbee's testimony suggesting a divergence in the tone of voice employed by prosecutors during voir dire examination of black and non-black venire panelists, especially during the first week of voir examination, there is no allegation prosecutors varied from the script they used at Lizcano's

110

jury selection to examine all venire members.  Likewise, unlike the situation in *Miller-El*, there was no allegation, much less any evidence before the TCCA on direct appeal suggesting the official policies of discriminatory jury selection identified by witnesses during Miller-El's state habeas corpus proceeding was still in vogue at the time of Lizcano's 2007 trial.

Lizcano identifies two white members of the jury whom he alleges gave some answers during voir dire examination which mirrored those of R___ H___, i.e., juror T___ R___ (whose voir dire examination appears at 15 R.R. Trial 87-120) and juror J___ K___ (whose voir dire examination appears at 25 R.R. Trial 159-227).  This court has independently reviewed the entire voir dire examination of each of these jurors and finds that neither of them were similarly situated with venire member R___ H___.  Given the extensive length and detail of the voir dire examination of each of Lizcano's venire members, any similarity between some isolated answers given by venire members against whom the prosecution exercised peremptory strikes and the answers of venire members against whom the prosecution did not exercise peremptory strikes is hardly surprising – or conclusive of anything.  *Broadnax v. Davis*, 2019 WL 3302840, *43 n.73 (N.D. Tex. July 23, 2019) (similarities between isolated answers given by different venire members in lengthy and detailed juror questionnaires was probative of nothing in terms of equal protection analysis).

For instance, juror T___ R___ did admit early on in his voir dire examination by the prosecution that he was not "itching" to convict someone and have them suffer the death penalty (15 R.R. Trial 97).  Juror T___ R__ did not, however, repeatedly emphasize that he was leaning toward a sentence of life without parole if called upon to render a verdict at the

111

punishment phase of Lizcano's trial.  Moreover, in sharp contrast to venire member R___ H___, juror T___ R___ displayed no confusion and exhibited no vacillation when asked about the "beyond a reasonable doubt" burden of proof facing the prosecution at the guilt-innocence phase of trial:

> Q: * * * And some people just say, I hear what you are saying, but I don't believe that is the standard that I need – I can't convict somebody of capital murder of [sic].  What are your feelings about the burden that the State has?
> A: I guess I haven't thought of it that way, you know, relative to reasonable versus all possible doubt.  I mean, I'm familiar with the term of all reasonable doubt but –
> Q: Right.  I mean, sometimes you might hear it on TV as beyond a shadow of a doubt?
> A: Right.
> Q: Or absolute certainty.  Because really the only way you can be absolutely certain is if you were probably a witness.
> A: You were there.  So is all possible doubt the same without a shadow of a doubt?  Is that the same terminology or is that –
> Q: I – you know, it is up to you.  There is no definition of what beyond a reasonable doubt is.  It is left up to each individual juror.  The only guidance we have from the law is that – and you will be given this instruction in the charge, is that it is not beyond all possible doubt.
> A: Right.
> Q: So all I can tell you is, beyond a reasonable doubt, that we don't have to prove it beyond all possible doubt, we don't have to prove it to an absolute certainty.  I mean, we know we don't have to do that.
> A: I understand.
> Q: And some people say, I have got to be here before I'm going to convict somebody of capital murder knowing they could get the death penalty.  So do you have – would you hold us to a higher burden or could you –
> A: I think reasonable doubt.

15 R.R. Trial 104-05.

Likewise, juror J___ K___ was not similarly situated to venire member R___ H___.  For example, juror J___ K___ never expressed any confusion or vacillation during his voir dire testimony regarding the burden of proof at the guilt-innocence phase of trial and never suggested

112

that he might hold the prosecution to a higher burden of proof than beyond a reasonable doubt. On the contrary, J___ K___ had no difficulty following the leading voir dire questions of Lizcano's defense counsel regarding the shifting burdens of proof applicable to the Texas capital sentencing special issues.  25 R.R. Trial 213-27.

J___ K___ did indicate he might, in a close case, tend to favor imposing a life sentence. 25 R.R. Trial 206-07, 220-21, 227.  Viewed in proper context, however, his voir dire testimony made it abundantly clear that his view of the propriety of imposing the death penalty turned on a weighing of the aggravating circumstances of a capital offense against the mitigating circumstances of the offense and the mitigating aspects of the defendant's character and background:

> Q: * * * Now, I want to refer a little bit to your questionnaire, not as much, but just on the first page when you were asked:  Are you in favor of the death penalty?  You wrote, "in extreme cases of homicide" – "only for extreme cases of homicide committed with malicious intent."
> A: Yes.
> Q: Could you expand a little bit on what you meant by "malicious"?
> A: I guess, you know, the same thing I said earlier, malicious or ill intent. For instance, I guess – I guess an example would be, you know, someone robbing – robbing a store and, you know, you see evidence that he – you know, that he has got his gun out and maybe he tries to shoot a warning shot or it doesn't look like he is really trying to shoot someone or may be accidentally shot him, or it was something where he maybe reacted and shot.  Those are instances where I may doubt whether it would be malicious.  But if someone were just, you know, went right up to someone and didn't hesitate and, you know, just – rather than ask for the money or something, just shot them right then, you know, without even thinking, I would consider that malicious.
> Q: Somebody that maybe is in a special situation or backed into a corner or for no reason at all, just does something?
> A: Like the instance where someone is obviously not a threat, and they are like, you know, cowering in a corner, and then they were – they were shot, I would consider that malicious.
> If, for instance, possibly he was shot in the leg or something and a bullet

ricocheted, and it was obvious, he didn't mean to actually kill them, but he stilled [sic] killed them, I may not consider that malicious.

You know, someone fires two, three shots at someone, like I said, malicious. You know, one warning shot or something. So I haven't thought of all the possible cases to define when a person is malicious, but you know, it is times when, you know, someone is cowering in a corner, someone is obviously, you know, scared or whatnot and you don't want any witness, you want something to be just – you know, just shoot them right then and there. I consider that malicious.

Q: You talked a little bit about someone who killed more than one person, kind of like a serial killer? Did that come to mind?

A: It would be a – serial killer would be one, but there would be a case where – I mean, any case where there is a robbery, is an example we are talking about here. Whatever the scenario was, if you kill more than two people, I would be – pretty much the scenario is where he killed some people. I don't [sic] he killed the people on accident.

You know, if there is [sic] two individual acts, he killed two people, I would definitely consider that malicious. If he killed two people with one act, mainly such as a bomb or something, I would consider that malicious. But if it was something else – I mean, I haven't thought of all the possible areas. I guess what I think is – you know, part of my thought is, you know, after the crime if someone – when I think of malicious, I think of someone leaving, and he is glad that he killed those people, that he would – he is going to – not that they might be witnesses or something as opposed to, oh, hey, oh, my gosh, I can't believe I just did that. So looking after the fact, and seeing his kind of intent.

Q: You would take into consideration – just tell me if I'm wrong – whether they get some kind of joy out of it, whether they are trying to cover up their crime by killing off witnesses?

A: Not so much that, but you know – and this is – this is difficult for me to – you know, this is not something that you could probably prove or whatever, but you know, if someone goes home at night after committing a crime and sleeps fine and, you know, doesn't even care – you know, has no care for life and he just doesn't, you know, he or she doesn't care that they committed a crime or, you know, either it is joy or just lack of – lack of remorse – lack of remorse after the fact would be something I would consider as malicious. If that – makes me – the fact that they had lack of remorse makes me think that their intent would have been malicious.

Q: Okay. Maybe you would look at them as somebody who was evil?

A: That would be a good – that would be one of – yeah, a broad definition. Someone who – yeah, some people just, you know –

Q: They are just bad to the core and evil?

A: Yeah, and I think part of the way you define what the person thought is

whether – kind of intent, whether they intended to kill someone or not and whether they, I guess, experience regret.

Q: Like in the robbery case you just talked about, it would be a big difference to you, somebody who kills the clerk and says, oh, my God.  Even though they did it. Intentionally, said, oh, my God, I can't believe I just did that, either just ran away, and then as opposed to the person who might shoot the clerk, see him on the ground and then go back and shoot him again in the head, something like that?

A: Right.  I mean, I could see cases where both of those instances I could – even if he – I guess to rephrase that, if someone were to shoot someone and then like, oh, my gosh, I can't believe I did that, I would definitely consider that.  I would personally consider as one I would consider for against [sic] the death penalty.

G: So that would be a mitigating factor in your mind?

A: Yes, that is the terminology I was looking for, yes.

25 R.R. Trial 192-97.

\*       \*       \*       \*       \*

Q: I'm taking you to the point where you have convicted somebody of capital murder.

A: Right.

Q: And I want to know what your feelings are about the death penalty versus a life sentence for that person?

A: You are asking me regardless of these special issues here?

Q: Before you even get to those issues, what is in your mind?

A: Yes, yes.  I guess I'm personally at a loss because, I'm kind of more a facts person, so I try to go by all of the facts, see what causes it.  But personally, I guess, I would go with what I said earlier about malicious intent, so I guess everything I considered here personally, I guess some of my biases are malicious intent and I guess whether you consider a threat to society, you know, so I know it wasn't an accident, I know someone, you know, covered all of those cases where you killed someone and having not be a capital murder –

Q: Let me interrupt you real fast.  I'm not asking you to decide what you would do right now.

A: Okay.

Q: Really what I want to know is, is your mind open to a life sentence for a person?

A: Yes, I just – I'm just a little confused.  I'm open-minded and I guess part of the reason why, I guess, I'm stumbling here is, I'm an [sic] open-minded and I would consider everything, so I guess I was a little confused about the details you talked to me about, all of the circumstances.  I'm trying to figure out cases in which I may be more inclined – I definitely would be cases [sic] where I would be more inclined to life in prison and cases more inclined for the death penalty.  I

guess those reasons from what I studied earlier.

Q: Just to make it easier on you, you don't even have to try to think of situations.

A: I guess the answer is, I'm kind of middle of the road.  I think in my questionnaire I answered a six so I think –

Q: I mean, that is all we are here to ask about.

A: Yeah, yeah.

Q: Because some people have told us, you know what?  Once I find him guilty of intentionally killing a person –

A: Yes.

Q: -- and it meets the elements of capital murder and it wasn't an accident, you know what?  It is going to be the death penalty.  You know, that is just the way I think.

A: Right.

Q: And it's – you know, I'm just going [sic] give the death penalty once I'm convinced, at that point life is never going to be an option, a life sentence.

A: Right.

Q: What do you – you think you fall somewhere in the middle is what you told me?

A: Yeah, this is one thing I think I did actually think on briefly and I guess – in other words, math in a normalized curve.  I would think about 80 percent of the time I would be in this making of – in the mainstream of the decision, but the extreme 10 percent where I definitely favor the death penalty and an extreme 10 percent where I definitely be [sic] for life in prison.  I probably have an 80 percent gray area where I haven't really thought about it much, so I'm really confident about 10 percent, I would be against and 10 percent would be for it, but it is probably 80 percent where it is difficult for me to really figure out where I fall.  I think I fit roughly around a six, slightly leaning towards.  That is probably my position.

Q: You mean, it would depend on the facts of the case?

A: Right.  It would depend on the facts, but more or less there is an 80 percent where kind of the fact I don't know.  I mean, I keep an open mind now.  I am not quite [sic[ go one way or the other.

Q: What do you think of a life sentence?  A life sentence, meaning life without parole, never getting out of the penitentiary, what do you think about that as a punishment for a capital murder?

A: Yeah, I think that's an acceptable punishment.

Q: You don't think it's a slap on the wrist for capital murder –

A: No.  I would think that anything less than that would be, but personally my opinion comes from the law and being aware that some states don't have death penalties, and they think it is perfectly fine.  So I – part of my opinion is formed by what, I guess, experts have agreed on.  I kind of trust them.  So I kind

116

of – I do find that a life in prison is acceptable and in some cases also, I guess, it's hard for me to figure which way I lean or not. I have never –

Q: Again, we are not asking you what you would do. We are trying to get what your feelings are either way, okay? You don't have to convince me when you would do it.

A: I guess for me, my feelings would be – what I'm trying to say, I would probably take less emotion out of it, more than most people. I would probably go strictly by the facts, and then if it ever came down to a difficult decision where the facts were, you know, were real, real close and I had to make a difficult decision like that, was real, real close and you couldn't decide, I would vote for life imprisonment. That is a tough choice. Real, real close, real, real difficult decision, and I would think I need to feel comfortable about doing the death penalty. I think that that is my opinion so –

Q: Just to ease your mind a little bit, you know, the law presumes a life sentence.

A: Okay.

Q: I'm sure you figured that out already just by looking at the way –

A: Right, right.

Q: -- the sentencing goes. The licensing – the law says, once you found somebody guilt [sic] of capital murder, it is going to be a life sentence.

A: Yes.

Q: And going to stay that way –

A: Yes.

Q: -- unless you can answer these questions in a way that would lead to that. In other words, there is a – the sentence is life, and it stays there. These are protections to keep you from getting the death sentence.

A: Right. So I guess my response would be, if I got to the third special issue, I think personally I would need – if there is a difficult decision and it was pretty close – if it was obvious, I would pick the death penalty. If it was a difficult decision, especially if it was a jury that was conflicted and whatnot, we couldn't decide, and the facts – if it was pretty close, like 55/45 or 49/51 or 50/50, I would vote for a life imprisonment instead of the death penalty. That would be my position.

25 R.R. Trial 202-07.

    *  *  *  *  *

Q: So basically – I think what I hear you saying is basically you would look at it and say, hey, you know, can we control this person in prison, that could be a factor?

A: I guess I would not – I would assume that whether life in prison or – I have not thought too much about that.

Q: Let me take you to the special issue.

A: I know exactly the point you are asking now and it is a difficult one for

117

me to answer.

Q: We are not asking you to answer it right now, okay?  I'm just asking you –

A: Okay.  So – well, I know the answer.  I have thought about it, so I would lean more towards life in prison without parole.  You know, that would be my position.  If there is a case where I had to decide between him being a danger, a threat to society, threat to the people, who were – who would be, you know, like prison – I mean, like prison guards, I would probably not keep that – that would be only a minimal factor.  I would probably lean against that.  That would probably be more extreme cases, roughly come to mind, 25 percent, if you are going to throw a number out there, where I would take that into a fact to say that, hey, this guy is a threat to prison guards.  I would think that in most cases, or my personal beliefs, I would lean towards – I guess, it is a difficult question to answer. I guess, I'm trying to say that –

Q: It would depend on the facts?

A: Right.  It would depend on the facts, but I mean, if I thought someone was going to be a threat to the prison guards, I would be – you know, if it was 50-50 or pretty close, a gray area, I would be more inclined to do life without parole then.  So I would basically – I would lean towards that rather than do life imprisonment for the reason of protecting the guards.

25 R.R. Trial 220-21.

*        *        *        *        *

Q: But basically, if you are on this jury and you said to yourself, you know what?  The man I found to be guilty, not retarded and future danger, but I find there is something sufficiently mitigating, based on my definition of mitigation, csn you stick to your guns and vote that way?

A: Yes.  When it comes down to it, I would fall back on to the law and all of the details.  I would go with the facts and if it came close, a close decision and it was really tough for me to make a decision, I would lean towards life in prison without parole.

25 R.R. Trial 227.

Thus, juror J___ K___ emphasized in his voir dire testimony that his vote on the Texas capital sentencing special issues would turn on the facts of the case and in a close case, he would be inclined toward voting for a life sentence.  Texas jurors are not called upon to make an up or down vote on life or death, however.  Instead, they are required to answer the Texas capital sentencing statute's special issues.  At no point in his voir dire testimony did juror J___ K___

indicate that he would hold the prosecution to a burden of proof at either phase of trial that went above and beyond the "beyond a reasonable doubt" standard. This distinguishes juror J___ K___ from venire member R___ H___.

Lizcano alleges no specific facts establishing that the same type of pernicious, racially-biased tactics employed by the Dallas County District Attorney during jury selection in Miller-El's 1986 capital murder trial also took place during his own 2007 jury selection. He identifies no pattern of racially disparate questioning by the prosecution during voir dire. His efforts to equate the voir dire answers of venire member R___ H___ with those of the two white jurors whose voir dire testimony is quoted at length above fail. Neither of those two jurors ever suggested they would hold the prosecution to a higher burden of proof than beyond a reasonable doubt. The Supreme Court vigorously condemned the race-based behavior of the Dallas County District Attorney during Miller-El's jury selection. The record from Lizcano's trial furnishes no proof to support his conclusory allusions to the prosecutorial misconduct present in *Miller-El*.

Finally, the prosecution set forth detailed, facially race-neutral reasons for its exercise of all its peremptory strikes, not just those which it exercised against minority venire members. 37 R.R. Trial 63-70. Lizcano argues that it was unreasonable for the prosecution to have placed so much significance on all the stricken venire members' answers to the self-ranking question found on page one of the juror questionnaire. This argument misses the point. The prosecution did not rely solely on the venire members' answers to that question as a basis for striking any of the venire members in question; instead, it explained that it employed those questionnaire answers as a starting point in, or framework for, its determination of how to exercise its peremptory strikes.

119

*Id.*

The prosecution furnished multiple race-neutral reasons for its peremptory strike of venire member R___ H___. The record from that venire member's voir dire examination fully supported the state trial court's implicit factual finding, i.e., its implicit credibility finding, that the prosecution's proffered reasons for striking that venire member were credible. *See Miller-El I*, 537 U.S. at 339 (the credibility of reasons given by a prosecutor for exercising a peremptory strike can be measured by "how reasonable, or how improbable the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy"). Lizcano has identified no clear and convincing evidence in the record showing that factual determination was unreasonable.

The TCCA's denial on the merits of Lizcano's *Batson* claim regarding venire member R___ H___ on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Lizcano's trial and state direct appeal proceedings. Under the AEDPA Lizcano's *Batson* claim does not warrant federal habeas corpus relief.

## C. *De Novo* Review: Ineffective Assistance by Trial Counsel in Litigating *Batson* Claim

Lizcano argues that his state trial counsel ineffectively litigated his *Batson* complaint regarding the prosecution's peremptory strike of venire member R___ H___ (ECF no. 57, 54-56). Specifically, Lizcano faults his trial counsel for failing to (1) identify and call to the trial court's attention alleged congruences between venire member R___ H___'s voir dire answers and voir

dire answers given by white venire members against whom the prosecution did not exercise a peremptory challenge; (2) affirmatively argue that the prosecution's purportedly race-neutral justifications should be examined  against the backdrop of the statistical evidence showing the prosecution struck six of eight black venire members; and (3) mention the Dallas County District Attorney's history of racially biased jury selection detailed in the Supreme Court's *Miller-El* decisions.   After conducting a de novo review of this claim, which the TCCA summarily dismissed on state writ-abuse principles during Lizcano's subsequent state habeas corpus proceeding, this court concludes Lizcano's complaints about his trial counsels' performance in connection with his *Batson* challenge to the prosecution's striking of venire member R___ H___ do not satisfy either prong of *Strickland*.

As explained above in Section VIII.B.1., Lizcano's trial counsel made a timely *Batson* objection to the prosecution's exercise of a peremptory strike against venire member R___ H___. Attorney Busbee called to the trial court's attention in her testimony what she characterized as the prosecution's disparate tone of voice while questioning black members of the jury venire and pointed the trial court's attention to the fact the prosecution struck six of eight black venire members.   Attorney Tatum ensured the juror questionnaire were made a part of the appellate record and argued the trial court should strike the entire venire based on the prosecution's allegedly racially disparate questioning of the venire members.   Attorney Sanchez vigorously argued that the prosecution's proffered reasons for striking venire member R___ H___ were pretextual (37 R.R. Trial 72-74).   Collectively, Lizcano's state trial counsel did everything reasonably necessary to preserve for state appellate review, the trial court's ruling denying the

defense's *Batson* challenge.   In fact, Lizcano's state appellate counsel did raise a point of error based upon *Batson* attacking the prosecution's peremptory strike of venire member R___ H___ and the TCCA denied that point of error *on the merits*.

Insofar as Lizcano now argues that his trial counsel should have done more to emphasize the statistical impact of the prosecution's striking of six or eight black venire members, both the state trial court and state appellate court were aware of the relevant statistics.   After some preliminary discussion during the *Batson* hearing, there was no genuine dispute over the fact that venire member R___ H___ was one of six black venire members stricken by the prosecution.   37 R.R. Trial 48, 56-57.   Nor was there any genuine dispute regarding the total number or percentages of members of other minority groups within the jury venire who were stricken by the prosecution.   In sum, at the *Batson* hearing the relevant statistics were made known to the trial court before it ruled on Lizcano's *Batson* challenges.

Insofar as Lizcano faults his trial counsel for failing to furnish what amounts to a side-by-side comparison of questionnaire or voir dire testimony given by minority venire members stricken by the prosecution and given by white venire members accepted by the prosecution, these complaints fail to satisfy the deficient performance prong of *Strickland* for two, equally compelling reasons.   First, the prosecution did not rely upon any individual minority venire member's answers to specific juror questionnaire questions as an independent reason justifying its use of a peremptory strike.   Instead, the prosecution merely referred to the potential juror's answers to the self-ranking question on page one of the questionnaire as an explanation of the context within which it exercised *all* of its peremptory challenges, including those it exercised

against non-minority venire members.  37 R.R. Trial 56-70.  Second, at the time of Lizcano's *Batson* hearing, his trial counsel did not have access to a transcription of the voir dire examination of the entire jury venire.  Without access to a transcript from the entire voir dire examination of the jury venire, the type of side-by-side comparison of the venire members' voir dire testimony now urged by Lizcano was simply infeasible.  Such analysis could have been conducted and included in Lizcano's state appellate brief or initial state habeas corpus application.  By the time of those proceedings a full transcription of the entire voir dire examination of Lizcano's jury venire would necessarily have been available to his state appellate or state habeas counsel.

There was nothing objectively unreasonable with the failure of Lizcano's state trial counsel to present the state trial court on September 6, 2007 with a detailed, side-by-side comparison of the voir dire testimony of minority venire members stricken by the prosecution with the voir dire testimony of non-minority venire members whom the prosecution did not challenge peremptorily.  Until that date, Lizcano's defense team could not reasonably have known which venire members the prosecution would strike or had sufficient lead time to conduct a scouring of the entire record of voir dire examination.  Clairvoyance is not an essential attribute of effective representation or objectively reasonable legal assistance.  *United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009); *Sharp v. Johnson*, 107 F.3d 282, 289 n.28 (5th Cir. 1997).  Neither is omniscience.

It is objectively unreasonable to argue that a state trial counsel, who lacks access to the court reporter's verbatim transcription of weeks and weeks of individual juror voir dire testimony,

123

should be required to mentally discern when a prosecutor's questioning of a single member of the jury venire differs from the prosecutor's questioning of another venire member who is otherwise similarly situated to the first juror but of a different ethnicity.  *Batson* claims premised on disparate questioning of venire members are usually the products of massive man hours of study of the written record from voir dire, along with careful review of dozens of juror questionnaires. It is objectively unreasonable to expect *trial* counsel operating only with the aid of their collective memory and contemporaneous handwritten notes to be able to identify prior to trial each and every instance in which a prosecutor may have questioned one venire member differently from another venire member of a different ethnicity.  Lizcano's trial counsel raised a timely *Batson* objection not once but at least six times and obtained trial court questioning of the prosecution for the race- neutral reasons for each of those uses of peremptory challenges by the prosecution. Trial counsels' objections were sufficient to preserve error on each of the *Batson* points of error included in Lizcano's brief on direct appeal.

The failure of Lizcano's state trial counsel to engage in the additional activities identified by Lizcano's federal habeas counsel did not cause the performance of Lizcano's trial counsel to fall below an objective level of reasonableness.  Nor did those failures prejudice Lizcano within the meaning of *Strickland*.  Lizcano's *Batson* claim was properly denied on the merits by the TCCA on direct appeal.  There is no reasonable probability that, but for the failure of Lizcano's trial counsel to engage in any of the additional activities or to make any of the additional arguments identified by Lizcano's federal habeas counsel, the outcome of the guilt-innocence phase of Lizcano's trial would have been any different.  Lizcano's ineffective assistance complaint

regarding his trial counsel's alleged failure to adequately litigate his *Batson* claim regarding venire member R___ H___ does not warrant federal habeas relief under a *de novo* standard of review.

## IX. CUMULATIVE ERROR CLAIM

### A. The Claim

In his final claim in his second amended federal habeas corpus petition Lizcano argues the cumulative effect of his prior counsels' ineffective assistance and the trial court errors identified in his latest federal habeas pleading warrant federal habeas relief (ECF no. 57, 63-64).

### B. State Court Disposition

Lizcano included a similar cumulative error claim as his tenth ground for relief in part B of his subsequent state habeas corpus application. Subsequent State Habeas Application (filed December 6, 2017), at 302. The TCCA summarily dismissed this claim pursuant to Texas writ-abuse principles. *Ex parte Lizcano*, WR-68,348-04, 2020 WL 5568625, *2 (Tex. Crim. App. Sept. 16, 2020).

### C. *De Novo* Analysis

It is well-settled in this Circuit that the cumulative error doctrine requires a showing that constitutional error occurred during the defendant's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error committed during his trial, as is required to satisfy the cumulative error doctrine (citing *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007))); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (federal habeas relief is only available for cumulative errors that are of a constitutional

dimension); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (absent constitutional error, there is nothing to cumulate); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999) (cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness (citing *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996)); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension other than violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process" (quoting *Cupp v. Naighten*, 414 U.S. 141, 147 (1973)).

For the reasons discussed at length above in Sections III through VIII, all of Lizcano's complaints about the performance of his trial counsel, state appellate counsel, and state habeas counsel fail to satisfy the prejudice prong of *Strickland*. Again, for the reasons discussed at length above in Sections III through VIII, all of Lizcano's other substantive constitutional claims lack arguable merit - some like his complaints of ineffective assistance by his state habeas counsel border on the legally frivolous. Thus, under the cumulative error doctrine recognized in this Circuit, there is nothing for this court to cumulate. Lizcano's conclusory cumulative error claim is without arguable merit. His final claim for federal habeas relief does not warrant federal habeas relief.

## X.  REQUEST FOR A FEDERAL EVIDENTIARY HEARING

Lizcano requests an evidentiary hearing (ECF no. 57, at 65). Insofar as Lizcano's claims

126

in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or initial state habeas corpus proceedings, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of his claims unless he can satisfy 28 U.S.C. § 2254(e)(2).  *Shinn v. Ramirez*, 142 S. Ct. 1718, 1728 (2022) (in all but the extraordinary situations listed in § 2254(e)(2), a federal habeas petitioner who failed to develop facts in state court supporting his claim is not entitled to an evidentiary hearing in federal court).  Likewise, a federal habeas petitioner is not entitled to an evidentiary hearing for the purpose of showing that his failure to develop facts in the state court was the result of the ineffective assistance of his state habeas counsel.  *Id.*, 142 S. Ct. at 1735-40.

Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court.  *See Harrington*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).  Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under

review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, Lizcano is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his initial state habeas corpus proceedings. *Shinn*, 142 S. Ct. at 1728; *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019). Furthermore, factual development of a claim in federal court is permissible only when the federal habeas court first determines the new evidence to be developed could properly be considered in light of the restrictions on evidentiary development imposed by the AEDPA. *Shoop v. Twyford*, 142 U.S. 2037, 2044 (2022) (where a petitioner failed to develop the factual bases for his claims in state court, he is entitled to present new evidence in support of his claims before the federal habeas court only in the two limited circumstances outlined in Section 2254(e)(2)).

This court is entitled to rely upon the facts alleged by Lizcano in his federal habeas corpus petition. Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts requires that the petition "state the facts supporting each ground. This is very different from the "notice pleading" requirement of Rule 8, FED. R. CIV. P. *See Murphy v. Dretke*, 416 F.3d 427, 436-38 (5th Cir. 2005) (holding generic reference to individual voir dire of entire jury venire insufficient to support a *Batson* claim (citing *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (conclusory allegations fail to establish a valid claim of ineffective assistance of counsel); and *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (conclusory allegations do not raise a

constitutional issue in a habeas proceeding)).  The Fifth Circuit has reaffirmed this rule in a wide variety of contexts.  *See, e.g., Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000) (conclusory due process allegations that petitioner was denied the presumption of innocence insufficient to support claims for federal habeas relief); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (conclusory assertions regarding alleged destruction of exculpatory evidence failed to show State destroyed the evidence in bad faith, i.e., with knowledge of its exculpatory value); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) ("A habeas petitioner must make specific allegations; 'conclusory allegations unsupported by specific facts' or 'contentions that in the face of the record are wholly incredible' will not entitle one to discovery or a hearing." (quoting *Blackledge v. Allison*. 431 U.S. 63, 74 (1977)).

It is well-settled in this Circuit that conclusory allegations will not support a claim of ineffective assistance of counsel.  *See Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir. 2023); *Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002); *Barnard v. Collins*, 958 F.2d 634, 642 n.11 (5th Cir. 1992).  It has long been recognized in this Circuit that complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.  *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020); *United States v. Fields*, 761 F.3d 443, 461 (5th Cir. 2014); *Coleman v. Thaler*, 716 F.3d 895, 906 (5th Cir. 2013); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985)); *Buckelew v. United States*, 575 F.2d 1226, 1227 (5th Cir. 1978).  To prevail on an

ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable. *Nelson*, 952 F.3d at 669; *Fields*, 761 F.3d at 461; *Gray v. Epps*, 616 F.3d 436, 443 (5th Cir. 2010); *Woodfox*, 609 F.3d at 808; *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir, 2009);   "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Gregory*, 601 F.3d at 352.

With regard to any new factual allegations, new evidence, or new legal arguments Lizcano presents in support of any of the claims for which this Court has undertaken *de novo* review, he is likewise not entitled to an evidentiary hearing.  In the course of conducting *de novo* review of Lizcano's claims that were summarily dismissed by the TCCA when it dismissed Lizcano's subsequent state habeas application, except for those assertions that are refuted by the state courts records now before this Court, this Court has assumed the factual accuracy of (1) all the specific facts alleged by Lizcano in support of his claims for relief and (2) any documents he has presented in support of those claims.  Even when the truth of all of Lizcano's new factual allegations supporting those claims is assumed, his claims do not warrant federal habeas relief. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").  Thus, Lizcano is not entitled to an evidentiary hearing in this Court with regard to any

of his claims for which this Court has undertaken *de novo* review.

## XI. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537

U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct). This court did not dispose of any of Lizcano's federal habeas corpus claims on procedural grounds. This court addressed the merits of all of Lizcano's federal constitutional claims, including those of his federal habeas claims which the TCCA summarily dismissed in the course of Lizcano's subsequent state habeas proceeding.

Reasonable minds could not disagree with this Court's conclusions that (1) all of Lizcano's complaints of ineffective assistance by his trial counsel and state appellate counsel fail to satisfy the prejudice prong of *Strickland*; (2) all of Lizcano's substantive federal constitutional claims, including his *Pate* claim, his complaints of allegedly improper prosecutorial jury argument, and his *Batson* claim. are without arguable merit; (3) all of Lizcano's complaints of alleged defects during his state habeas corpus proceeding, including his complaints of ineffective assistance by his state habeas counsel, are legally frivolous; and (4) Lizcano's cumulative error claim is legally frivolous.  There are no constitutional errors to cumulate in this case.  Lizcano is not entitled to a Certificate of Appealability on any of his claims for relief.

## XII. ORDER

For the foregoing reasons, it is hereby ORDERED that the referral of this cause to the Magistrate Judge is WITHDRAWN; all claims included in Lizcano's second amended petition for federal habeas relief (ECF no. 57) are DENIED on the merits; Lizcano's request for a federal evidentiary hearing is DENIED; and Lizcano is DENIED a Certificate of Appealability on all his claims for relief.

DATED: September 28, 2023.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE